**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| ROSE HILLS, | § | |
|      Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | **Civil Action No. 6:18-cv-00301-ADA-JCM** |
| SAM'S EAST, INC., SAM'S CLUB, AND | § | |
| WAL-MART, INC., FORMERLY KNOWN | § | |
|  AS WAL-MART STORES, INC., | § | |
| Defendants. | § | |

## DEFENDANTS' MOTION TO EXCLUDE THE EXPERT OPINIONS OF HECTOR MIRANDA-GRAJALES, MD, CLCP

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Sam's East, Inc., Sam's Club, and Wal-Mart Inc., formerly known as Wal-Mart Stores, Inc. (collectively "Defendants") in the above-styled and numbered cause and files this Motion to Exclude the Expert Opinions of Hector Miranda-Grajales, M.D., CLCP, and for cause would show as follows:

### I.      SUMMARY OF ARGUMENT

The opinions of Plaintiff's retained expert, Dr. Miranda-Grajales, should be excluded as they are: unreliable, irrelevant, lack proper foundation, and include improper legal conclusions. Dr. Miranda-Grajales testified that he relied solely on one cost source in arriving at the cost of Plaintiff's future medical treatment while discounting Plaintiff's actual billed charges for the same treatment. He further admits that his cost of treatment fails to account for the time value of money and is without the support of an accredited economist or other similar expert. Dr. Miranda-Grajales admits he lacks the expertise necessary to evaluate Plaintiff's future cost per the time value of money. Lastly, Dr. Miranda-Grajales provides conclusory unfounded medical opinions regarding

---

causation of Plaintiff's alleged injuries. Thus, his opinions will not assist the trier of fact and should be excluded.

## II.    BACKGROUND

This matter arises out of an incident that occurred in the parking lot of the Sam's Club located in Temple, Texas on October 13, 2016. *See Ex. A: Plf's First Am. Cmplt*. Plaintiff seeks recovery of medical expenses in the past and future, among other claimed damages. *See id*. In support of her claims, Plaintiff identifies Hector Miranda-Grajales, M.D., CLCP, as a retained testifying expert. *See Ex. D: Plf's Expert Disclosures*. Based on this designation, Dr. Miranda is expected to testify that Plaintiff's collision caused injuries for which she will require future medical treatment in the total amount of $713,802.00 to $1,261,770.00. *See id*.; *see also, Ex. A*.

## III.    ARGUMENTS & AUTHORITIES

Federal Rules of Evidence 702 and 703, as interpreted in *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of testimony of expert witnesses. Before allowing expert testimony to be heard, a district court must be assured that the proffered witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training or education." *See id*. The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met. *Daubert*, 509 U.S. at 593, n.10; *Moore v. Ashland Chem., Inc*., 151 F.3d 269, 276 (5th Cir. 1998); *Kumho*, 526 U.S. at 147.

In *Daubert*, the Supreme Court held that expert scientific testimony must be "grounded in the methods and procedures of science" and based on "more than a subjective belief or unsupported speculation." *Id*. at *24 (quoting *Daubert*, 509 U.S. at 590). The Supreme Court explained that proposed testimony must be supported by appropriate validation, that is, "good grounds," based

upon what is known. *Id.* To be admissible under the *Daubert* standard, an expert's opinion must have a "reliable basis in the knowledge and experience of his discipline." *Id.* To determine reliability of expert opinion, trial courts must analyze the *Robinson* factors, which include:

(1)     the extent to which the theory has been or can be tested;

(2)     the extent to which the technique relies upon the subjective interpretation of the expert;

(3)     whether the theory has been subjected to peer review and/or publication;

(4)     the techniques potential rate of error;

(5)     whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6)     the non-judicial uses which have been made of the theory or technique.

*Robinson*, 923 S.W.2d at 557.

In evaluating the admissibility of expert testimony, the key factors are reliability and relevance. *Daubert*, 509 U.S. at 589 (under Rule 702, expert testimony must be "not only relevant, but reliable"). The overarching goal of *Daubert*'s gatekeeping requirement, however, is to ensure the reliability and relevancy of expert testimony and to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho*, 526 U.S. at 152. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). The issue is whether a particular expert has "sufficient specialized knowledge to assist the jurors [or trier of fact] in deciding the particular issues . . . ." *Kumho*, 526 U.S. at 156 (internal quotation omitted). It is the role of the district court to assure "that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience,

training, or education.'" *Id.* (quoting FED. R. EVID. 702). A court "should refuse to allow an expert witness to testify if the witness is not qualified to testify in a particular field or on a given subject." *Id.*; *Falcon v. State Farm Lloyds*, No. 1:12-CV-491-DAE, 2014 U.S. Dist. LEXIS 83040, at *10-11 (W.D. Tex. June 16, 2014).

When the testimony involves scientific knowledge, the expert's conclusions must be "grounded 'in the methods and procedures of science.'" *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (U.S. 1993)). Otherwise, the testimony is "no more than 'subjective belief or unsupported speculation." *Id.* (quoting *Daubert*, 509 U.S. at 590). Because the party sponsoring the expert bears the burden of showing that the expert's testimony is admissible, the burden of presenting understandable evidence that will persuade the trial court is on the party presenting the expert's testimony. *See Robinson*, 923 S.W.2d at 557.

**A.** **Dr. Miranda's Opinions Are Irrelevant, Unreliable, Lack Proper Foundation and Must be Excluded as They are Based on One Cost Source of Which Dr. Miranda Lacks Knowledge of the Specific Data Upon Which that Source Relies and His Opinions Are Not Based on His Own Expertise or Specialized Knowledge.**

In the instant case, Dr. Miranda opines that Plaintiff will require medical treatment and care for the rest of her life (another 48 years). *See Ex. "A"* at p. 2-12. Per Dr. Miranda's testimony, he relies solely on the Fairhealth.org website in identifying the present cost of the prescriptions he includes in Plaintiff's life care plan. *See Ex. C* 66:14-67:22. Dr. Miranda testified that he subscribes to this website, inserts the CPT code and a ZIP code, and Fairhealth.org will provide a cost of treatment. *See Id.* Dr. Miranda has no knowledge of the data upon which this website relies in arriving at the cost of treatment it provides to him. *See Id.* Dr. Miranda simply inputs information and the website spits out a response. In fact, Dr. Miranda cannot tell the jury what data the website considers, other than billed rates gathered from providers in the certain area from Medicare and private payers, in arriving at a particular cost. *See Id.* Specifically, Dr. Miranda cannot explain to

the jury the particular data the website relies on, the particular payors, particular billers, how large a server they use, or how large a sample they use in formulating a particular medical cost. *See Id.* However, Dr. Miranda does know the cost of Plaintiff's actual past treatment, the same of which is also included in her life care plan. As an example, Dr. Miranda included in Plaintiff's life care plan a recommendation that she have one cervical MRI every five years at a cost of $2,954.00 per MRI. *See Ex. "A"* at p. 8,12.   This estimated cost, obtained solely from his reliance on Fairhealth.org, is $2,602.00 more than the actual amount Plaintiff was charged for this same treatment as noted in her billing records related to the underlying incident. *See Ex. "C"* at 68:3-17. Further, Dr. Miranda admits that he solely relies on this database to determine the cost of treatment, like a cervical MRI, and did not refer to Plaintiff's own billing records for the same treatment she already incurred and that she will continue to incur in the future if she follows the life care plan. *See Ex. "C"* at 68:18-25 and 69:15-22.

Dr. Miranda's sole reliance on one database that he did not create and does not have knowledge of the data utilized by that database is unreliable and lacks any sort of scientific approach or specialized knowledge. It does not require an expert to input a CPT code in a website as Dr. Miranda did when he created Plaintiff's life care plan. In essence, the jury is capable of completing the same task and obtaining the same information as Dr. Miranda.  Accordingly, his opinions do nothing to assist the trier of fact in this case and should be excluded.

**B.**   **Dr. Miranda's Opinions Are Irrelevant, Unreliable, and Lack Proper Foundation and Must be Excluded as They Fail to Account for the Time Value of Money.**

In the instant case, Dr. Miranda opines that Plaintiff will require medical treatment and care for the rest of her life (another 48 years). *See Ex. "A"* at p. 2-12. As noted above, and per Dr. Miranda's testimony, he relies solely on the Fairhealth.org website in identifying the cost of the

prescriptions he includes in Plaintiff's life care plan. *See Ex. "C"* 66:14-67:22. Dr. Miranda testified that he subscribes to this website for him to utilize in obtaining a cost of treatment. *See Id.*

In his report, Dr. Miranda determines the nominal values, *i.e.* the value in today's dollars, of the medical treatment, care, and therapies Plaintiff will allegedly require in the future and extrapolates those nominal costs over the course of Plaintiff's remaining 48 years of life. *See id.* To take a specific example, Dr. Miranda opines that Plaintiff will require 1 unit of the drug Emgality for the treatment of post-traumatic headaches per month each year of her life through the age of 85. *Id.* at p. 12. Dr. Miranda determines the nominal value of this injection/unit, i.e. how much it would cost today, and uses that nominal value to opine as to what the injection will cost in 2068, when Plaintiff will actually receive the injection. *Id.* at p. 8, 12. Dr. Miranda offers no opinion as to the future or present value of any of the treatment he recommends for Plaintiff over the next 48 years. *Id.* at p. 1-12. Because Dr. Miranda offers no opinion as to the future or present value of the costs of Plaintiff's future medical care, his opinions regarding the nominal value of the care are irrelevant; they will not aid or assist the jury in determining what the medical care will cost in the future when the costs are actually incurred by the Plaintiff. *Id.*; *see also Gharda USA*, 464 S.W.3d at 349.

Further, Dr. Miranda admits in his deposition that he did not adjust Plaintiff's life care plan to account for the time value of money. *See Ex. "C"* at 45:21-23 and 46:23-47:12. Even more interesting is that not only does Dr. Miranda not account for the present value of money, he also admits that the drugs he includes in Plaintiff's life care plan can reduce in price over time. *See Ex. "C"* at 45:24-46:7. Absent the assistance of an economist or other expert in the area of accounting, the jury cannot determine the accurate cost of Plaintiff's life care plan if solely relying on the life

care plan or Dr. Miranda's testimony. Dr. Miranda's nominal value opinions cannot withstand scrutiny under the *Robinson* factors as his nominal value opinions fail to account for inflation, discounts, and other "time value of money" factors, his opinions have an extremely high rate of potential error. *See Robinson*, 923 S.W.2d at 557. While Dr. Miranda may accurately identify the cost of certain medical treatment modalities today, these nominal value estimates are plainly erroneous and unreliable insofar they purport to identify what the same treatment modality will cost over the course of the next 48 years.

Further, by comparing the rate of inflation as applied to the costs of medical treatment over the past five (5) years, the Court will also see that Dr. Miranda's nominal value opinions also fail the testability *Robinson* factor. Between 2013 and 2017, the costs of medical care in an average U.S. city experienced an average inflation rate of 2.7% per year. *Consumer Price Index, Calendar Year Historical, 2013-2017*, UNITED STATES DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS, https://www.bls.gov/regions/southwest/data/consumerpriceindexcyhistorical_southwest_table.ht m (last visited April 27, 2018). Given this average rate of inflation over the past five (5) years, it is apparent that the costs of medical care will continue to vary each and every year. *Id.* Because Dr. Miranda's nominal value opinions fail to account for the variability in the costs of medical care they are patently unreliable and will not assist the jury. Dr. Miranda's nominal value opinions do not account for the time value of money and are thus missing an essential piece of analysis. *See Ex. "A"* at p. 1-14; *see also Ex. "C"* at 59:4-18. Plaintiff did not timely designate any expert to proffer an opinion reducing Dr. Miranda's nominal value calculations into their present or future value. *See Ex. "D"*.

---

Since Dr. Miranda is not qualified to render an opinion that properly accounts for the time value of money per his own testimony (*See Ex. "C"* at p. 97:17-20), his opinions do not reliably identify the true cost of Plaintiff's medical treatment in the future when those costs are actually incurred. Therefore, Defendant moves this Court to exclude Dr. Miranda's testimony and opinions due to the analytical gap created by his failure to account for the time value of money. As a result, Defendant moves this Court to exclude the opinions and testimony of Dr. Miranda because they are unreliable under the *Robinson* factors and will not assist the jury in determining the cost of Plaintiff's future medical treatment.

**C.      Dr. Miranda's Opinions Are Inadmissible Legal Conclusions.**

Statements of advocacy and legal conclusions do not assist the factfinder and are inadmissible. *Am. Home Assur. Co. v Cat Tech, LLC*, 717 F.Supp.2d 672, 681 (S.D. Tex. 2010) (citing *Snap-Drape v. Comm'r of Internal 13 Revenue*, 98 F.3d 194, 197–98 (5th Cir. 1996)). The court may exclude expert testimony that usurps the role of the judge or jury by proffering legal opinions or conclusions. *Fisher v. Halliburton*, No. H-06-1168, 2009 WL 5216949, at *2 (S.D. Tex. Dec. 21, 18, 2009) (citing *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)). The burden of proving the admissibility of an expert's testimony rests on Plaintiffs as the party offering the expert as a witness. *See Bocanegra v. Vicmar Services*, 320 F.3d 581, 585 (5th Cir. 2003). [I]t does not help the jury for an expert to give testimony that 'states a legal standard or draws a legal conclusion by applying law to the facts,"…because it 'supplies the jury with no information other than the witness's view of how the verdict should read…" *U.S. v Offill*, 666 F.3d 168, 175 (4th Cir. 2011).

Dr. Miranda included in Plaintiff's life care plan that the conditions of post-traumatic headaches; post-traumatic cervical radiculopathy; and post-traumatic disc herniations at C5-6, C7-

T1, and T1-2 are causally related to the underlying incident. *See Ex. "A"* at p. 7. In providing this opinion, Dr. Miranda does not provide any scientific or technical methodology or reasoning for such conclusions. *See id.* He simply draws legal conclusions from particular case facts/verbal history without providing an actual mechanism of injury that caused Plaintiff's conditions. *See Offill*, 666 F.3d at 175. During his deposition, when given an opportunity to explain the methodology behind or approach to reaching his ultimate opinions, Dr. Miranda continuously referenced Plaintiff's verbal history and portions of her medical records but he could not articulate how the conditions were specifically caused by the fall as opposed to her prior car accidents and prior assault. Dr. Miranda could not provide specific scientific or technical bases to support his opinions regarding causation of Plaintiff's medical conditions. *See Ex. "C"*: at 32:8 – 40:25, 95:10-14. Instead, he simply reiterates conclusory statements regarding his opinion that Plaintiff's conditions were caused by the underlying incident.  *See id.* Because Dr. Miranda's proposed testimony is solely compromised of statements of advocacy, bare facts and legal conclusions, it will not assist the trier of fact and is inadmissible.  *See Am. Home Assur.*, 717 F.Supp.2d at 681 (citing *Snap-Drape*, 98 F.3d at 197–98).

## III.   PRAYER

WHEREFORE PREMISES CONSIDERED, Defendants respectfully request that the Court grant Defendants' Motion to Exclude the Expert Opinions of Hector Miranda-Grajales, MD, CLCP, and grant any other relief, at law or in equity, the Court deems appropriate.

Respectfully submitted,

**WALTERS, BALIDO & CRAIN, L.L.P.**

/s/ Brett H. Payne

BRETT H. PAYNE - 00791417
Great Hills Corporate Center
9020 N. Capital of Texas Hwy
Building II, Ste 225
Austin, Texas 78759
Tel: 512-472-9000
Fax: 512-472-9002
Email: paynevfax@wbclawfirm.com

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

This is to certify that on this the 31st day of January 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record.

/s/ Brett H. Payne

BRETT H. PAYNE

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| ROSE HILLS, | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | **Civil Action No. 6:18-cv-00301-ADA-JCM** |
| SAM'S EAST, INC., SAM'S CLUB, AND | § | |
| WAL-MART, INC., FORMERLY KNOWN | § | |
|  AS WAL-MART STORES, INC., | § | |
| Defendants. | § | |

## ORDER GRANTING DEFENDANTS' MOTION EXCLUDE THE EXPERT OPINIONS OF HECTOR MIRANDA-GRAJALES, MD, CLCP

On this day came on the be heard Defendants' Motion to Exclude the Expert Opinions of

Hector Miranda-Grajales, MD, CLCP ("Defendant's Motion"), and the Court having reviewed the

papers on file in this cause and having heard arguments of counsel, if such arguments were

requested, it is of the opinion of the Court that Defendants' Motion should be GRANTED in its

entirety and Dr. Miranda's opinions and testimony be EXCLUDED from trial.

(1)     It is therefore ORDERED, ADJUDGED and DECREED by the Court that

        Defendants' Motion is in all parts GRANTED;

(2)     It is therefore ORDERED, ADJUDGED and DECREED by the Court that the

        expert opinions, expert report, and any expert testimony of Dr. Hector Miranda-

        Grajales are hereby EXCLUDED from this suit in their entirety.

(3)     All relief not expressly granted or denied herein is hereby DENIED.

SIGNED this _____ day of _____, 2020.

                                _____

                                  JUDGE PRESIDING

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| ROSE HILLS, | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | **Civil Action No. 6:18-cv-00301-ADA-JCM** |
| SAM'S EAST, INC., SAM'S CLUB, AND | § | |
| WAL-MART, INC., FORMERLY KNOWN | § | |
|  AS WAL-MART STORES, INC., | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION EXCLUDE THE EXPERT
OPINIONS OF HECTOR MIRANDA-GRAJALES, MD, CLCP**

EXHIBIT A:   Life Care Plan for Rose Hills – July 14, 2019

EXHIBIT B:   Cirriculum Vitae – Hector A. Miranda-Grajales, MD, CLCP

EXHIBIT C:   Deposition of Hector A. Miranda-Grajales, MD, CLCP - January 16, 2020

EXHIBIT D:   Plaintiff Rose Hill's Expert Disclosures – July 18, 2019

Respectfully submitted,

**WALTERS, BALIDO & CRAIN, L.L.P.**

/s/ Brett H. Payne

_____

BRETT H. PAYNE - 00791417
Great Hills Corporate Center
9020 N. Capital of Texas Hwy
Building II, Ste 225
Austin, Texas 78759
Tel: 512-472-9000
Fax: 512-472-9002
Email: paynevfax@wbclawfirm.com

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

This is to certify that on this the 31st day of January 2020, a true and correct copy of the foregoing has been forwarded to all counsel of record.

/s/ Brett H. Payne

_____

BRETT H. PAYNE

# EXHIBIT A



# Life Care Plan

### Rose Hills

DOB: 08/12/81
Date of Report:  07/14/19

MD Certified Life Care Planner

4201 Bee Caves Road
Suite C-213
West Lake Hills, TX 78746

512-960-4717

Total Cost of LCP without Occipital Nerve Blocks: $713,802

Total Cost of LCP with Occipital Nerve Blocks: $1,264,770



Client: Rose Hills                           Date of Report: 07/14/19

                                             DOI: 10/13/16


                                             Life Expectancy: 48 years.

Date of Evaluation: 7/11/19

Location of Evaluation:
4201 Bee Caves Rd, Suite C-213, West Lake Hills, TX 78746

Report completed by: Dr. Hector Miranda-Grajales, MD, CLCP



## Introduction

A life care plan is a dynamic document based upon published standards of practice, comprehensive assessment, data analysis, and research, which provides an organized, concise plan for current and future needs with associated costs for individuals who have experienced catastrophic injury or have chronic health care needs. (International Academy of Life Care Planners, 2003. Established during the 2000 Life Care Planning Summit). A life care plan is designed, among many things, to help reduce medical complications and provide the best possible care for the unique needs of the particular patient involved.

 The opinions, diagnoses, and conclusions mentioned in this report are based within a reasonable degree of rehabilitation and medical certainty. These opinions are based on my clinical experience as well as my training in physical medicine and rehabilitation, pain management, and life care planning. They are also based on the history provided, records reviewed, and examination findings. I reserve the right to modify my opinion should new information be made available to me.

## Independent Medical Examination (IME) Report For Life Care Plan

In regards to: Rose Hills          (examinee and patient)
Date of Birth: 8/12/81
Date of Loss: 10/13/16
Examiner: Hector Miranda-Grajales, MD
Specialty: Physical Medicine & Rehabilitation/Interventional Pain Management/Life Care
 Planner
Date of IME: 7/11/19

## Questionnaire

Home address: 1814 Buckskin Trl, Temple, TX 76502

Cell phone number: 254-421-0014

Age: 37

Race: Hispanic

Sex: Female

Dominant hand: Right

Work history: Hair stylist.

Prior accidents: She was involved in a car accident in 1999; she did not have chronic headaches or pain after that accident; she did not treat with a chiropractor, physical therapist, pain doctor, or surgeon after that accident.  She was involved in another accident in 2000 or 2001.  She was taken to the hospital by ambulance and was discharged home the same day.  She developed lower back and right hip pain that resolved with chiropractic care.  She did not have aggravated headaches after that accident.  She did not treat with physical therapy, pain management, or surgeon after that accident.  In 2002 she was assaulted and was punched in the nose and went to the ER.  She did not have aggravated headaches, neck or back pain after that assault.  She has not been assaulted, injured in a car accident, or in another slip and fall incident since the slip and fall of 10/13/16.

Has the patient ever had any disability prior to the accident in question?

Can the patient drive a car? Yes.

Sleeping habits: She wakes up at night with neck pain and headaches.

Social Activities: She reports with Emgality injections she can function more.

Activities of Daily Living: She is independent in ADLs.

## Disclaimer

The examinee was informed that today's examination was to evaluate specific conditions pertinent to the accident in question; hence, information provided would not be confidential. Prior to the physical examination the patient was instructed not to perform any maneuver that might cause injury or exacerbation of symptoms, and to advise the examiner to avoid or immediately abort any such test.

**Records Summary**

| Date | Provider | Note Type | Summary |
|---|---|---|---|
| 10/13/16 | - | Incident report | Mrs. Hills fell at the parking lot. |
| 10/13/16 | Baylor Scott & White | Progress note | She treated for whiplash injury, shoulder pain, neck pain. |
| 10/17/16 | Baylor Scott & White | Progress note | She treated for neck and wrist pain. |
| 10/18/16 | Baylor Scott & White | Progress note | She treated for neck and left wrist pain. |
| 10/21/2016 - 1/9/17 | Comprehensive Injury Treatment Services | Billing records | As of 10/21/16 she reported headaches. |
| 10/31/2016 - 8/14/17 | Baylor Scott & White | Progress note | She treated for neck pain and headaches. |
| 11/14/2016 - 1/6/17 | PT | Progress note | She treated for neck pain and headaches. |
| 2/24/17 | Pain Specialists of Austin | Progress note | She treated for pain in: neck, left shoulder, and left arm.  She was diagnosed with cervical radiculopathy and a cervical ESI was recommended. |
| 4/8/2019 - 11/29/17 | Baylor Scott & White | Progress note | Mrs. Hills treated for post-traumatic headaches and neck pain.  Her cervical MRI showed disc protrusions in: C5-6, C7-T1, T1-2. |

## Summary

HPI: Mrs. Hills is a 37 y/o woman who was injured in a slip and fall accident on 10/13/16 at Sam's Club parking lot.  She did not hit her head.  She landed on her hands and knees.  She did not hurt at the time of the fall.  She went home that day and when she woke up she "could not move her neck."  She then went to the ER the same day of the slip and fall due to neck pain and headaches.  She eventually developed numbness in her left 4th and 5th digits that persists to today.  She treated with a chiropractor, but this treatment did not provide long term relief.  She treated at Pain Specialists of Austin.  Her pain doctor recommended injections of her neck.  However, she has glaucoma and her ophthalmologist advised against doing any kind of steroid injections "because I can go blind."  She did not proceed with cervical steroid injections.

Note, she was on gabapentin, but this did not help.  She had an adverse reaction to Lyrica, she was "seeing things" while on that medication.  Robaxin did not help much either.  She is treating with Dr. Cabret for her headaches.  She started Emgality injections for her migraines.  She had a

history of headaches prior to the fall, since her mid 20s, but those headaches were resolved with over the counter medications and were not nearly as frequent and severe as they have become since the fall of 10/13/16.

Her post-traumatic headaches started after the fall of 10/13/16. They are constant; intensity: 6-9/10; her room is "blacked out" because bright lights make her headaches worse (also worsened with noise, and certain smells); she reports that Emgality, a prophylactic headache medication, helps bring down her headaches to 6/10. Without the Emgality, she would throw up from the nausea, and would be dizzy. Prior to taking Emgality she was taking anti-emetic medications daily, and now she only takes them once a week. She cannot take triptans because they make her drowsy. She takes Nortriptyline to sleep better. She takes dihydroergotamine 4mg/mL sprays for severe headaches at least twice a week. The headaches are throbbing, stabbing, shooting, tension-like. They're located on the back of her head and shoot to the front.

Her neck pain is constant; quality: throbbing, burning; it shoots down the left arm; intensity: 5-9/10; not associated with spasms; worsened with neck motion.

Review of Systems: as above.

Medications: Dihydroergotamine 4mg/mL sprays twice a week, Emgality 120mg/ml once a month, Reglan 10mg once a week, birth control, eye drops for glaucoma, Nortriptyline 40mg at night.

PMH: Glaucoma.

PSH: Tubal ligation.

Allergies: NKDA.

FH: Mother: diabetic, hypertension (alive); father: alive, has hypertension.

Social History: She does not smoke cigarettes or drink alcohol.

Physical Exam:

Constitutional: Patient is A & O X 3, normal in appearance, attention to hygiene and body habitus, in no apparent distress and coherent and cooperative.

Eyes: Examination of eyes reveals normal eyelids and conjunctivae; normal irises.

ENT/Mouth: Normal external ears and nose; normal hearing

Cardiovascular: no edema in extremities; palpable pedal pulses

Respiratory: normal respiratory effort

MSK:

ROM: Limited cervical ROM on extension and rotation due to pain.

Palpation: Tenderness to palpation in cervical paraspinal muscles.

Strength: 5/5 in upper and lower extremities.

Sensation: Intact to light touch in upper and lower extremities.

DTRs: 2+ in upper and lower extremities.

Neuro: Cranial nerves intact.

**Analysis Of Findings**

Diagnoses: The patient suffers from the following conditions, which are causally related to the slip and fall of 10/13/16:

1. Post-traumatic headaches.
2. Post-traumatic cervical radiculopathy.
3. Post-traumatic disc herniations in: C5-6, C7-T1, T1-2.

Clinical Status:  It is within a reasonable degree of medical certainty that the patient's impairments are permanent.

**Itemized Records**

1.     Pain Specialists of Austin - Records
2.     BSW - bills
3.     BSW - records
4.     BSW - Supplement
5.     CVS - meds
6.     HEB - pt expense
7.     Incident report
8.     Plaintiff's First Amended Comp
9.     Plaintiff's R.26 Initial Disclosures
10.    Pltf's First Amended Disclosures
11.    Rose Hills - deposition
12.    Walmart - meds 2
13.    Walmart - meds

**Cost Sources**

1. Fair Health Online database was used to calculate medical services. The rates for care and services are from the claimant's geographical area.

2. Source for medications: Goodrx.com

Geozip: 76502            Year of benchmarks FAIR HEALTH: April 2019

Future care without ONBs

| Item | Frequency | CPT | Rate |
|---|---|---|---|
| Neurology | 3x per year | 99214 | $    212 |
| *Dihydroergotamine | 4mg/mL sprays twice a week | - | $5,190 per year. |
| Emgality 120mg/pen | 1 per month | - | $8,280 per year. |
| Reglan | 10mg once a week | - | $4 per year. |
| Nortriptyline | 40mg qhs | - | $207 per year. |
| Cervical MRI | 1x every 5 years | 72141 | $    2,954 |

*One spray has 0.5mg; it is sprayed twice in each nostril (2mg per use). 1 vial has 3.5 mL (14 mg per vial).  At twice a week, she is using 4mg/week or 208 mg/year (52*4=208).  She will need 15 (208/14=15) vials per year.  $346 per vial. $5,190 per year.

Future care with ONBs

| Item | Frequency | CPT | Rate |
|---|---|---|---|
| Neurology | 3x per year | 99214 | $    212 |
| Bilateral greater and lesser occipital nerve blocks (ONB) | 2x per year | 64405x2, 64450x2 | $    5,708 |
| Dihydroergotamine | 4mg/mL sprays twice a week | - | $5,190 per year. |
| Emgality 120mg/pen | 1 per month | - | $8,280 per year. |
| Reglan | 10mg once a week | - | $4 per year. |
| Nortriptyline | 40mg qhs | - | $207 per year. |
| Cervical MRI | 1x every 5 years | 72141 | $    2,954 |

| Item | CPT | Rate |
|------|-----|------|
| Greater ONB | 64405 | $1,708 |
| Lesser ONB | 64450 | $1,146 |

Hector A. Miranda-Grajales, M.D., C.L.C.P.
Diplomate of American Board of Physical Medicine and Rehabilitation
Board Certified Pain Management Specialist
Board Certified in Brain Injury Medicine
Certified Life Care Planner



# Life Care Plan Tables

A life expectancy was obtained from the National Vital Statistics
Report Volume 67, Number 7, November 13, 2018, Table 12.
According to this source, Rose Hills's life expectancy is 48 years.
The expected age of death is 85 years old.

DOB: 8/12/1981
AGE: 37
RACE: Hispanic

Client Name: Rose Hills
Date of Injury: 10/13/2016
Gender: Female

## Projected Evaluations

Primary Disability: Post-traumatic: headaches, cervical radiculopathy.                                    Date of Preparation:  7/14/19

| Item | Frequency and Duration of Need | | | Average Cost | Average Annual Cost | Years of Duration | Average Total Cost | Age At Start | Age At End | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Every | # Years | | | | | | | |
| LCP | 1 | X | 48 | $ - | $ - | 48 | $ - | 37 | 85 | |
| Totals | | | | $ - | $ - | | $ - | | | |

Projected Evaluations Average Unit Cost Total:  $
Projected Evaluations Average Annual Cost Total:  $
Projected Evaluations Average Cost Total:  $

**Projected Treatment - without ONBs**

DOB: 8/12/1981
AGE: 37

Client Name: Rose Hills
Date of Injury: 10/13/16
Date of Preparation: 07/14/19

Primary Disability: Post-traumatic headaches, cervical radiculopathy.

The expected age of death is 85 years old.

| Item | Frequency and Duration of Need | | | Average Cost | Average Annual Cost | Years of Duration | Average Total Cost | Age At Start | Age At End | Comment |
|------|------|------|------|------|------|------|------|------|------|------|
| | Units | Every | # Years | | | | | | | |
| Neurology | 3 | X | 1 | $ 212.00 | $ 636.00 | 48 | $ 30,528.00 | 37 | 83 | |
| Dihydroergotamine | 1 | X | 1 | $ 5,190.00 | $ 5,190.00 | 48 | $ 249,120.00 | 37 | 85 | |
| Emgality | 1 | X | 1 | $ 8,280.00 | $ 8,280.00 | 48 | $ 397,440.00 | 37 | 85 | |
| Reglan | 1 | X | 1 | $ 4.00 | $ 4.00 | 48 | $ 192.00 | 37 | 85 | |
| Nortriptyline | 1 | X | 1 | $ 207.00 | $ 207.00 | 48 | $ 9,936.00 | 37 | 85 | |
| Cervical MRI | 1 | X | 5 | $ 2,954.00 | $ 590.80 | 48 | $ 26,586.00 | 37 | 85 | |
| Totals | | | | $16,847.00 | $ 14,907.80 | | $ 713,802.00 | | | |

Projected Treatment - without ONBs  Average Unit Cost Total: $        16,847.00
Projected Treatment - without ONBs  Average Annual Cost Total: $        14,907.80
Projected Treatment - without ONBs  Average Cost Total: $        713,802.00

**Projected Treatment - with ONBs**

DOB: 8/12/1981
AGE: 37

Client Name: Rose Hills
Date of Injury: 10/13/16
Date of Preparation: 07/14/19

Primary Disability: Post-traumatic headaches, cervical radiculopathy.

The expected age of death is 85 years old.

| Item | Frequency and Duration of Need | | | Average Cost | Average Annual Cost | Years of Duration | Average Total Cost | Age At Start | Age At End | Comment |
|------|------|------|------|------|------|------|------|------|------|------|
| | Units | Every | # Years | | | | | | | |
| Neurology | 3 | X | 1 | $ 212.00 | $ 636.00 | 48 | $ 30,528.00 | 37 | 85 | |
| ONBs | 2 | X | 1 | $ 5,708.00 | $ 11,416.00 | 48 | $ 547,968.00 | 37 | 85 | |
| Dihydroergotamine | 1 | X | 1 | $ 5,190.00 | $ 5,190.00 | 48 | $ 249,120.00 | 37 | 85 | |
| Emgality | 1 | X | 1 | $ 8,280.00 | $ 8,280.00 | 48 | $ 397,440.00 | 37 | 85 | |
| Reglan | 1 | X | 1 | $ 4.00 | $ 4.00 | 48 | $ 192.00 | 37 | 85 | |
| Nortriptyline | 1 | X | 1 | $ 207.00 | $ 207.00 | 48 | $ 9,936.00 | 37 | 85 | |
| Cervical MRI | 1 | X | 5 | $ 2,954.00 | $ 590.80 | 48 | $ 26,586.00 | 37 | 85 | |
| Totals | | | | $22,555.00 | $ 26,323.80 | | $ 1,261,770.00 | | | |

Projected  Projected Treatment - with ONBs  Average Unit Cost Total: $        22,555.00
Projected  Projected Treatment - with ONBs  Average Annual Cost Total: $        26,323.80
Projected Projected Treatment - with ONBs  Average Cost Total: $        1,261,770.00

# CURRICULUM VITAE
## HÉCTOR A. MIRANDA-GRAJALES, MD, FAAPM&R, CLCP

**March 2019**

---

4201 Bee Caves Rd.,
Suite C-213
West Lake Hills, TX 78746-6458

email:
hmirandamd@mdclcp.net
hmirandamd@medinjury.net
Office: (512) 960-4717
Fax: 855-868-9882

**LANGUAGES SPOKEN**
- English
- Spanish

**MEDICAL LICENSES:**
- Florida: ME107880
- Texas: Q4469
- New York: 262463-1
- California: C149232

**CERTIFICATONS**

- Board Certified in Brain Injury Medicine
  - December 1, 2016 – December 31, 2026
  - Certificate Number: 385

- Certified Life Care Planner (CLCP)
  - September 2015
  - Certified by the University of Florida, College of Public Health & Human Professions, Department of Behavioral Science & Community Health

- Board Certified in Pain Medicine
  - August 18, 2012 – December 31, 2022
  - Certificate Number: 1521

- Diplomate of American Board Physical Medicine and Rehabilitation
  - 7/1/2012 – 12/31/2022

       o  Certificate Number: 10537

**PROFESSIONAL EXPERIENCE**
September 3, 2013 –
- Founded Medical Injury Rehabilitation Specialists, LLC
  - Medical Director and interventional pain management physician of this practice
    - 4201 Bee Caves Road, Suite C-213, West Lake Hills, TX 78746
    - 4611 NW 53rd Avenue, Gainesville, FL 32653
    - 404 Hall of Fame Drive, Lake City, FL 32055

- August 27, 2012 – August 26, 2013
  - Interventional pain management physician at the Institute of Pain Management
    - 1325 San Marco Blvd. Suite 4A, Jacksonville, FL, 32207; tel: 904- 306- 9860 fax: 904-306-9864; Business address: PO Box 57970 Jacksonville, FL 32241-7970
    - 4243 Sunbeam Rd., Jacksonville, FL, 32207; tel: 904-264-5661
    - 1210 Kingsley Ave., Orange Park, FL 32073; tel: 904-264-5661

**EDUCATION**
August 3, 2003 – June 15, 2007 University of Puerto Rico School of Medicine, Rio Piedras, Puerto Rico.

       o  M.D.
       o  Graduation June 15, 2007.
       o  Graduated *magna cum laude.*

August 16, 1999- February 16, 2003 University of Puerto Rico, Rio Piedras.

       o  B.S. General Sciences.
       o  Graduated February 16, 2003.
       o  Graduated *magna cum laude.*

**POSTGRADUATE TRAINING**
July 1, 2011-June 30, 2012

       o  Fellowship training in Anesthesia ACGME accredited Pain Management at Beth Israel Medical Center in New York City, NY.

July 1, 2008-June 30, 2011

○ Residency training in Physical Medicine and Rehabilitation atthe University of Miami Miller School of Medicine.

July 1, 2007- June 30, 2008

○ Internship in Internal Medicine at the Veterans Affairs Medical Center in San Juan, Puerto Rico.

## HONORS/AWARDS/ACHIEVEMENTS

### Residency
April 23, 2010

○ Named Chief Resident of PM&R residency program.

### Undergraduate
2002-03

○ Who's who among students in United States colleges and universities.

1999-03

○ Dean's List.
○ Honor Roll student at University of Puerto Rico, Rio Piedras.

## POSTERS & PUBLICATIONS
2013

· **Miranda-Grajales H.,** Hao J, Cruciani R. False Sense of Safety by Daily QTc Interval Monitoring During Methadone IVPCA Titration in a Patient with Chronic Pain. *Journal of Pain Research;* May 2013;6 375-378.

## PROFESSIONAL ASSOCIATION MEMBERSHIPS
2015

· Member of American Medical Association
· Member of Texas Medical Association
· Member of American Academy of Physical Medicine & Rehabilitation
· Member of the International Association of Rehabilitation Professionals

Journal of Pain Research

Dovepress



CASE REPORT

# False sense of safety by daily QTc interval monitoring during methadone IVPCA titration in a patient with chronic pain

Hector Miranda-Grajales
Joy Hao
Ricardo A Cruciani

Department of Pain Medicine and Palliative Care, Beth Israel Medical Center, New York, NY, USA

**Abstract:** It has been proposed that some deaths attributed to methadone are related to prolongation of the QTc interval; however, there are no clear recommendations on electrocardiogram (ECG) monitoring in patients undergoing intravenous methadone infusion. This is a report on a patient receiving methadone intravenous patient-controlled analgesia titration for the treatment of chronic pain. Initially, her daily ECGs showed QTc intervals within normal limits; however, she experienced a rapid increase in QTc interval from 317 ms to 784 ms within a 24-hour period after methadone had been discontinued for excessive sedation. QTc interval greater than 500 ms is considered to be high risk for the fatal arrhythmia Torsades de Pointes. Daily ECGs did not detect a gradual increase in the QTc interval that would have alerted the medical staff of the need to decrease or stop the methadone before reaching a prolonged QTc interval associated with cardiotoxicity. In selected cases where aggressive methadone titration is required, more intensive monitoring, such as telemetry or ECG determinations every 12 hours, might help detect changes in QTc interval duration that might otherwise be missed by daily ECG determinations.

**Keywords:** methadone, QTc prolongation, opioids, opioid side effects, IVPCA methadone

## Background

The use of methadone for the management of chronic pain has increased in the last decade, as has the number of the deaths attributed to its use.[1] Methadone is a chiral mixture with a variable metabolization rate[2] that contributes to its unpredictable half-life (ranging between 15 and 150 hours), which can lead to drug accumulation and potential cardiac toxicity.[1] Methadone and other opioids, including oxycodone,[3] can block delayed potassium rectifying currents ($I_{kr}$), thus interfering with the repolarization of the conductive tissue of the heart[4] and predisposing to Torsade de Pointes (TdP), a fatal ventricular arrhythmia. On electrocardiogram (ECG), prolonged depolarization manifests as QTc interval prolongation.[5] An acceptable QTc interval upper limit has been proposed to be 430 and 450 ms for males and females,[6] respectively, while values beyond 500 ms are considered to be high risk for TdP irrespective of sex.[6]

Although the use of intravenous (IV) methadone in the terminally ill population is considered to be safe,[7] and the QTc prolongation reported by Kornick et al was attributed to the preservative chlorobutanol,[8] many reports suggest that methadone itself may prolong the QTc interval in a dose-dependent manner.[4] Furthermore, coadministration of certain medications may increase the risk of cardiotoxicity, for example, drugs that have the potential to prolong the QTc interval,[9] such as certain antibiotics or antiarrhythmic agents, or drugs that may compete with methadone as substrates for the cytochrome P450 isoenzymes 3A4, 2D6, and 2B6,[10] such as certain antidepressants, resulting in

Correspondence: Ricardo A Cruciani
10 Union Square East, Suite 2Q-2R,
Department of Pain Medicine and
Palliative Care, Beth Israel Medical
Center, New York, NY 10003, USA
Tel +1 212 844 1390
Fax +1 212 844 6962
Email rcrucian@chpnet.org

Journal of Pain Research 2013:6 375–378 **375**
© 2013 Miranda-Grajales et al, publisher and licensee Dove Medical Press Ltd. This is an Open Access article which permits unrestricted noncommercial use, provided the original work is properly cited.

elevated methadone plasma levels. To address the risk of cardiotoxicity, some authors have advocated serial ECGs to monitor the QTc interval duration,[11] but the recommendations on frequency of monitoring and medication dose at which the ECG should be done are controversial[12] and range from "ECG is never necessary" to perform ECG "in every patient."[13]

## Objective

To promote awareness that daily ECG monitoring during IV patient-controlled analgesia (PCA) with methadone may not be sufficient to anticipate a rapid prolongation of the QTc interval.

## Methods and findings

The patient was a 50-year-old woman with chronic abdominal pain for over 10 years due to lupus vasculitis who during hospitalization for opioid rotation, experienced QTc prolongation beyond 500 ms during rapid IV methadone titration in less than 24 hours. The patient's pain had not been managed to satisfaction as an outpatient, and admission for IV opioid titration was recommended. At the time of admission to the Pain Service Inpatient Unit, Beth Israel Medical Center, New York, NY, USA, the patient's medications included morphine sulfate 150 mg intramuscular (IM) every 4 hours and meperidine 75 mg IM every 8 hours, and her pain score was 10/10. During hospitalization, the patient underwent trials with intravenous patient controlled analgesia (IVPCA) hydromorphone, morphine, and fentanyl, which did not alleviate the pain or cause significant side effects and had to be discontinued. Afterwards, the patient received IV methylprednisolone and ketamine infusion, and both were ineffective. After a baseline ECG that showed a QTc interval of 449 ms, an IVPCA methadone trial was initiated. The 12-lead ECG was obtained with a MAC 5000 machine (GE Medical Systems, Milwaukee, WI, USA). The QT interval was measured manually by a board-certified cardiologist. The interval was corrected for heart rate using the Bazett formula:[6]

$$QTc = QT/Sqrt \ [RR].$$

QTc prolongation was defined as intervals longer than 430 ms for males and 450 ms for females.[14] During the first 7 days of methadone IVPCA titration, the QTc interval duration ranged from 416 to 449 ms (Table 1). On the morning of day 8, the QTc interval was 317 ms (Table 1). That night, due to excessive sedation, the IVPCA methadone was discontinued, so the patient received only 184 mg during the 24-hour period. During this episode, the patient was easily aroused; oriented to self, time, and space; had stable vital signs (BP

134/82; HR 62; RR 12); and had no evidence of arrhythmia (although an ECG was not done). The next morning, a repeat ECG showed a QTc interval of 784 ms (12 hours after the methadone IVPCA had been discontinued). At that point, the sedation was resolved, there was no evidence of withdrawal symptoms, and the electrolytes were within the normal range ($K^+$ 4.3, $Ca^{2+}$ 9.3, $Mg^{2+}$ 2.0, aspartate aminotransferase (ALT) 17, alanine aminotransferase (AST) 16 for a reference range of 3.7–5.2 mEq/L, 8.5–10.9 mg/dL, 1.7–2.2 mg/dL, 8–37 IU/L, and 10–34 IU/L respectively). The patient remained on nortriptilyne 25 mg in the morning and afternoon and 50 at bed time (plasma level of 81 for a therapeutic range of 70–170 ng/mL), and baclofen 10 mg every 8 hours that she had been taking at the same dose for several months before this admission. It is worth noting that no new medications that could prolong the QTc interval or interfere with methadone metabolism were initiated at this admission, (for a list of medications that can prolong the QTc interval, visit http://www.torsades.org). Twenty-four hours later, the QTc interval duration was 476 ms, and the patient reported a pain score of 8/10. At this time, methadone was resumed as an oral formulation at half the dose of that before discontinuation (30 mg three times a day), which is a dose that had not caused significant QTc interval prolongation a few days earlier. In addition, the patient received hydromorphone 8–16 mg IV every 3 hours as needed to provide additional pain relief and to control withdrawal symptoms. This combination of medications provided inadequate pain relief, as the patient reported pain scores ranging from 6/10 to 10/10.

On day 15, in view of the poor response obtained with IV and oral opioids (the patient continued to report pain scores of 10/10), methadone was discontinued, and a trial of neuroaxial analgesia that included hydromorphone, bupivacaine, clonidine, baclofen, and midazolam was conducted. At day 21, the patient continued reporting pain scores that ranged between 8/10 and 10/10, and the neuroaxial analgesia trial was discontinued. At this point, oral methadone was titrated, up to 30 mg four times a day, and the patient also received transdermal fentanyl 300 μg/hour every 72 hours (dose based on the IVPCA fentanyl trial that the patient had had earlier during this hospitalization). Hydromorphone 8–16 mg every 3 hours as needed was continued to manage breakthrough pain and withdrawal symptoms. On day 24, the patient was discharged on methadone and transdermal fentanyl, with the addition of meperidine IM and morphine IM, which the patient had used for many years, but now at lower doses and with longer intervals between administrations. At discharge, her pain score was 4/10 and the QTc interval

False sense of safety by daily QTc interval monitoring

**Table I** Methadone dose over time and daily ECG

| Day of IVPCA | Methadone | | | QTc interval duration (ms) |
|---|---|---|---|---|
| | Total methadone oral dose (mg/24 h) | IVPCA methadone dose (continuous rate plus demand, mg/24 h) and conversion to PO equivalency dose (IV to PO conversion factor = 2) | Total methadone dose in PO equivalent (mg/24 h) | |
| Day 1 | 40 | 28.8 × 2 = 57.6 | 97.6 | 449 |
| Day 2 | 60 | 58.8 × 2 = 117.6 | 177.6 | 445 |
| Day 3 | 60 | 94.8 × 2 = 189.6 | 249.6 | 430 |
| Day 4 | 60 | 151.6 × 2 = 303.2 | 363.2 | 426 |
| Day 5 | 60 | 121 × 2 = 242 | 302 | 416 |
| Day 6 | 60 | 126.9 × 2 = 253.8 | 313.8 | 420 |
| Day 7 | 60 | 137.3 × 2 = 274.6 | 334 | 429 |
| Day 8 | 60 | 62 × 2 = 124 (12 h) | 184 | 317 |
| Day 9 | 20 | – | 20 | 784 |
| Day 10 | 120 | – | 120 | 476 |
| Day 11 | 120 | – | 120 | 486 |
| Day 12 | 120 | – | 120 | 477 |
| Day 13 | 120 | – | 120 | 495 |
| Day 14 | 120 | – | 120 | 471 |
| Day 15 | None | – | 0 | 485 |
| Day 16 | None | – | 0 | 432 |
| Day 17 | None | – | 0 | 451 |
| Day 18 | None | – | 0 | 418 |
| Day 19 | None | – | 0 | 437 |
| Day 20 | None | – | 0 | 421 |
| Day 21 | 30 | – | 30 | 404 |
| Day 22 | 60 | – | 60 | 443 |
| Day 23 | 90 | – | 90 | 448 |
| Day 24 | 90 | – | 90 | 467 |

**Notes:** QTc duration versus total methadone dose. The first ECG was done to obtain a QTc interval duration baseline. Thereafter, daily ECGs were obtained to monitor the duration of the QTc while the IVPCA methadone titration was conducted. The total methadone dose was defined as the addition of the constant infusion rate, the demand dose, and the IV equivalent oral dose, in 24-hour periods. The methadone IV to oral conversion ratio was 1:2.
**Abbreviations:** ECG, electrocardiogram; IV, intravenous; PCA, patient-controlled analgesia; PO, per oral.

was 437 ms. We recognize that meperidine IM long-term use is not recommended, and the potential buildup of the metabolite normeperidine can cause seizures. However, the patient expressed anxiety at the prospect of discontinuing this medication, which she had been taking for many years without experiencing significant side effects. Therefore, we developed a plan to gradually switch from the use of injectable meperidine to injectable morphine, with eventual plan to transition to oral medications. After discharge, the patient was evaluated weekly in an outpatient setting for 1 month, at the end of which her pain score was 4/10, and the QTc interval was 372 ms. Four months later, the overall injectable mediations had been reduced by an additional 25% and her QTc interval duration was 410 ms.

## Discussion

An ECG is a good screening tool for cardiac arrhythmias;[14] however, in this case, daily ECGs were not sufficient to guide dosing during rapid methadone titration as a gradual prolongation of the QTc interval was not observed. Instead, the QTc interval jumped from what is considered to be low risk for cardiotoxicity to over 700 ms in less than 24 hours, putting the patient at high risk for fatal arrhythmias such as TdP. Since the methadone was preservative-free, and medications that can be substrates of the cytochrome P450 isoenzymes 3A4, 2D6, and 2B6, or those that can block the $I_{kr}$, were not initiated during this hospitalization, it is likely that the observed prolongation was due to a dose-dependent effect of methadone on the QTc interval caused by drug accumulation. In this report, daily ECGs did not detect a gradual increment of the QTc interval duration that would have guided clinical decisions to either decrease or stop the drug before the QTc interval exceeded 500 ms. Therefore, while daily ECGs may be useful, this should not be the only method used to guide clinical decisions regarding dose adjustments of methadone, as a normal QTc interval can give a false sense of safety.

Telemetry monitoring or ECG determinations every 12 hours should be considered in cases in which aggressive titration of IV methadone is elected. However, since methadone plasma levels were not measured in this case, the conclusions of this report cannot be generalized.

## Disclosure

Ricardo A Cruciani is on the speaker board for ENDO, Covidien, and Pfizer; has been coinvestigator in research funded by Ameritox; has organized CME courses funded by Grupo Ferrer; and has been in the advisory board for Depomed and Janssen Pharmaceuticals. The authors report no other conflicts of interest in this work.

## References

1. Webster LR, Cochella S, Dasgupta N, et al. An analysis of the root causes for opioid-related overdose deaths in the United States. *Pain Med.* 2011;12 Suppl 2:S26–S35.
2. Eap CB, Crettol S, Rougier JS, et al. Stereoselective block of hERG channel by (S)-methadone and QT interval prolongation in CYP2B6 slow metabolizers. *Clinic Pharmacol Ther.* 2007;81(5):719–728.
3. Daniell HW. Torsades-de-Pointes associated with Taku-Tsubo cardiomyopathy following greatly reduced oxycodone use in an elderly woman. *J Opioid Manag.* 2011;7(2):155–159.
4. Ansermot N, Albayrak O, Schläpfer J, et al. Substitution of (R,S)-methadone by (R)-methadone: impact on QTc interval. *Arch Intern Med.* 2010;170(6):529–536.
5. Krantz MJ, Lewkowiez L, Hays H, Woodroffe MA, Robertson AD, Mehler PS. Torsade de pointes associated with very-high-dose methadone. *Ann Intern Med.* 2002;137(6):501–504.
6. Moss AJ, Zareba W, Benhorin J, et al. ISHNE guidelines for electrocardiographic evaluation of drug-related QT prolongation and other alterations in ventricular repolarization: task force summary. A report of the Task Force of the International Society for Holter and Noninvasive Electrocardiology (ISHNE), Committee on Ventricular Repolarization. *Ann Noninvasive Electrocardiol.* 2001;6:333–341.
7. Shaiova L, Berger A, Blinderman CD, et al. Consensus guideline on parenteral methadone use in pain and palliative care. *Palliat Support Care.* 2008;6(2):165–176.
8. Kornick CA, Kilborn MJ, Santiago-Palma J, et al. QTc interval prolongation associated with intravenous methadone. *Pain.* 2003;105(3):499–506.
9. Cruciani RA, Sekine R, Homel P, et al. Measurement of QTc in patients receiving chronic methadone therapy. *J Pain Symptom Manage.* 2005;29(4):385–391.
10. Pelet A, Favrat B, Cavassini M, Eap CB, Besson J, Monnat M. Usefulness of methadone plasma concentration measurement in patients receiving nevirapine or efavirenz. *Am J Drug Alcohol Abuse.* 2011;37(4):264–268.
11. Krantz MJ, Martin J, Stimmel B, Mehta D, Haigney MC. QTc interval screening in methadone treatment. *Ann Intern Med.* 2009; 150(6):387–395.
12. Girgis G. Concerns about consensus guidelines for QTc interval screening in methadone treatment. *Ann Intern Med.* 2009;151(3):217–218.
13. Cruciani RA. Methadone: to ECG or not to ECG ... That is still the question. *J Pain Symptom Manage.* 2008;36(5):545–552.
14. Roden DM. Drug-induced prolongation of the QT interval. *N Engl J Med.* 2004;350(10):1013–1022.

**Journal of Pain Research**

**Publish your work in this journal**

The Journal of Pain Research is an international, peer-reviewed, open access, online journal that welcomes laboratory and clinical findings in the fields of pain research and the prevention and management of pain. Original research, reviews, symposium reports, hypothesis formation and commentaries are all considered for publication.

Submit your manuscript here: http://www.dovepress.com/journal-of-pain-research-journal

The manuscript management system is completely online and includes a very quick and fair peer-review system, which is all easy to use. Visit http://www.dovepress.com/testimonials.php to read real quotes from published authors

**Dove**press

Dr. Miranda-Grajales Testimony Experience

EW = Expert Witness; TP = Treating Physician   LCP = Life Care Plan

| | | Depos Date | Location | Court style | Case# | Name of c | Retained b | Payments recei | Insurance comp | Defense at | Was it videographed? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | EW | 9/24/2013 | 4611 NW 53 | Circuit court | 12-2012 | Budnik, Ar | Tommy De | $1000 for the de | Statefarm | Jason Fanc | No |
| 2. | TP | - | 136 SW Nass | Circuit court | 11-327-4 | Staley, Rar | Tommy De | $1000 for the de | Statefarm | - | No |
| 3. | EW | 2/24/2014 | 4611 NW 53 | Circuit court | 13-330-4 | Bonesio, G | Tommy De | $1000 for reco | Statefarm | Raymond / | No |
| 4. | TP | 2/24/2015 | 136 SW Nass | IN THE CIRCU | 13-47A-4 | Proveaux, | Tommy De | $1,500 for 1 hou | - | Harris Bro | Yes |
| 5. | EW | 5/11/2016 | 4201 Bee Ca- | - | M-2010€ | Kenneth B | Carlson La | $3,000 | Non-subscriber | Bill Ashcra | Yes |
| 6. | TP | 5/26/2016 | 4202 Bee Ca | Circuit court | 01-2014 | Brian Cohe | Defense: | $1,000 | - | Robert Tuc | No |
| 7. | LCP | 5/24/2015 | 4203 Bee Ca | IN THE DISTR | CAUSE N | Sharon Pre | Plaintiff: | $3,275 | - | Eric W. Hin | Yes |
| 8. | EW | 5/31/2016 | 4201 Bee Ca- | - | M-2010€ | Kenneth B | Carlson La | $1 billed $1,750 | Non-subscriber | Bill Ashcra | Yes |
| 9. | LCP | 6/20/2016 | Carlson Law Firm Office 11606 N IH | | | Melissa Bl | Carlson La | $2,500 | - | - | yes |
| 10. | LCP | 6/30/2016 | 4201 Bee Caves Rd, Suite C-213, WA | | | Vanmeter, | Aaron Baker | | | | yes |
| 11. | LCP | 9/8/2016 | 4201 Bee Ca | Distric Court | NO. 201 | Edward Ya | Plaintiff: Jc | $10,500: $8,000 | James Christopl | Nathan Ry | Yes |
| 12. | LCP | 9/16/2016 | 111 Congres | District Court | CAUSE N | Roel Rodri | Defense: A | When I was beir | Plaintiff: Collen | Defense: A | Yes |
| 13. | LCP | 10/14/2016 | Omni Hotel | District Court | NO. 201 | Bulmaro F | Plaintiff: E | $4,000 for life c | SCS Constructi | O.L. Hans Bar | No |
| 14. | LCP | 11/11/2016 | 111 Congres | 99th District | 2014-51 | William La | Plaintiff: - | $54,000 for life c | C&D Waste Ltd | Eliott V Nixon; CRENSHAW, DUPREE, & MILLAM | |
| 15. | TP | 2/7/2017 | The Carlson | District Court | Cause N | Zafar Al-de | Plaintiff: Jc | My bill is $2,500 | Joshua Holley | Robert House | |
| 16. | EW-IN | 3/31/2017 | Thompson, .c | Distric Court | Cause N | Nancy Pett | Michael Jc | $1,500 for IME a | - | yes | |
| 17. | LCP | 4/27/2017 | 1220 Colora | IN THE 70TH | CAUSE N | Michael D | Jonathan C | $5,000 for life ca | - | Christopher Rigler, Jennifer Aufricht | |
| 18. | EW-IN | 1/3/2017 | 901 MoPac | IN THE COUN | CAUSE N | Wendy Jo | Terrence D | $2,500 for depo | - | Christopher Slayton | |
| 19. | LCP | 7/26/2017 | 11606 N IH-3 | IN THE DISTR | CAUSE N | Doyle "Par | Todd Kelly | $6,500 for LCP; | - | - | Yes |
| 20. | LCP | 5/3/2017 | 1717 N IH-3 | American Arl | Case No, | Corrin San | Rob Ranco | $7,650 for LCP; | - | William Ch | No |
| 21. | LCP | 8/18/2017 | Wright & Gre | American Arl | Case No, | Corrin San | Rob Ranco | $7,650 for LCP; | - | Mark Giltn | No |
| 22. | LCP | 9/25/2017 | 812 San Anto | IN THE DISTR | CAUSE N | James Scol | Parker Poli | $4,000 for LCP; | - | Mark Giltn | No |
| 23. | LCP | 9/21/2017 | 808 W Ave, | IN THE DISTR | Cause N | Ricardo Gd | Justin Den | $4,000 for LCP; | - | Jeff Otto | No |
| 24. | LCP | 10/12/2017 | 11940 Jollyvil | IN THE DISTR | NO. D-1 | CHARISSA | Lee, Gobel | $4,000 for repor | - | No | |
| 25. | LCP | 11/8/2017 | Travis Count | IN THE DISTR | CAUSE N | Parker, Pai | | $4,000 for LCP | - | Ryan Bueche, James Hicks | |
| 26. | LCP | 12/5/2017 | US Legal Suppl | IN THE DISTR | CAUSE N | SANDRA A | Steve Dun | $5650 for LCP; | $ | Peter C. Bl | Yes |
| 27. | LCP | 1/12/2018 | Veritext Lega | IN THE DISTR | CAUSE N | KATHLEEN | Darrell Kel | $10,750 for LCP; | $ | James Stou | No |
| 28. | LCP | 1/26/2018 | 701 Brazos S | AMERICAN A | No, 01-1 | Debra Bail | Charles Cal | $6,830 for LCP r | - | Mark Carri | Yes |
| 29. | EW | 1/26/2018 | Calle Resolud | US District Ci | Federal: | Janet Herr | Yadira Mal | $975 for phone | - | Doris Quin | No |
| 30. | EW | 2/21/2018 | Federal Court | UNITED STAT | Case: 1 | Grover Tha | Larry "Wal | $8,200 for LCP; | - | Michael Bir | Yes |
| 31. | LCP | 1/26/2018 | Travis Count | IN THE DISTR | NO. D-1 | CHARISSA | Lee, Gobel | $4,000 for repor | - | Ryan Buech | |

| # | Type | Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 32. | LCP | 3/8/2018 | 700 Brazos S | In the district | Cause N | Marshall S | Todd Kelly | $6750 for LCP; $ | | David Criss | - |
| 33. | LCP | 6/1/2018 | 100 Congress | 224th Dist C | Cause 2 | Stephenie, | Steven, DU | $9,000 for LCP a | | | |
| 34. | LCP | 6/26/2018 | 11605 N Inte | In the district | Cause N | Agueda Cu | Scott Crive | $4,000 for LCP a | - | Douglas Gd | No |
| 35. | EW | 7/17/2018 | 248 Addie Rd | In the county | Cause N | Kendrick S | Jeff Villam | $500 for a causa | State Farm | Edward F. | Yes |
| 36. | LCP | 9/19/2018 | 701 Brazos S | In the distric | CAUSE N | Stephen B | Nielsen La | $4,000 for LCP; | - | Alexandra | No |
| 37. | LCP | 9/26/2018 | 701 Brazos S | District Court | Cause N | Andrew Ra | Robert Rai | $5,000 for each | State Farm | Ron Clark | No |
| 38. | LCP | 10/24/2018 | 1502 W Ave. | District Court | CAUSE N | JOSEPH M | Joe Lopez | $6,200 for LCP a | KELLY-MOORE F | Jay R. Dew | No |
| 39. | LCP | 10/25/2018 | 7703 North | District Court | CAUSE N | LELA MON | Michael TU | $6,750 for LCP a | CHAE CHAI | MATT MO | No |
| 40. | LCP | 11/28/2018 | 701 Brazos S | District Court | Cause N | Perry Den | Michael Bl | $5,000 for LCP r | - | Ryan Roge | Yes |
| 41. | LCP | 1/9/2019 | 701 Brazos S | DISTRICT CO | CAUSE N | Jamil Jones | Geoffrey M | $56,200 for LCP a | - | Paul Garcia | Yes |
| 42. | LCP | 2/21/2019 | 701 Brazos S | DISTRICT CO | CAUSE N | GABRIEL R | Brian H. Cr | $4,000 for LCP a | HEB | D. Alan Erw | Yes |
| 43. | LCP | 2/??/2019 | 10 Maskell S | SUPREME CO | Index N | Dewitt ex | Michael J | $17,500 for LCP | liberty Mutual | Marc Shelf | No |
| 44. | LCP | 3/11/2019 | 701 Brazos S | UNITED STAT | Civil Acti | DOMENIC | Mark Perk | $ 12,500 | - | Gregorio, | Yes. |
| 45. | LCP | 3/25/2019 | 701 Brazos S | In the distric | CAUSE N | Stephen B | Nielsen La | $4,000 for LCP; | - | Alexandra | No |
| 46. | LCP | 5/30/2019 | 405 Martin | IN THE DISTRIC | CAUSE N | Beverly La | LINDSAY V | $2,400 for LCP | - | KENNETH R | |
| 47. | LCP | 6/13/2019 | 7703 North | IN THE DISTRIC | CAUSE N | DAVID MC | Christophe | $6,750 for LCP; | GARRISON PRO | ROBERT F. SCHEIHING | |
| 48. | LCP | 6/21/2019 | Court Report | JUDICIAL W | JWA No | Edwin Veg | Juan C. He | $4,000; $2,500 | - | Travis R. Bl | Yes |



Dr. Miranda-Grajales Testimony Experience

EW = Expert Witness; TP = Treating Physician LCP = Life Care Plan

[redacted]

| | Depo type | Date | Location | Court style | Case# | Name of client/patient | Retained by | Payments received (to the best of Dr. Miranda's recollection) | Insurance company | Defense attorney/Plaintiff | Was it videographed? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | EW | 9/24/2013 | 4611 NW 53 Ave, Gainesville, FL 32653 | Circuit court of the third judicial circuit, in and for Columbia | 12-2012-000278-CA | Bjelnik, Anatoly | Tommy Demas - Plaintiff attorney | $1000 for the deposition and record review. | Statefarm | Jason Fancher | No |
| 2. | TP | - | 136 SW Nassau Street, Lake City, FL | Circuit court, third judicial circuit, in and for Suwannee | 11-327-CA | Staley, Randy | Tommy Demas - Plaintiff attorney | $1000 for the deposition and record review. | Statefarm | - | No |
| 3. | EW | 9/2/2014 | 4611 NW 53 Ave, Gainesville, FL 32653 | Circuit court of the third judicial circuit, in and for Columbia | 13-130-CA | Bonesio, Genna | Tommy Demas - Plaintiff attorney | $3,000 for record review, IME, and IME report; $1,000 for deposition. | Statefarm | Raymond Roebuck | No |
| 4. | TP | 2/24/2015 | 136 SW Nassau Street, Lake City, FL | IN THE CIRCUIT COURT, THIRD JUDICIAL CIRCUIT IN AND FOR COLUMBIA COUNTY, FLORIDA | 13-474-CA | Provaux, Macy | Tommy Demas - Plaintiff attorney | $1,500 for 2 hour and 8 minutes of deposition ($750/hr) ; $400 for meeting with Tommy prior to case ; $400 for record review; total $2,300 -> but check was | - | Harris Brown | Yes |
| 5. | EW | 5/11/2016 | 4201 Bee Caves Rd, Suite C-212, West Lake Hills, TX 78746 | - | M-20106 | Kenneth Blackstock | Carlson Law Firm - Scott Crivelli | $3,000 | Non-subscriber Worker's Comp - PAM | Bill Ashcraft | Yes |
| 6. | TP | 5/26/2016 | 4202 Bee Caves Rd, Suite C-213, West Lake | Circuit court of the eighth judicial circuit, in and for Alachua | 01-2014-CA-2439 | Brian Colten | Defense: Robert Tucker | $1,000 | - | Robert Tucker (Alan | No |
| 7. | LCP | 5/24/2016 | 4203 Bee Caves Rd, Suite C-213, West Lake | IN THE DISTRICT COURT, DALLAS COUNTY, TX 101ST | CAUSE NO. DC15-06316-E | Sharon Prescott | Plaintiff: Jim Mills | $3,275 | - | Eric W. Hines; Justin Edward | Yes |
| 8. | EW | 5/31/2016 | 4201 Bee Caves Rd, Suite C-213, West Lake Hills, TX 78746 | - | M-20106 | Kenneth Blackstock | Carlson Law Firm - Scott Crivelli | (I billed $1,750 for deposition) | Non-subscriber Worker's Comp - PAM | Bill Ashcraft | Yes |
| 9. | LCP | 6/20/2016 | Carlson Law Firm Office 11606 N IH-35, | | | Melissa Bishop | Carlson Law Firm - Rob Ranco | $2,520 | - | | Yes |
| 10. | TP | 6/30/2016 | 4201 Bee Caves Rd, Suite C-213, West Lake | | | Vermeter, Jubilee | Aaron Baker | | - | | Yes |
| 11. | LCP | 9/8/2016 | 4201 Bee Caves Rd, Suite C-213, West Lake Hills, TX 78746 | District Court of Lubbock County, TX, 72nd Judicial District. | NO. 2015-514,474 | Edward Yards | Plaintiff: John Cook; Glasheen, Valles, Inderman | $10,500: $8,000 for life care plan; $2,500 for half a day of deposition. | James Christopher Dawson dba D&D Enterprises | Nathan Rymer; Laura Sley; Firm: Rymer, Moore, Jackson, | Yes |
| 12. | LCP | 9/16/2016 | 111 Congress Ave., Suite 400, Austin, TX 78701 | District Court 191ST JUDICIAL DISTRICT, DALLAS COUNTY, TEXAS | CAUSE NO. DC-14-12627 | Roel Rodriguez, Jr. | Defense: Adam Athony; law firm: HARTLINE DACUS BARGER DREYER, LLP | When I was being retained by attorney David Ortega I received a total of $5,000 for record review and submitting a report. When the case was transferred to attorney | Plaintiff: Collen Clark, Omar Alvarez | Defense: Adam Athony; law firm: HARTLINE DACUS | Yes |
| 13. | LCP | 10/14/2016 | Omni Hotel Downtown Austin, 701 Brazos Street, Suite 100, Austin, Texas 78701 | District Court of Harris County, TX 190th Judicial District | NO. 2014-13017 | Bulmaro Flores | Plaintiff: Eric Nielsen | $4,000 for life care plan; $2,500 for deposition; $32.23 for car rental; $481.96 for plane flight from Austin to Houston round trip. Total of: $7,014.19 | SCS Construction Management, Inc. and | J. Hans Barcus; CANTRELL, RAY & BARCUS, LLP | No |
| 14. | LCP | 11/11/2016 | 111 Congress Ave., Suite 400, Austin, TX 78701 | 99th District Court of Lubbock County, TX | 2014-511,459 | William James Lang | Plaintiff: Craig Carlson | $4,000 for life care plan; $1,300 for deposition | C&D Waste Ltd., Thomas Cisneros, and Zahn | Elliott V Nixon; CRENSHAW, DUPREE, & MILAM | |
| 15. | TP | 1/7/2017 | The Carlson Law Firm, located at 2800 IH 35 South, Suite 250, Austin, Texas 78704 | District Court of Williamson County, TX, 277th judicial district | Cause No. 15-1031-C277 | Zafar Al-dean | Plaintiff: John McNeff | My bill is $2,500 for half a day of depo | Joshua Holley | Robert House | |
| 16. | EW-IME | 3/31/2017 | Thompson, Coe, Cousins, & Irons Law Firm: 701 Brazos St., Suite 1500, Austin, TX 78701 | District Court of Dallas County, 101st Judicial District | Cause No. DC-16-02337 | Nancy Paterson | Michael Doyle | $1,300 for IME and $2,500 for half a day of deposition | - | Christopher Figier, Jennifer Aufricht | |
| 17. | LCP | 4/27/2017 | 1220 Colorado, Suite 320, Austin, Texas 78701 | IN THE 70TH DISTRICT COURT OF ECTOR COUNTY, TEXAS | CAUSE NO. A-140423 | Michael Davis | Jonathan Clark | $5,000 for life care plan. Will bill $2,500 for deposition and $1,000 for update on LCP. | - | Christopher Slayton | |
| 18. | EW-IME | 1/3/2017 | 901 MoPac Expwy, Austin, TX 78746 | IN THE COUNTY COURT, COURT 4, WILLIAMSON COUNTY, | CAUSE NO. 14-2075-FC4 | Wendy Jo Pfeiffer | Terrence Davis | $2,500 for deposition and $1,500 for IME | - | - | Yes |
| 19. | LCP | 7/26/2017 | 11606 N IH-35, Austin, TX 78753 | IN THE DISTRICT COURT, SMITH COUNTY, TX 241ST JUDICIAL | CAUSE NO. 13-2477-C | Doyle "Randy" Paroline | Todd Kelly | $6,500 for LCP; $617.40 for flight trip to Tyler, TX to examine the patient; $6,750 for | - | William Chambliss; Annik | No |
| 20. | LCP | 5/3/2017 | 1717 N IH-35 Ste 305, Round Rock, TX | American Arbitration Association | Case No. 01-16-0000-7967 | Corrin Sanjuan | Rob Ranco | $7,020 for LCP; $2,500 for deposition | - | Mark Giltner | No |
| 21. | LCP | 8/18/2017 | Wright & Greenhill, 900 Congress Ave., | American Arbitration Association | Case No. 01-16-0000-7967 | Corrin Sanjuan | Rob Ranco | $7,020 for LCP; $2,500 for deposition; $5,000 for appearing in arbitration | - | Mark Giltner | No |
| 22. | LCP | 9/25/2017 | 812 San Antonio St, Suite 310, Austin, TX 78701 | IN THE DISTRICT COURT, 98TH JUDICIAL DISTRICT, TRAVIS COUNTY, TX | CAUSE NO. D-1-GN-15-004009 | James Scott Mullins | Parker Polan & Hayden Briggle | $4,000 for LCP; $2,500 for deposition | - | Jeff Otto | |
| 23. | LCP | 9/21/2017 | 808 W Ave, Austin, TX 78701 | IN THE DISTRICT COURT TRAVIS COUNTY, TEXAS 200TH | Cause No. D-1-GN-16-002863 | Ricardo Gandara | Justin Demerath | $4,000 for LCP; $2,500 for deposition | - | - | No |
| 24. | LCP | 10/12/2017 | 11940 Jollyville Road, Suite 220-S, Austin, Texas 78759 | IN THE DISTRICT COURT 345TH JUDICIAL DISTRICT, TRAVIS COUNTY, TEXAS | NO. D-1-GN-15-001846 | CHARISSA SOUTH, JACOB SOUTH, RACHEL ANDREWS | Lee, Gober, Reyna | $4,000 for report; $5,000 for deposition. | - | Ryan Dusche, James Hicks | |
| [redacted] | | | | | | | | | | | |
| 26. | LCP | 12/5/2017 | US Legal Support, 701 Brazos St., Suite 340 Austin, | IN THE DISTRICT COURT 285TH JUDICIAL DISTRICT, [illegible] | [illegible] | SANDRA AGUERO SOTO | Steve Dummitt: Carlson Law Firm | $3450 for LCP; $2,500 for deposition (half day) | - | [illegible] HARTLINE [illegible] DREYER LLP | Yes |
| 27. | LCP | 1/12/2018 | Veritext Legal Solutions, 1600 Rio Grande, Suite 443, Austin, Texas 78701 | IN THE DISTRICT COURT 342ND JUDICIAL DISTRICT, [illegible] COUNTY, TX | [illegible]-14 | KATHLEEN K. O'SHEA | Darrell Keith | $10,750 for LCP; $2,500 for deposition | - | [illegible] | No |
| 28. | LCP | 1/26/2018 | 701 Brazos St., Suite 420, Austin, TX 78701 - US Legal | AMERICAN ARBITRATION ASSOCIATION [illegible] - EMPLOYMENT ARBITRATION | [illegible] | Debra Bailey | Charles Carr III, Joy Brannan - Defense attorneys | $6,830 for LCP review; $2,500 for deposition | - | [illegible] | Yes |
| 29. | EW | 1/26/2018 | Calle Resolución #39, Suite 702, San Juan, [illegible] | [illegible] Court for the District of Puerto Rico [illegible] | [illegible] (AG); PR [illegible] | Janet Hernandez Fernandez | Yadira Manfredy | $975 for phone calls and supplemental information [illegible] | - | [illegible] | No |
| [redacted] | | | | | | | | | | | |
| 32. | LCP | 2/9/2018 | 700 Brazos St., Suite [illegible] | [illegible] Judicial District, Smith County, TX | [illegible] | [illegible] Llewellyn | Todd Kelly [illegible] | [illegible] for LCP [illegible]. Another $2,500 was charged because [illegible] | - | David Criss, Urban Forte III | - |
| [redacted] | | | | | | | | | | | |
| 34. | LCP | 6/26/2018 | 11606 N Interstate Hwy 35, Austin, TX | In the district court 169th judicial district, Bell County | Cause No: [illegible] | [illegible] | Scott Crivess - Carlson Law Firm | $4,000 for LCP and $1,900 for deposition | | Douglas Goetz | No |
| 35. | EW | 7/17/2018 | 248 Addie Roy Rd., Suite B-302, Austin, TX | In the county court at law No. 1, Travis County, TX | Cause No. C-1-CV-17-004559 | Kendrick Stevenson | Jeff Villarreal | $500 for a causation report; $2,500 for deposition | State Farm | Edward F. Kaye - Skelton & | Yes |
| 36. | LCP | 9/19/2018 | 701 Brazos St., Suite 420, Austin, TX 78701 | In the district court 295th judicial district, Harris County | CAUSE NO. 2015-45760 | Stephen Bouche | Nielsen Law Firm | $4,000 for LCP; $2,500 for deposition; about $500 for travel expenses to meet | | Alexandra W. Wahl | No |
| 37. | LCP | 9/20/2018 | 701 Brazos St., Suite 420, Austin, TX 78701 | District Court, Travis County, TX 53rd Judicial District | Cause No. D-1-GN-15-001538 | Andrew Ramirez, Eric Ramirez | Robert Ranco - Komie & Murrow | $5,000 for each LCP (2 total) including $1,000 for rush fee; $2,500 for deposition. | State Farm | Ron Clark | No |
| 38. | LCP | 10/24/2018 | 1501 W Ave., Austin, TX 78701 | District Court, Travis County, TX 261st Judicial District | CAUSE NO. D-1-GN-16-000069 | JOSEPH MURILLO | Joe Lopez | $6,200 for LCP and $2,500 for deposition | KELLY-MOORE PAINT COMPANY, INC. AND | Jay R. Downs, Tab Keener | No |
| 39. | LCP | 10/25/2018 | 7703 North Lamar Boulevard, Suite 410, Austin, TX 78752 | District Court, Travis County, TX 126th Judicial District | CAUSE NO. D-1-GN-17-000422 | LELA MONTGOMERY | Michael Yucker - Komie & Murrow | $6,750 for LCP and $2,500 for deposition | CHAE CHAI | MATT MONTGOMERY, KRISTI F. WOOD | No |
| 40. | LCP | 11/29/2018 | 701 Brazos St., Suite 420, Austin, TX 78701 - | District Court of Bend County 268th Judicial District | Cause No. 16-DCV-234062 | Perry Danby | Michael Brophy - Defense | $5,000 for LCP rebuttal; $2,500 for deposition | | Ryan Rogers; Firm: Godsey | Yes |
| 41. | LCP | 1/9/2019 | 701 Brazos St., Suite 420, Austin, TX 78701 - | DISTRICT COURT, 63rd JUDICIAL DISTRICT, VAL VERDE | CAUSE NO. 32589 | Jarol Jones | Geoffrey N. Courtney - CLEMENS & | $6,200 for LCP and $2,500 for deposition | | Paul Garcia | Yes |
| [redacted] | | | | | | | | | | | |
| 44. | LCP | 2/11/2019 | 701 Brazos St., Suite 420, Austin, TX 78701 - US Legal | UNITED STATES DISTRICT COURT WESTERN DISTRICT OF LOUISIANA SHREVEPORT DIVISION | Civil Action: 16-1454 | DOMENICA FUSCO v SCOTT LEVINE, et al. | Mark Perkins | $ 12,500 | - | Gregorio, Cha'in, & Johnson, 7500 Fern Avenue, Bldg., | Yes |
| 45. | LCP | 2/25/2019 | 701 Brazos St., Suite 420, Austin, TX 78701 | In the district court 295th judicial district, Harris County | CAUSE NO. 2015-45760 | Stephen Bouche | Nielsen Law Firm | $4,000 for LCP; $2,500 for deposition of 9/19/18; about $500 for travel expenses to | | Alexandra W. Wahl | No |
| [redacted] | | | | | | | | | | | |
| 47. | LCP | 5/13/2019 | 7703 North Lamar Boulevard, Ste. 410, Austin, Texas 78752 | IN THE DISTRICT COURT 126TH JUDICIAL DISTRICT TRAVIS COUNTY, TEXAS | CAUSE NO. D-1-GN-16-001162 | DAVID MOSRIE | Christopher T. Morrow | $6,750 for LCP; $3,300 for deposition | GARRISON PROPERTY AND CASUALTY INSURANCE | ROBERT F. SCHEIHING | |
| 48. | LCP | 6/21/2019 | Court Reporters Clearinghouse, 7800 North Mopac Expressway, Suite 120, Austin, Texas | JUDICIAL WORKPLACE ARBITRATIONS, INC. | JWA No. 2066-A 2018 | Edwin Vega and Camila Hernandez | Juan C. Hernandez | $4,000; $2,500 for deposition | - | Travis R. Brewer; Dennis D. Gibson | Yes |

**Medical Injury
Rehabilitation
Specialists**

Hector Miranda-Grajales, M.D.

4201 Bee Caves Rd., Suite C-213
West Lake Hills, TX 78746
Tel: 512-960-4717 / Fax: 855-868-9882

Date: 7/17/19

In accordance to the rules for Federal Court, section (vi) *statement of the compensation to be paid for the study and testimony in the case:*

I billed and collected $7,200 for the life care plan on Rose Hills. I will bill $2,500 for a deposition lasting 4 hours or less and $5,000 lasting more than 4 hours. I will bill $5,000 for trial.

Hector Miranda-Grajales, M.D.



## Medical Injury Rehabilitaion Specialists

MIRS - Hector Miranda Grajales, MD
512-960-4717

4201 Bee Cave Rd
West Lake Hills, Texas
78746
United States

| Billed To | Date of Issue | Invoice Number | Amount Due (USD) |
|---|---|---|---|
| Julie L. Peschel | 06/29/2019 | 0000062 | **$0.00** |
| Carlson Law Firm | | | |
| 2010 SW HK Dodgen Loop, Suite 201 | Due Date | | |
| Temple, TX | 07/01/2019 | | |
| 76504 | | | |

| Description | Rate | Qty | Line Total |
|---|---|---|---|
| Hills, Rose - LCP with rush fee<br>Hills, Rose - LCP with rush fee | $7,200.00 | 1 | $7,200.00 |

| | | |
|---|---|---|
| Subtotal | | 7,200.00 |
| Tax | | 0.00 |
| Total | | 7,200.00 |
| Amount Paid | | 7,200.00 |
| Amount Due (USD) | | $0.00 |

# EXHIBIT B

# CURRICULUM VITAE
## HÉCTOR A. MIRANDA-GRAJALES, MD, FAAPM&R, CLCP

**March 2019**

4201 Bee Caves Rd.,
Suite C-213
West Lake Hills, TX 78746-6458

email:
hmirandamd@mdclcp.net
hmirandamd@medinjury.net
Office: (512) 960-4717
Fax: 855-868-9882

**LANGUAGES SPOKEN**
- English
- Spanish

**MEDICAL LICENSES:**
- Florida: ME107880
- Texas: Q4469
- New York: 262463-1
- California: C149232

**CERTIFICATONS**

- Board Certified in Brain Injury Medicine
  - December 1, 2016 – December 31, 2026
  - Certificate Number: 385

- Certified Life Care Planner (CLCP)
  - September 2015
  - Certified by the University of Florida, College of Public Health & Human Professions, Department of Behavioral Science & Community Health

- Board Certified in Pain Medicine
  - August 18, 2012 – December 31, 2022
  - Certificate Number: 1521

- Diplomate of American Board Physical Medicine and Rehabilitation
  - 7/1/2012 – 12/31/2022

- Certificate Number: 10537

## PROFESSIONAL EXPERIENCE

September 3, 2013 –

- Founded Medical Injury Rehabilitation Specialists, LLC
  - Medical Director and interventional pain management physician of this practice

    - 4201 Bee Caves Road, Suite C-213, West Lake Hills, TX 78746
    - 4611 NW 53rd Avenue, Gainesville, FL 32653
    - 404 Hall of Fame Drive, Lake City, FL 32055

- August 27, 2012 – August 26, 2013
  - Interventional pain management physician at the Institute of Pain Management

    - 1325 San Marco Blvd. Suite 4A, Jacksonville, FL, 32207; tel: 904- 306- 9860 fax: 904-306-9864; Business address: PO Box 57970 Jacksonville, FL 32241-7970
    - 4243 Sunbeam Rd., Jacksonville, FL, 32207; tel: 904-264-5661
    - 1210 Kingsley Ave., Orange Park, FL 32073; tel: 904-264-5661

## EDUCATION

August 3, 2003 – June 15, 2007 University of Puerto Rico School of Medicine, Rio Piedras, Puerto Rico.

- M.D.
- Graduation June 15, 2007.
- Graduated *magna cum laude*.

August 16,1999- February 16, 2003 University of Puerto Rico, Rio Piedras.

- B.S. General Sciences.
- Graduated February 16, 2003.
- Graduated *magna cum laude*.

## POSTGRADUATE TRAINING

July 1, 2011-June 30, 2012

- Fellowship training in Anesthesia ACGME accredited Pain Management at Beth Israel Medical Center in New York City, NY.

July 1, 2008-June 30, 2011

- o  Residency training in Physical Medicine and Rehabilitation atthe University of Miami Miller School of Medicine.

July 1, 2007- June 30, 2008

- o  Internship in Internal Medicine at the Veterans Affairs Medical Center in San Juan, Puerto Rico.

## HONORS/AWARDS/ACHIEVEMENTS

### Residency
April 23, 2010

- o  Named Chief Resident of PM&R residency program.

### Undergraduate
2002-03

- o  Who's who among students in United States colleges and universities.

1999-03

- o  Dean's List.
- o  Honor Roll student at University of Puerto Rico, Rio Piedras.

## POSTERS & PUBLICATIONS
2013

- **Miranda-Grajales H.,** Hao J, Cruciani R. False Sense of Safety by Daily QTc Interval Monitoring During Methadone IVPCA Titration in a Patient with Chronic Pain. *Journal of Pain Research;* May 2013;6 375-378.

## PROFESSIONAL ASSOCIATION MEMBERSHIPS
2015

- Member of American Medical Association
- Member of Texas Medical Association
- Member of American Academy of Physical Medicine & Rehabilitation
- Member of the International Association of Rehabilitation Professionals

# EXHIBIT C

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF TEXAS

 3                      WACO DIVISION

 4   ROSE HILLS,                 )      CIVIL ACTION NO:

 5            Plaintiff,         )      6:18-cv-00301-

 6                               )      ADA-JCM

 7   VS.                         )

 8                               )      JURY TRIAL

 9   SAM'S EAST, INC., SAM'S CLUB, )    REQUESTED

10   AND WAL-MART, INC., formally )

11   known as WAL-MART STORES,   )

12   INC.,                       )

13            Defendants.        )

14

15        BE IT REMEMBERED that the videotape

16   deposition of HECTOR MIRANDA-GRAJALES, M.D.

17   duly sworn, was taken on January 16, 2020, at

18   U.S. Legal Support, 701 Brazos Street, Suite

19   380, Austin, Texas 78701, between the times of

20   3:18 p.m. and 5:34 p.m., before Noelle Rose

21   Nevius, Court Reporter, reported by machine

22   shorthand, after which time the videotape

23   deposition was reduced to writing and set

24   forth as follows:

25
```

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 2..5

Page 2

```
1   A P P E A R A N C E S:
2
3
4   FOR THE PLAINTIFF:
5   THE CARLSON LAW FIRM
6   BY:  JULIE PESCHEL, ESQUIRE
7   2010 SW HK Dodgen Loop
8   Suite 201
9   Temple, Texas  76504
10  254-771-5688
11
12
13  FOR THE DEFENDANTS:
14  WALTERS, BALIDO AND CRAIN, LLP
15  BY:  BRETT PAYNE, ESQUIRE
16  9020 N. Capital of Texas Highway
17  Building II, Suite 225
18  Austin, Texas 78759
19  512-472-9000
20
21
22  Videographer:  Joe Bazan
23
24
25
```

Page 4

| | | | PAGE |
|---|---|---|---|
1   E X H I B I T S

```
2
3                                              PAGE
4   Exhibit 1   CD - Dr. HMG's Files          12
5
6   Exhibit 2   11/25/2016 Cervical Spine     50
7               MRI Record
8
9   Exhibit 3   The Legal Connection, Inc.    52
10              Documents
11
12  Exhibit 4   GoodRX Website Forms          54
13
14  Exhibit 5   Fairhealth Form               71
15
16  Exhibit 6   Accuracy of Information Form  71
17
18  Exhibit 7   Baylor Scott & White Records  84
19
20
21
22
23
24
25
```

Page 3

```
1                  I N D E X
2
3
4   EXAMINATION OF HECTOR MIRANDA-GRAJALES, M.D.   PAGE
5
6   Mr. Payne.....................................5,91
7   Ms. Peschel..................................78,98
8   Witness Signature Page.........................100
9   Court Reporter's Certification Pg.............103
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                  -  -  -
2            THE VIDEOGRAPHER:  We are on the
3   record for the videotape deposition of
4   Dr. Hector Miranda-Grajales taken on
5   Thursday, January 16, 2020.  The time is
6   3:18 p.m.
7            Will the court reporter please
8   swear in the witness?
9                  -  -  -
10           HECTOR MIRANDA-GRAJALES, M.D. was
11  called as a witness, and after having
12  been duly sworn to tell the truth,
13  testified as follows:
14           (Witness sworn)
15                  -  -  -
16           DIRECT EXAMINATION
17                  -  -  -
18  BY MR. PAYNE:
19       Q.  Doctor, could you please state your full
20  name for the video record?
21       A.  Hector Miranda-Grajales, but I go by
22  Dr. Miranda.
23       Q.  And, Doctor, you -- well, what is your
24  occupation?
25       A.  I'm a physical medicine -- I'm a doctor, and
```

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 6..9

Page 6

1   I practice in pain medicine, and physical medicine,
2   and rehabilitation.
3       Q.  And so that Ms. Peschel doesn't have to do
4   it later, let me ask you to go through your
5   training and educational background.
6       A.  Yes.  So I went to Medical School at the
7   University of Puerto Rico School of Medicine four
8   years, and I did an internship at the VA San Juan
9   Medical Center in internal medicine.  Then I did a
10  three-year program in physical medicine and
11  rehabilitation at the University of Miami.  Then I
12  did a one-year fellowship in pain medicine in New
13  York at Beth Israel Medical Center.
14      Q.  In what do you consider yourself to be an
15  expert in as far as offering testimony?
16      A.  Physical medicine rehabilitation, pain
17  medicine, brain injury medicine, and life care
18  planning.
19      Q.  All right.  You do not consider yourself to
20  have expertise or be an expert who can testify as
21  to radiology issues; is that accurate?
22      A.  I can.
23      Q.  But do you consider yourself to be an
24  expert?
25      A.  It depends on the situation.  Yes.

Page 7

1       Q.  Would you defer to a radiologist if your
2   opinion was different than a radiologist?
3       A.  It's possible.
4       Q.  All right.  What about orthopedics?  Do you
5   consider yourself to be an expert in orthopedics?
6       A.  Orthopedics is a board term.  So I am an
7   expert in certain regards of orthopedic profession,
8   but I'm not a surgeon, you know.
9       Q.  Where or in what parts do you consider
10  yourself to have expertise in orthopedics?
11      A.  The musculoskeletal system, including the
12  spine.
13      Q.  All right.  And I guess to use your
14  qualifications, you do not consider yourself to be
15  an expert in orthopedic surgery; true?
16      A.  Correct.
17      Q.  Would it also be true that you do not
18  consider yourself to be an expert in neurology?
19      A.  I'm not a neurologist.  That's correct.
20      Q.  And so, you would agree you would not feel
21  comfortable offering an opinion, an expert opinion,
22  on neurology; is that accurate?
23      A.  It depends, because I do treat headaches,
24  and I know this case involves headaches.  So I feel
25  comfortable, you know, treating headaches.

Page 8

1       Q.  All right.  Okay.  And you feel comfortable
2   offering opinions about headache treatment from
3   your background and physical medicine and pain
4   management, but not in neurology; is that
5   accurate?
6       A.  It's accurate to the sense that I'm not a
7   neurologist.  I didn't complete a residency in
8   neurology.  But again, one of my board
9   certifications is in brain injury of medicine, and
10  part of the brain injury is having posttraumatic
11  headaches.
12      Q.  All right.  Doctor, to the extent that my
13  questions call for an expert opinion, a medical
14  expert opinion, would you give me that opinion
15  based on a reasonable degree of medical
16  probability?
17      A.  Yes, sir.
18      Q.  If you cannot answer a question and are not
19  comfortable answering a question based on a
20  reasonable degree of medical probability, will you
21  let us know?
22      A.  Yes, sir.
23      Q.  All right.  And if you feel that a topic or
24  a question is outside of your area of expertise,
25  will you likewise let us know?

Page 9

1       A.  Yes, sir.
2       Q.  In this instance, you were hired by Ms. Rose
3   Hills' attorneys to prepare a life care plan; is
4   that true?
5       A.  Yes, sir.
6       Q.  You do not consider yourself to be a
7   treating physician of Ms. Hills.  Accurate?
8       A.  Correct.
9       Q.  All right.  You have never provided any
10  treatment to Ms. Hills; true?
11      A.  True.
12      Q.  Did you have an in-person meeting with
13  Ms. Hills?
14      A.  Yes, sir.
15      Q.  When did that occur?
16      A.  Let me open up my report here.
17      Q.  Of course.
18      A.  I evaluated Ms. Hills on July 11, 2019.
19      Q.  All right.  So about six months ago?
20      A.  Just about.  Yeah.
21      Q.  Okay.  And what was the nature of your visit
22  with Ms. Hills on that occasion last July?
23      A.  It was for a history interview, and physical
24  examination in relation to a life care plan.
25      Q.  How long did that examination last?

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 10..13

Page 10

1    A.  I'm going to guess about an hour.
2    Q.  What did it entail?
3    A.  History and physical exam.
4    Q.  Did it involve anything beyond a history and
5  a physical examination?
6    A.  No, sir.
7    Q.  You did not perform or have performed any
8  type of radiology testing; true?
9    A.  True.
10   Q.  You did not perform or have performed any
11 type of nerve conduction testing or anything of
12 that nature; correct?
13   A.  Correct.
14   Q.  There would be no other testing that would
15 have been performed in connection with your visit
16 on July of 2019; true?
17   A.  True.
18   Q.  It would have simply been a standard
19 physical examination, as well as a conduction of
20 her history; true?
21   A.  True.
22   Q.  And that was done at the request of
23 Ms. Hills' legal counsel in this litigation matter;
24 true?
25   A.  True.

Page 11

1    Q.  Just so the jury is not confused.  It was
2  not at the request of the Court; true?
3    A.  True.
4    Q.  It was not at the request of me, defense
5  counsel; true?
6    A.  True.
7    Q.  It was at the request of the attorneys
8  representing her in her personal injury litigation;
9  true?
10   A.  Yes.
11   Q.  All right.  Was Ms. Hills cooperative in
12 your examination?
13   A.  Yes, sir.
14   Q.  And as a result of the examination, you did
15 in fact prepare a life care plan; is that true?
16   A.  Correct.
17   Q.  And I believe you have produced that, along
18 with -- what I understand to be your complete file
19 on a CD form, which I've briefly been able to
20 produce through the courtesy of Ms. Peschel, who
21 has a CD player.
22              MR. PAYNE:  And this CD that I'll
23        now mark as Exhibit Number 1.
24 BY MR. PAYNE:
25   Q.  Is that your response to my request for your

Page 12

1  entire file pertaining to this litigation?
2    A.  Yes, sir.
3    Q.  All right.
4              MR. PAYNE:  And, again, I marked
5        that CD, or at least the envelope of the
6        CD, as Exhibit Number 1.
7              (Exhibit No. 1 was marked for
8        identification.)
9  BY MR. PAYNE:
10   Q.  Of course, I only took a few minutes because
11 we were running a little late to begin with, but I
12 didn't see any correspondences exchange between you
13 and The Carlson Law Firm.  Does such correspondence
14 exist?
15   A.  Yes, but it wasn't requested in the Duces
16 Tecum.
17   Q.  Okay.  You don't consider that part of your
18 file?
19   A.  It wasn't requested, so, no.
20   Q.  Okay.  The request -- and I'll read it to
21 you.  Exhibit A, Duces Tecum number one, the
22 witness' entire file pertaining to this litigation.
23 You do not consider correspondences from the
24 attorneys who hired you to be pertinent to this
25 litigation?

Page 13

1    A.  It might be.  But again, when I do produce
2  e-mail correspondences, it's because specifically
3  stated in the Duces Tecum.  I didn't see it there.
4    Q.  Okay.  But you may or may not consider it
5  part of your entire file, but you did not produce
6  it here today; true?
7    A.  I didn't bring either correspondences.
8  Correct.
9    Q.  Do you have e-mails -- well, let me ask it
10 two different ways.  Do you have e-mail
11 correspondences from The Carlson Law Firm?
12   A.  Yes, sir.
13   Q.  Do you have written correspondences received
14 by regular mail or by fax from The Carlson Law
15 Firm?
16   A.  Not that I recall regarding this case.
17   Q.  Okay.  There had been other occasions where
18 The Carlson Law Firm has retained you to prepare a
19 life care plan on behalf of one of their clients;
20 true?
21   A.  True.
22   Q.  Okay.  On how many occasions has The Carlson
23 Firm retained you for that purpose?
24   A.  I'm going to guess about 20 or less.
25   Q.  I'm sorry?

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020          Pages 14..17

Page 14

1    A.  Twenty or less.
2    Q.  Okay.  All right.  While I am on this, let
3  me just go through it.  The second item I requested
4  for you to bring here today is all written or other
5  documentation concerning reflecting factual
6  observations test supporting data, calculations,
7  and opinions of you including your reports.
8          Have you provided that information to
9    me?
10   A.  Yes.  That's in the CD.
11   Q.  Okay.  And that consists of the life care
12  plan; true?
13   A.  True.
14   Q.  All right.  There are no other tests,
15  supporting data, calculations, or opinions that you
16  have made, or obtained, or created in this case
17  that are not present on that CD; is that accurate?
18   A.  Accurate.
19   Q.  Number three on the Duces Tecum I request
20  all writings or other documentation used in forming
21  the basis of your opinions.  Are there any such
22  writings?
23   A.  Like literature review?  No, sir.
24   Q.  Okay.  So in this instance, you did not rely
25  on any documentation or writings as a basis for

Page 15

1  forming your opinions other than anything contained
2  on that CD; true?
3    A.  True.
4    Q.  Did you bring your CV here today?
5    A.  It's in the CD.
6    Q.  All right.  Did you bring a list of your
7  writings, speeches, and publications?
8    A.  No, sir.  There's a mention of one of the
9  publications that I was involved in in the CD, or
10  it should be.
11   Q.  All right.  And then number six is similar,
12  I guess, to number two or three.  All documents,
13  reports, letters, studies, and statistical data of
14  compilations that will be to substantial your
15  opinions.  Are there any documents, reports,
16  letters, data that support your opinions that are
17  not on that CD and in your life care plan?
18   A.  No, sir.
19   Q.  Item number seven is calculations, formulas,
20  and equations to support your opinion.  Is there
21  anything that you utilized that's not on that CD?
22   A.  No, sir.
23   Q.  Finally, number eight is a display of
24  exhibits that you intend to use at the trial of
25  this case.  Do you intend to use any visuals or

Page 16

1  anything like that?
2    A.  I don't anticipate any.  No.
3    Q.  All right.  I did see in my brief look at
4  what was on the CD that you were provided with some
5  medical records; is that true?
6    A.  Yes, sir.
7    Q.  And did you review those medical records in
8  preparation of your life care plan?
9    A.  Yes, sir.
10   Q.  And I think your life care plan does contain
11  a record Summary, does it not?  On page five?
12   A.  Yes, sir.
13   Q.  And then the Summary continues on to the top
14  of page seven; true?
15   A.  True.
16   Q.  All right.  And so, your report itself
17  consists of the initial phase -- well, there is a
18  cover page, page two is an introduction, and then
19  the bottom part of page -- pardon me -- of page
20  three references the IME.
21         And I do not see on the IME, page three
22  of 12, any particular notations about the results
23  of your physical examination.  Are they located
24  anywhere else in your report?
25   A.  Yes.  The physical examination starts in

Page 17

1  page six of 12 until seven of 12.
2    Q.  Okay.  All right.  And on page four of your
3  report, there's a section entitled Questionnaire.
4  And I assume this is, in part, or maybe in its
5  entirety the history that Ms. Hills provided to
6  you; is that true?
7    A.  The request was part of it.  Also, the
8  Summary section page five of 12 includes part of
9  the interview that I had with her.
10   Q.  And you -- she reported to you that she had
11  been involved in a motor vehicle accident in 1999?
12   A.  Yes, sir.
13   Q.  And she had been involved in another
14  accident in either 2000 or 2001?
15   A.  Yes.
16   Q.  For which she received or was taken to the
17  hospital?
18   A.  Yes.
19   Q.  And for which she had reported to you lower
20  back pain, right hip pain for which she received
21  chiropractic care; is that true?
22   A.  Yes.
23   Q.  And then in 2002, she reported to you that
24  she had -- was assaulted and punched in the nose,
25  and went to the emergency room?

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020          **Pages 18..21**

Page 18

1    A.  Yes.

2    Q.  But that she did not have aggravating

3  headaches, neck pain, or back pain as a result?

4    A.  Correct.

5    Q.  She also reported to you that she did have a

6  prior history of migraine headaches; is that true?

7    A.  Yes, sir.

8    Q.  When did she tell you those first started?

9  And I'll refer you to the top of page six, I think.

10    A.  She said since her mid 20s.

11    Q.  And how old of a lady is she now?

12    A.  She was 37 when I saw her.

13    Q.  So she had been having headaches for at

14  least a decade before the event at the Sam's Club,

15  according to her own history; is that true?

16    A.  Yes.

17    Q.  Now, your record notes that the headaches

18  preceding the event at Sam's were not nearly as

19  frequent or severe as they were following the event

20  at Sam's.  Do you see where that is written in that

21  same area?  At the top of page six?

22    A.  Hold on.  True.  True.  Yeah.  Yeah.  I see

23  it.

24    Q.  So -- but the inclusion of that statement

25  that the headaches before this event as opposed to

Page 19

1  after this event, that is written in there as part

2  of her history, that is what she told you; true?

3    A.  True.

4    Q.  That statement is not written in there based

5  on your independent review of her medical records;

6  true?

7    A.  True.

8    Q.  As to any kind of -- well, you are not

9  offering a medical opinion that her headaches were

10  more severe following this event as opposed to

11  prior to this event on anything other than what she

12  told you; true?

13    A.  And the medical records.

14    Q.  Well, but did you do an independent review

15  of her medical records?

16    A.  I reviewed her records.  Yeah.

17    Q.  And you saw where there were numerous

18  reports of a history of migraine headaches

19  preceding the event at Sam's; true?

20    A.  She did have a -- she reported headaches.

21  But the ones that I'm referring to were the ones

22  described as posttraumatic headaches from her

23  neurologist.

24    Q.  Well, let me ask it this way:  Did your

25  independent review of Ms. Hills -- well, did you

Page 20

1  have her prior records?

2    A.  I had her records.  Yeah.

3    Q.  Did you have records predating the October

4  event?  October 2016?

5    A.  No.

6    Q.  So you didn't have her prior records?

7    A.  I had her -- I mean, prior obviously to my

8  evaluation, but not prior to the accident.

9    Q.  And perhaps I should be more precise.  You

10  were not provided and as we sit here today, you

11  have not reviewed Ms. Hills' medical records that

12  predate the event the Sam's; true?

13    A.  True.

14    Q.  And so kind of back to my other question.

15  As to the severity and frequency of her prior

16  migraine headaches, you have no independent way of

17  knowing that; true?

18    A.  Other than what she said.  Correct.

19    Q.  Other than what the plaintiff in this

20  lawsuit has told you, you have no way of knowing

21  her history of migraines that predate the event at

22  Sam's; true?

23    A.  To the extent that I didn't review records

24  showing that.  Correct.  And then prior to the

25  fall.

Page 21

1    Q.  Okay.  And so, back to my question then.

2  Other than what she told you, you have no basis for

3  any -- well, are you offering an opinion that her

4  headaches were worse after the event at Sam's?

5    A.  Yes.

6    Q.  And that's based on what she told you?

7    A.  And the medical records showing that she has

8  a new kind of headache, a posttraumatic headache.

9    Q.  Well -- but you don't know what was going on

10  before; right?

11    A.  Headaches.  I mean --

12         MS. PESCHEL:  Objection to form.

13  BY MR. PAYNE:

14    Q.  But migraine headaches?

15    A.  Correct.

16    Q.  Okay.  I mean, I didn't -- I'm not sure if I

17  brought her prior records.  But I'll represent to

18  you, her prior records do reference migraine

19  headaches within the few years leading up the event

20  at Sam's.

21         Do you have any reason to disagree with

22  that?

23         MS. PESCHEL:  I'm going to object

24         to the form of the question, because I

25         have the records here, and I don't want

**Page 22**

1   the witness to be misled because when I
2   looked at them, I didn't see anything
3   where she's complaining of migraines in
4   any of those prior records.
5        MR. PAYNE:  Okay.  Well --
6        MS. PESCHEL:  Only on the History
7   section, like, in her current records,
8   if that makes sense.  Like, there's a
9   medical history of the patient.
10       MR. PAYNE:  That says history of
11  migraine headaches.
12       MS. PESCHEL:  But there's no
13  treatment.
14       MR. PAYNE:  Okay.  Well, there is
15  treatment in her prior records; right?
16  You agree with that?
17       MS. PESCHEL:  For migraines?  For
18  migraines?
19       MR. PAYNE:  Yes.
20       MS. PESCHEL:  I did not see any
21  treatment for migraines.
22       MR. PAYNE:  Okay.  You didn't see
23  at least three references to migraine
24  headaches predating this accident?
25       MS. PESCHEL:  I saw her go in with

**Page 23**

1        complaints of headaches and have
2        sinusitis I had her go in, and complain
3        of headaches, and diarrhea, and they
4        said it was a viral infection.
5             Can we go off the record and
6        give the prior records to the doctor?
7             MR. PAYNE:  Well, no.  We are here
8        to discuss what his opinions are today;
9        okay?
10  BY MR. PAYNE:
11       Q.  You have not reviewed her prior records;
12  right?
13       A.  Prior to the fall.  Correct.
14       Q.  Yeah.  You don't know what she reported to
15  her doctors about migraines or not migraines based
16  on anything other than what she told you; right?
17       A.  True.
18       Q.  She sold you they were more severe after the
19  event at Sam's, but you have no way of
20  independently verifying that based on what you've
21  received up to today; true?
22       A.  True.
23       Q.  But even she told you that she had at least
24  a decade-long history of headaches before any event
25  at Sam's; true?

**Page 24**

1        A.  True.
2        Q.  And you're not -- you have not reviewed any
3   objective testing that shows any way -- well, have
4   you observed any objective testing that supports
5   her complaints of migraine headaches?
6        A.  Short answer is no.  I mean, migraine
7   headaches for the most part -- there's, you know,
8   it's a subjective complaint.  You know, a brain MRI
9   will not tell you somebody -- it depends; right?
10  Some MRI showings can show you -- point a
11  differential diagnosis of a headache; right?  But,
12  you know, it's not 100 percent specific for that.
13       Q.  Let's talk a little bit about that.  You
14  characterized a migraine as a subjective complaint.
15  Can you explain to the ladies and gentlemen of the
16  jury what you mean by subjective?
17       A.  Subjective means something that the patient
18  is telling you.
19       Q.  And versus -- what does objective mean?
20       A.  Objective is something that you can measure.
21       Q.  And --
22       A.  Or, you know, independently verify
23  basically.
24       Q.  Okay.  Yeah.  So in this instance, and in
25  most instances unless you see some lesion, or, you

**Page 25**

1   know, something pretty traumatic, or important, or
2   significant, you're not typically going to find an
3   objective independent verification of a migraine
4   headache; correct?
5        A.  For the most part.  Correct.
6        Q.  All right.  And so, you have to rely on the
7   patient to tell you that they're having a migraine
8   headache; right?
9        A.  Right.
10       Q.  And so, any diagnosis of a migraine
11  headache, in this instance, is based only on what
12  Ms. Hills has told you and told her other medical
13  providers; true?
14       A.  True.
15       Q.  All right.  So we have to rely on Ms. Hills'
16  subjective complaints to support a diagnosis a
17  migraine headaches; true?
18       A.  True.
19       Q.  And if she is mistaken or otherwise wrong,
20  then that diagnosis cannot be supported; true?
21            MS. PESCHEL:  Form.
22            THE WITNESS:  If she is mistaken as
23       to what?
24  BY MR. PAYNE:
25       Q.  As to whether she is actually having a

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020

Pages 26..29

Page 26

1  migraine headache.
2     A.  I mean, in the event that she's not being
3  truthful about her symptoms, you know, that would
4  be a problem.
5     Q.  Right.  It would be a problem -- you cannot
6  offer an accurate diagnosis if someone is not
7  accurate about their symptoms?
8     A.  True.
9     Q.  And if someone says that their symptoms are
10 worse after a particular event, you have no way of
11 independently varying that; true?
12    A.  In this case, it would be tough.  I mean, I
13 would rely on her verbalization of her symptoms.
14 Right.
15    Q.  Well, and did you review her emergency room
16 records?
17    A.  From the date of the accident?  I have
18 Baylor, Scott & White notes.
19    Q.  Okay.
20    A.  Here.
21    Q.  And did you have an opportunity to review
22 those?
23    A.  Yes.  I reviewed those records.
24    Q.  Okay.  And according to the history of
25 present illness, what was her primary complaint on

Page 27

1  the date of this event at the Sam's Club?  Was it
2  shoulder pain?
3     A.  I got to find that document.
4     Q.  All right.
5     A.  Hold on.  If you have it there, and you want
6  to provide it, it'll make it faster.
7     Q.  You know, and again, unfortunately I only
8  brought my summary.
9     A.  Okay.
10    Q.  I did not bring -- well, I may actually have
11 brought the ER record.  Let me see.
12    A.  Okay.
13    Q.  No, I don't.  It's October 13, 2016 from
14 Baylor Scott & White.
15    A.  The date of the accident you're talking
16 about; right?
17    Q.  Yes.  And the date of that record.  And I
18 think buy Baylor Scott & White goes backward if
19 that's -- you know what I mean?
20    A.  Let me try to find it.  Hold on.  I need to
21 be sure.  October 13, 2016; correct?
22    Q.  Yes, sir.
23    A.  Yeah.  And your question was?
24    Q.  What was her primary complaint when she
25 appeared at the Baylor Scott & White Emergency

Page 28

1  Room?
2     A.  Okay.  I'm looking at the document Bate
3  Stamped at the bottom, PLTF00029.  Okay.  It says
4  here, chief complaints patient presents with
5  shoulder pain.
6     Q.  Okay.  And do you see on there where she
7  denied hitting her head?
8     A.  Yes.
9     Q.  Do you see where she denied losing
10 consciousness?
11    A.  Yes.
12    Q.  Do you see where she denied hitting her
13 shoulder or neck directly?
14    A.  Yes.
15    Q.  Then it is noted that she had small
16 abrasions on her foot and ankle.  Do you see that?
17    A.  Yeah.
18    Q.  And so, do you see anything in the emergency
19 room record referencing a blow to the head or any
20 reference to headaches?
21    A.  It says here, a few hours later she reports
22 bilateral neck stiffness and muscle soreness.  And
23 there's a history here (witness indicating) of
24 migraine headaches.
25    Q.  A history of migraine headaches; right?

Page 29

1     A.  Yeah.
2     Q.  But no report of a -- no current complaint
3  of headaches; true?
4     A.  Let me double-check here.  Almost done
5  here.
6     Q.  Sure.
7     A.  Yes.  You're correct about that.
8     Q.  And just so we are clear:  You've now had
9  the opportunity to review the emergency room
10 record.  The primary complaint is shoulder pain;
11 true?
12    A.  True.
13    Q.  She denies hitting her head or losing
14 consciousness; correct?
15    A.  Correct.
16    Q.  She denies hitting her shoulder or neck
17 directly; correct?
18    A.  True.
19    Q.  And there -- she does tell the folks at the
20 emergency room about her history of migraine
21 headaches; true?
22    A.  True.
23    Q.  But she is not reporting any new headaches
24 on the date of the accident; correct?
25    A.  Correct.

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                Pages 30..33

| Page 30 | Page 32 |
|---|---|
| 1    Q.  And then, if you can turn to October 17, | 1  anything like that; true? |
| 2  which I think is her next visit to Baylor Scott & | 2     A.  True. |
| 3  White. | 3     Q.  And no loss of consciousness; correct? |
| 4     A.  I'm here (witness indicating). | 4     A.  Correct. |
| 5     Q.  And do you see where she specifically denies | 5     Q.  And no films made of the head?  Any type of |
| 6  headaches in that record? | 6  x-ray, or MRI, or CT scan; true? |
| 7     A.  Hold on.  I see it. | 7     A.  True. |
| 8     Q.  All right.  And it also reports that her | 8     Q.  All right.  You reference in the History and |
| 9  neck has no midline or bony tenderness with a good | 9  Summary posttraumatic headaches.  Why -- what is |
| 10  range of motion.  Do you see that? | 10  the basis of your characterization of her headaches |
| 11     A.  In the Physical exam section? | 11  as being posttraumatic? |
| 12     Q.  I'm not sure where.  I think so. | 12     A.  Partly it's her treating neurologist |
| 13     A.  Let me see.  I see in review of symptoms, | 13  categorized it as that.  But independently, it is a |
| 14  positive for arthrology as in neck pain, but you're | 14  posttraumatic headache because may not immediately |
| 15  saying limitation of range of motion? | 15  after the fall, but progressively thereafter she |
| 16     Q.  Again, and I apologize for not bringing that | 16  did develop headaches after that fall. |
| 17  record today.  I'm just -- my Summary reflects good | 17     Q.  Well, let me ask you this:  We -- based on |
| 18  ROM next to neck or denial of neck tenderness. | 18  our own medical records that you have looked at, |
| 19     A.  I see it. | 19  she's got a history of migraines; right? |
| 20     Q.  Okay.  And they -- | 20     A.  Yes. |
| 21     A.  However -- I'm sorry to interrupt.  It says | 21     Q.  She has no blow to the head on the date of |
| 22  she exhibits spasms in her neck. | 22  the accident; right? |
| 23     Q.  Okay.  And they did an x-ray on her left | 23     A.  Right. |
| 24  wrist; correct? | 24     Q.  No subjective complaints of headaches on the |
| 25     A.  Yes, sir. | 25  date of the accident; right? |

| Page 31 | Page 33 |
|---|---|
| 1     Q.  And that appears to be her primary complaint | 1     A.  True.  Well, she did have neck pain in that |
| 2  that day; true? | 2  one. |
| 3     A.  And -- | 3     Q.  Okay. |
| 4            MS. PESCHEL:  Objection. | 4     A.  Sometimes that can take time before it |
| 5            THE WITNESS:  And neck pain.  Yeah. | 5  starts. |
| 6  BY MR. PAYNE: | 6     Q.  Well, I understand.  But no migraine |
| 7     Q.  But they don't x-ray, they don't MRI, they | 7  headaches are reported either on the accident, or |
| 8  don't do anything in terms of tests or films of her | 8  three or four days later; right? |
| 9  neck on that day; true? | 9     A.  Not immediately after the accident. |
| 10     A.  Correct. | 10  Correct. |
| 11     Q.  And they certainly don't do anything with | 11     Q.  All right.  And so, I understand you're |
| 12  respect to her head in terms of testing; true? | 12  saying that a neurologist characterized them as |
| 13     A.  Correct. | 13  posttraumatic headaches, but I'm asking you.  Do |
| 14     Q.  Now, those records on the date of the | 14  you have an independent basis of -- an opinion, if |
| 15  accident and a few days following the accident, are | 15  you're offering that opinion, that her headaches |
| 16  those consistent or inconsistent with an | 16  are posttraumatic as opposed to these ongoing |
| 17  aggravation of her migraine complaints? | 17  issues she has with migraines? |
| 18     A.  The question is did the records that we just | 18     A.  Posttraumatic.  That's my opinion. |
| 19  talked about, are they consistent with -- | 19     Q.  Based on what?  What are you basing that on? |
| 20     Q.  Or inconsistent with a -- some type of | 20     A.  Well, the fall.  Again, it doesn't have to |
| 21  aggravation of her issue with migraines? | 21  happen immediately after the injury.  However, the |
| 22     A.  So she didn't develop any worsening | 22  course of -- and again, as we established, I don't |
| 23  headaches or migraine headaches after -- | 23  have her prior records before the fall. |
| 24  immediately after the fall. | 24            But according to her history and the |
| 25     Q.  And there was no blow to the head or | 25  nature of her condition dramatically changed after |

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                Pages 34..37

Page 34

1   that fall.  So that's why I'm attributing the
2   diagnosis of posttraumatic headache to the fall.
3      Q.  Okay.  Based on what she said happened?
4      A.  Yes, sir.
5      Q.  Okay.
6      A.  And again, the medical records and the
7   change of her pathology afterwards.
8      Q.  But again, headaches are what she says;
9   right?
10     A.  She has headaches.  Yeah.
11     Q.  Okay.  Ms. Hills; reported to you, she
12  reported to her neurologist, she did not report to
13  the ER physicians, but reported to those folks that
14  her headaches became worse after this fall; true?
15     A.  Hmm-hmm.  Yeah.
16     Q.  And nothing else supports her headaches
17  becoming worse after this fall other than her
18  saying that to her healthcare providers; true?
19     A.  True.
20            MS. PESCHEL:  Objection to form.
21            THE WITNESS:  Right.
22  BY MR. PAYNE:
23     Q.  And so, the sole basis that you're relying
24  on from your review of the records, the neurologist
25  is relying on is what Ms. Hills said happened as

Page 35

1   far as her headaches becoming worse; true?
2      A.  Yeah.  Again, my opinion is based on her
3   saying that her -- and what she told her treaters
4   that her headaches worsened.  Yeah.
5      Q.  And if she is mistaken, or wrong, or is not
6   being candid, then that diagnosis is misplaced;
7   true?
8      A.  It's possible.  Yeah.
9      Q.  All right.  So moving on under your analysis
10  of findings.  And we have kind of talked about this
11  as well.  You offer a diagnosis -- three diagnoses:
12  Posttraumatic headaches, posttraumatic cervical
13  radiculopathy, and posttraumatic disc herniations
14  at three levels.  Do you see that?
15     A.  Yeah.
16     Q.  We've already talked about the posttraumatic
17  headaches that your opinion relies solely on what
18  Ms. Rose -- pardon me -- Ms. Hills said; true?
19     A.  True.
20     Q.  What about -- what is the basis of your
21  diagnosis that Ms. Hills has cervical
22  radiculopathy?
23     A.  On her history, her neck pain was shooting
24  down the arms, and there's a cervical MRI showing
25  the herniations at C5-6, C6-7, T1.  I'm sorry.

Page 36

1   C5-6, C7-T1, and T1, and T2.
2      Q.  And have you reviewed those actual films?
3      A.  No.  I saw the reports.
4      Q.  You rely on the radiology report?
5      A.  I do.
6      Q.  Okay.
7      A.  In this case, I do.
8      Q.  All right.  As far as whether those
9   herniations resulted from the event in question or
10  were preexisting degenerative conditions, do you
11  have any way of knowing?
12     A.  Yeah.  My opinion is that they were caused
13  by the fall.
14     Q.  What is the basis of that opinion?
15     A.  The fact that, you know, multiple disc
16  herniations after a traumatic event with reports of
17  neck pain, and having physical exam findings of,
18  you know, neck tenderness and spasms.  And within a
19  reasonable degree of medical probability, that's my
20  opinion.
21     Q.  But again, it relies on her saying that she
22  had neck pain following this event; true?
23     A.  Yes.  I mean, these herniations are
24  symptomatic in her case.  Correct.
25     Q.  Well, in -- I mean, are thoracic herniations

Page 37

1   typically related to any type of trauma?
2      A.  They can be.  Yeah.
3      Q.  But as to here -- as I understand it, you
4   are relying on the radiology report, which notes
5   herniations.  Your opinion that they resulted --
6   that those herniations that are reflected or
7   reported relate to this particular event, as
8   opposed to two car wrecks, being punched in the
9   face, ordinary disease of life, and degeneration.
10  The reason you distinguish it and say it was from
11  this accident is based only on what she told you;
12  true?
13     A.  No.  And the medical records as well.
14  Right.  She did report neck pain, stiffness.  She
15  had, you know, a physical exam that showed she had
16  neck pain and spasms.  So those things have --
17     Q.  So what she told you and what she told her
18  medical providers; true?
19     A.  True.
20     Q.  Is that --
21     A.  And part of the physical exam that is an
22  objective finding is palpating for spasms.  Right.
23  So --
24     Q.  But as to what those spasms resulted from,
25  any relationship to this event versus these other

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020
Pages 38..41

**Page 38**

1   events that she reported to you, it relies solely
2   on her saying that it came from this fall; true?
3        MS. PESCHEL:  Objection to form.
4        THE WITNESS:  To the extent that
5        the emergency room, you know, from the
6        fall reported those symptoms.  Yes.
7   BY MR. PAYNE:
8        Q.  Well, you just read the ER record.  Didn't
9   she in fact even after the event occurred, she left
10  home, and took a nap, and then decided go back to
11  the emergency room.  Did you say that in there?
12       A.  What date are we talking about?
13       Q.  The initial emergency room visit.  She did
14  not feel bad -- I'll just read from it from
15  nurses's notes.  She did not feel bad at first, but
16  realized at home that she feels hurt.
17            Do you see that in there?
18       A.  I got to find it.
19       Q.  Okay.  I'll tell you what, let's keep
20  moving, if you don't mind.
21       A.  All right.
22       Q.  Certainly the event at the Sam's Club did
23  not necessitate -- based on history and your review
24  of the record any paramedics come to the scene;
25  true?

**Page 39**

1        A.  I don't recall that.
2        Q.  She wasn't transported by ambulance;
3   correct?
4        A.  Correct.
5        Q.  She reported -- I'll represent to you that
6   she reported that she actually left on her own,
7   went home, took a nap, and then realized she
8   decided she wanted to go to the emergency room.
9   That's reflected in that ER record.  Do you have
10  any reason to disagree with that?
11       A.  If you represent it, I'll believe you.
12       Q.  All right.  And as far as any prior neck
13  complaints, you have not reviewed any record
14  predating the October event at Sam's; true?
15       A.  True.
16       Q.  Nor have you reviewed any films, if they
17  exist, of any -- for her that predate the event at
18  Sam's; true?
19       A.  Correct.
20       Q.  All right.  As far -- well, really part
21  three of your diagnoses really relates to part two.
22  You're saying she has disc herniations, but you're
23  relying only on the radiology report that reports
24  of herniations; true?
25       A.  Correct.

**Page 40**

1        Q.  You did not make an independent review of
2   the films to offer that opinion; true?
3        A.  Correct.
4        Q.  Now, you go on to say that her impairments
5   are permanent.  What is the basis of that opinion?
6        A.  The fact that she persists with the symptoms
7   of, you know, neck pain, cervical radiculopathy,
8   posttraumatic headaches that are chronic in nature,
9   despite treatment.  You know, that's why my opinion
10  is that she has a permanent impairment.
11       Q.  But as far as whether she already had a
12  permanent impairment from her history of migraine
13  headaches -- we've already discussed this, you have
14  no way of making that distinction; true?
15       A.  I'm sorry.  Can you repeat that?
16       Q.  You cannot say, based on a reasonable degree
17  of medical certainty, that she was not already
18  permanently impaired given her history of migraine
19  headaches; true?
20       A.  I can.  No, I can.
21       Q.  Based only on what she told you?
22       A.  Yes.  And again, the medical records --
23  you're right, I didn't review the medial record
24  prior, but based on the records I reviewed and her
25  history.  Yes.

**Page 41**

1        MS. PESCHEL:  And if we are going
2        to go down there, I have them sitting
3        right here.  I was just provided the
4        previous records last night at about
5        5:30.  If we could go off the record, he
6        can peruse them real quickly.
7        MR. PAYNE:  Okay.  Well, let's
8        continue on.  And if you want to do that
9        with your direct, that's fine.
10       MS. PESCHEL:  That's fine.
11  BY MR. PAYNE:
12       Q.  All right.  Let's shift gears and talk about
13  kind of what I would characterize as part two of
14  your opinions.  And that is the life care plan.
15  You have offered a life care plan in this case;
16  correct?
17       A.  Yes, sir.
18       Q.  And as it relates to the life care plan,
19  what is your opinion that you're offering to the
20  jury or opinions?
21       A.  You're talking about the specific -- the
22  cost of future care?
23       Q.  Well, I mean whatever they are.  Tell me
24  what your opinions are in terms of what Ms. Hills
25  needs in the future.

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 42..45

**Page 42**

1   A.  Okay.  So regarding the future needs of Ms.
2   Hills -- I'm looking at page -- I did two types of
3   care, one more conservative and one less
4   conservative.  I'm looking at page 8 of 12.  Let me
5   know when you're there.
6   Q.  Okay.
7   A.  So future care would be neurology visits at
8   least three times per year.  Then the
9   Dihydroergotamine medications at least twice a
10  week, Emgality medication one per a week, Reglan
11  (ph) 10 milligram once a week, Naratriptan 40
12  milligrams every night, and a cervical MRI one time
13  every five years.
14          The other option for her would be the same
15  thing, but to treat her headaches also with
16  bilateral greater and lesser occipital nerve blocks
17  two times a year.
18  Q.  Now you understand -- well, do you
19  understand whether Ms. Hills has glaucoma?
20  A.  Yes, sir.
21  Q.  Would you still recommend occipital nerve
22  blocks to someone who has glaucoma?
23  A.  Yeah.  When you do the -- part of the reason
24  -- she was told not to get cervical epidural
25  steroid injections.  She went to the doctor because

**Page 43**

1   steroids can aggravate the glaucoma.  But when you
2   do occipital nerve blocks, you can do them with
3   steroids.  Personally, I use local anesthetics
4   only.  I don't use steroids.  So it shouldn't be a
5   concern.
6   Q.  But again, as to whether this future care
7   resulted from or relates to the event at Sam's
8   Club, we talked about this several times now, is
9   based on what she told you and what she told her
10  other medical providers; true?
11  A.  True.
12  Q.  As far as -- help me understand -- are you
13  recommending that she take two different
14  high-dollar migraine medications all at once?
15  A.  You're talking about the medications that I
16  recommend?
17  Q.  Yeah.
18  A.  That's the regimen.  Yeah.  The regimen that
19  I recommended here.  Correct.
20  Q.  And as I generally understand it, this --
21  how do you say it?  Emgality?
22  A.  Yeah.
23  Q.  Emgality.  That's a drug that just received
24  FDA approval within the last couple of years;
25  right?

**Page 44**

1   A.  I don't recall exactly.
2   Q.  Pretty recently.  It's a pretty expensive
3   drug?
4   A.  I list the price here, $8,280 per year.
5   Q.  Okay.  Are there migraine medications
6   available that are priced less than what you list
7   as 8,000 per year?
8   A.  It's possible.  Yeah.
9   Q.  And likewise, the Dihydroergotamine -- and
10  I'll give that to you -- which I think it goes --
11  what's its trade name?  Which is certainly easier
12  to say.
13  A.  Trade name?  I don't recall that one.
14  Q.  It's something like migratol (ph) or
15  something?
16  A.  No.
17  Q.  That doesn't ring any bells?
18  A.  No.
19  Q.  Are you familiar with that medication?
20  A.  The Ergotamine family.  Yeah.
21  Q.  I'm sorry.  Which family?
22  A.  Ergotamine family.  Yeah.
23  Q.  Okay.  And why did you choose that
24  particular drug that costs $5,000 a year?
25  A.  She was taking it.

**Page 45**

1   Q.  Okay.  Did you plug in those medications for
2   any reason other than she had taken those two drugs
3   in the past?
4   A.  And they work.  Yeah.
5   Q.  Well, she said they worked; right?
6   A.  Yeah.
7   Q.  Okay.  Is that the sole basis for you using
8   those drugs?
9   A.  Yes, sir.
10  Q.  Okay.  There are other drugs -- migraine
11  drugs that you could have put into your life care
12  plan; true?
13  A.  Yes.  However, she did try others and she
14  failed, like, Tripheinze (ph), Lyrica.  So the
15  regimen she is on right now, you know, she is not
16  headache-free, but it's -- to a certain extent,
17  it's working for her.
18  Q.  And you are reporting that she will continue
19  to need that for her entire life span; right?
20  A.  Yes.
21  Q.  And you have not discounted it for present
22  value; true?
23  A.  True.
24  Q.  And you have not accounted for the fact that
25  new drugs often fall in price as they're replaced

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 46..49

Page 46

1  by other new drugs; correct?
2      A.  It's possible.  Yeah.
3      Q.  So it's certainly possible that this
4  Emgality will not continue to cost, as you put it,
5  $8,200 a year, but will reduce in price over time;
6  true?
7      A.  Well, it's possible.  Yeah.
8      Q.  Well, based on -- I mean, you're a pain
9  doctor in part.  You're familiar with pain
10  medications.  Do prices go down over time as
11  different drugs come in and out of style?  For lack
12  of a better phrase.
13      A.  Now, it's possible.  But again, there are
14  examples of -- I mean, you might have heard a
15  medication for -- I think it was tuberculosis.
16  Some company bought that particular drug, and then
17  they raised the prices, and --
18      Q.  And he went to jail.
19      A.  No.  That was somebody else.  But, you know,
20  so is it possible that new medications will come
21  and compete with this one?  Driving the price down
22  is possible.  Yeah.
23      Q.  Okay.  And just so we are clear:  Your
24  opinion as to Ms. Hills' future need of
25  pharmaceutical drugs, one number, does not consider

Page 47

1  present value of the future needs of those drugs;
2  true?
3      A.  No.  When you said present value, I did not
4  adjust it -- I used today's dollars.
5      Q.  Okay.  And that is in part what I'm asking.
6  And let's be clear about all of those points.  You
7  did not adjust your figure for present value for
8  the future need of these drugs; true?
9      A.  True.
10      Q.  And likewise, you did not consider that
11  those drugs may change in price over time; true?
12      A.  I did not make that calculation.  Correct.
13      Q.  And your inclusion of these drugs is based
14  only on the fact that she has used them in the past
15  with some success; correct?
16      A.  Correct.
17      Q.  And her need for those drugs, it may change
18  over time; correct?
19      A.  It's possible.  She may need more.
20      Q.  She may need more or she may need less?
21      A.  It's possible.
22      Q.  All right.  And as far as the -- well, the
23  need of a cervical MRI, you're saying she needs one
24  every five years?
25      A.  Yes, sir.

Page 48

1      Q.  What is -- why do you -- how do you arrive
2  at that opinion?
3      A.  So this is a conservative life care plan;
4  right?  I mean, you could make the argument that
5  she was a candidate for the epidural steroid
6  injection, which wasn't done because of her
7  glaucoma.  However, there are other kinds of
8  injections and therapy.  She may be a candidate for
9  or such as cervical radial nerve branch blocks,
10  cervical radiofrequency lesioning.  I'm not a
11  surgeon, but it's possible that she might need
12  surgery in the future.  Spinal cord stimulator
13  trials, implants, and all of that stuff, I didn't
14  include that in here (witness indicating).  But at
15  the very least, to monitor the condition of her
16  cervical spine once every five years.
17      Q.  And you price the cervical spine that she'll
18  need -- or pardon me.  Cervical MRI that she'll
19  need every five years at $590.80; true?
20      A.  I'm sorry.  What?
21      Q.  You priced the cervical MRI at an average
22  annual cost of $590.80.  True?
23      A.  You changed the page on me.  It's 5 -- yeah,
24  you're right, $590.80.  Yeah.
25      Q.  Okay.  And in fact, the cervical MRI that

Page 49

1  Ms. Hills had in this instance was done --
2      A.  Could I interrupt you for a second?
3      Q.  Of course.
4      A.  The MRI cost is $2,954.  So what you're
5  looking at is a different table that divides it by
6  five years.
7      Q.  Well, how much are you suggesting or opining
8  that the cervical MRI is going to cost?  Each one
9  of them?
10      A.  $2,954.  And that's page 8 of 12.
11      Q.  Oh.  Okay.  So you're actually saying that
12  the cervical MRI will cost almost $3,000?  I guess
13  I did misread your table.  You're saying the MRI
14  costs that much?
15      A.  Yes, sir.
16      Q.  Has that been your practice and experience
17  that they actually cost that much?
18      A.  I've seen higher than that.
19      Q.  Well, did you look at what she was actually
20  billed in this case for a cervical MRI that she did
21  have?
22      A.  I don't recall that.
23      Q.  It isn't -- you do have the billing records
24  though; right?
25      A.  I think so.

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020          Pages 50..53

**Page 50**

1    Q.  All right.  I will hand you what I will mark
2  as Exhibit Number 2.
3    A.  Okay.
4              (Exhibit No. 2 was marked for
5         identification.)
6  BY MR. PAYNE:
7    Q.  Did Ms. Hills undergo a cervical MRI in this
8  instance?
9    A.  Yes, sir.
10   Q.  And when was that done?
11   A.  I have here November 25, 2016.
12   Q.  And what was she initially charged for that
13  cervical MRI?
14   A.  $352.
15   Q.  All right.  And what did the provider
16  ultimately accept in satisfaction for having that
17  cervical MRI done?
18       MS. PESCHEL:  Do you have both
19          sides of the bills?
20       MR. PAYNE:  I don't know what that
21          means.
22       MS. PESCHEL:  Scott White bills
23          facility charge and doctor charge.  So
24          if you only have one of them, that's not
25          the full charge of the MRI.

**Page 51**

1        MR. PAYNE:  Okay.
2        THE WITNESS:  So to answer your
3          question $111.25.
4  BY MR. PAYNE:
5    Q.  And so, your opinion as to future cervical
6  MRIs did not account the actually -- and if I have
7  a misrepresentation, either way your number doesn't
8  account for what she was actually billed in this
9  case; true?
10   A.  That number is the average of, you know, the
11  region for that.
12   Q.  And we'll get to that.  But your number does
13  not consider what she was actually billed; true?
14   A.  It does consider it.  Yeah.
15   Q.  No.  What was actually billed for this
16  charge.
17   A.  Well, the database I use looks at all bill
18  charges in that region.
19   Q.  We're going to get to this.  But in this
20  instance, this particular bill, do you know what
21  she was billed in this case for her cervical MRI?
22   A.  Yeah.  $352.  Yeah.
23   Q.  And do you -- and you did not consider your
24  actual bill in offering an opinion as to what it
25  will cost her in the future to have more cervical

**Page 52**

1  MRIs done; true?
2    A.  True.  Because I used the database that
3  includes bill charges from Baylor Scott & White.
4    Q.  And likewise, did you see what she was
5  billed for the Emgality?  And what she was actually
6  billed for that medication?
7    A.  I don't recall that.
8    Q.  Okay.
9        MR. PAYNE:  Let me hand you what
10         I'll mark as Exhibit 3.
11             (Exhibit No. 3 was marked for
12         identification.)
13  BY MR. PAYNE:
14   Q.  What do you have as the price per dose of
15  the Emgality?  What number do you plug in?
16   A.  Per year?  $8,280.
17   Q.  Well, per dose.
18   A.  So what I did was I usually look at the cost
19  of the total 120 milligrams, and then look at the
20  cost for that for the whole year.  So I guess you
21  can divide that by 12.
22   Q.  And what's your number again?
23   A.  The -- can divide it if you want.  So if you
24  divide it by 12, it's $690 a month.
25   Q.  Okay.

**Page 53**

1    A.  For the Emgality.
2    Q.  All right.  And I'm going to hand you
3  Exhibit 3, and show you, and represent to you these
4  are billing charges from a Walmart Pharmacy.  And
5  you see it was actually a little bit lower than
6  that.  What she was actually billed for that?
7    A.  She was billed $1,153.60.  Correct.
8    Q.  No.  Look at each dose.  120 milligrams,
9  they're each about 575.  That's like a triple dose
10  or a double dose?
11   A.  Oh, okay.  I see Emgality 120 milligrams per
12  millimeter injection $577.45.
13   Q.  And again, your life care plan does not
14  account for what she has actually been billed in
15  the past, just this input that you use or the
16  system that you use; true?
17   A.  True.
18   Q.  Okay.
19   A.  Can I get some water?  If you don't mind.
20   Q.  Of course.  Yeah.  Let's take a little
21  break.
22       THE VIDEOGRAPHER:  We are off the
23         record at 4:14 p.m.
24             (At this time, off the record.)
25             (At this time, back on the record.)

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 54..57

Page 54

1          THE VIDEOGRAPHER:  Standby.  We are
2     back on the record at 4:16 p.m.
3  BY MR. PAYNE:
4     Q.  All right.  Dr. Miranda, are you ready to
5  continue?
6     A.  Yes, sir.
7     Q.  All right.  Dr. Miranda, the -- let's talk
8  about how you arrived -- you talked about an
9  average.  How do you arrive at the annual costs for
10  each of the medications and the other treatment
11  that you have recommended for Ms. Hills?
12     A.  I used it -- for the medications, I used
13  GoodRX.  For the neurology visits, I have the MRI.
14  I used a database called Fairhealth.org, the same
15  thing for the injections, occipital nerve blocks.
16     Q.  All right.  So as far as GoodRX --
17  interestingly, I just happened upon a website
18  called GoodRX, and I'll mark this as Exhibit 4.
19          And again, this is just what I looked up
20  yesterday, just kind of looking at this thing.  You
21  can see down here at the bottom, it says www.getrx,
22  and it actually lists a bunch of pricing for that
23  Emgality.  Do you see that?
24     A.  Yes, sir.
25          (Exhibit No. 4 was marked for

Page 55

1          identification.)
2  BY MR. PAYNE:
3     Q.  And then again, it processes it even lower
4  than what she's been paying, does it not?
5     A.  I don't know why they used here, but the
6  numbers here are -- well, you look at the retail
7  price, not looking at the free discount; right?
8  So, we don't use collateral sources when we do life
9  care plans.  So when I do use these numbers, I use
10  the estimated retail price.
11     Q.  Well, I'll tell you -- I'll represent to
12  you, all I did was type in cost of Emgality, and
13  that page popped up, and that pricing popped up.
14  Did you do something different?
15     A.  I put the area code for the patient.  That
16  would be the only different thing.
17     Q.  Okay.  At least based on what I've
18  represented to you that I did, that pricing is
19  different than what's reflected in your report for
20  what is Emgality pricing; true?
21     A.  True.
22     Q.  And as far as the --
23     A.  Mind you, it's not way off.
24     Q.  No.  It's not way off.  About 100 bucks a
25  pop off; right?

Page 56

1     A.  No, not even.  I mean, if you look at the
2  estimated retail price per dose, I divided my
3  number by 12.  It was 690.  I'm looking at the
4  estimated retail price from Walmart 658, CVS 787,
5  Walgreens 691, Kroger's 691, Target 680, Costco
6  676.  So it's there, you know, in the 600s.
7     Q.  Using the retail pricing; right?
8     A.  No.
9     Q.  You don't consider any discounts that are
10  readily available; right?
11     A.  Correct.
12     Q.  So your life care plan does not consider
13  either the discount reflected in Ms. Hills' own
14  records, nor does it reflect generally available
15  discounted pricing available on the Internet; true?
16     A.  True.
17     Q.  All right.  And as far as the
18  pharmaceuticals go, it's pretty simple what you
19  have done.  You have simply taken a retail price
20  for Emgality, and have assumed that Ms. Hills will
21  not change that medication -- well, first it
22  assumes her life span; right?
23     A.  Yes.
24     Q.  And then it assumes she will continue to
25  take that exact medication; right?

Page 57

1     A.  Sure.
2     Q.  And then it assumed that the price of that
3  medication will not change over the next, what is
4  it, 30 or 40 years?
5     A.  Whatever her life care plan is.  Yeah.
6     Q.  All right.  Okay.  Now, as far as the
7  medical treatment, what did you rely on as a basis
8  for your opinions?
9     A.  I'm sorry.  I don't understand the question.
10  You mean what database I use for --
11     Q.  Yes.
12     A.  So for the neurology visits, the cervical
13  MRI, and the occipital nerve blocks, I used a
14  database called Fairhealth.org.
15     Q.  But as far as the -- and I am not -- I mean,
16  obviously you're a professional and have a lot more
17  education than I do.  You know, you treat patients.
18  I'm not trying to belittle what you do.
19          What I'm saying is -- would you
20  agree with me that at least as far as offering an
21  opinion about the pharmaceutical pricing that Ms.
22  Hills can anticipate in the future, that doesn't
23  really require any of your medical background or
24  expertise, either as a life care planner or a
25  physician; right?

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020          **Pages 58..61**

Page 58

1   A.  The question is do I require medical
2   expertise in determining exactly what -- the
3   changes in costs in the future or --
4   Q.  Well, you -- as I understood what you did
5   here, you just got the retail price at GoodRX.com
6   for Emgality, and the one I can't say, and you have
7   assumed all of those things that she'll take it for
8   the rest of her life, and it won't change in price;
9   right?  Those opinions do not require your medical
10  expertise and they also do not require your life
11  care planner expertise; true?
12              MS. PESCHEL:  Objection.  Form.
13              THE WITNESS:  I mean, as a life
14          care planner, they train us to look up
15          pricing; right?  So, I mean, it does
16          require that part of the background.
17                  As far as the medical
18          component and recommendations,
19          obviously, you know, my training and
20          expertise in these matters.
21                  As far as, you know,
22          determining if these numbers are going
23          to change, I don't know that for 100
24          percent sure.
25  BY MR. PAYNE:

Page 59

1   Q.  Yeah.  And you haven't offered that opinion;
2   right?
3   A.  What opinion?
4   Q.  That they'll change, that the pricing will
5   change?
6   A.  They might.  They might.  Yeah.  They might
7   change.
8   Q.  But your opinion assumes they're not going
9   to change; right?
10  A.  Well, my opinion -- again, I used today's
11  dollars.  I don't have a database telling me what
12  the price is going to be in the future.
13  Q.  All right.  So back to my original question:
14  Your opinion as to Ms. Hills' future pharmaceutical
15  costs is only based on you looking up the retail
16  price of those medications in today's dollars, and
17  assuming it for some period of time; true?
18  A.  Correct.
19  Q.  And would you agree that that does not
20  require expertise to offer that opinion either from
21  your medical background or your life care planner
22  background; true?
23              MS. PESCHEL:  Objection to form.
24              THE WITNESS:  Little confusing.  It
25          does require my medical background in

Page 60

1          terms that I -- you know, I'm
2          recommending a treatment for headaches
3          and full-out care.  And the life care
4          planning part comes in when we look at
5          the costing.  I mean, that's something
6          that they train us how to do.
7   BY MR. PAYNE:
8   Q.  But now you're not recommending treatment to
9   Ms. Hill, are you?
10  A.  Well, the treatment that I'm putting here.
11  Yeah.  She's not my patient, but the life care plan
12  is future treatment.
13  Q.  But let's be clear:  Are you making a
14  recommendation to Ms. Hills as to what she needs to
15  do in the future?
16  A.  That's what the life care plan is.  Yeah.
17  Q.  It's a recommendation to her?  Do you -- are
18  you comfortable doing that even though you're not
19  her treating physician?
20  A.  Again, she's not my patient.  But the
21  recommendations that I'm making, you know, they're
22  medical recommendations.
23  Q.  Okay.
24  A.  Knowing she's not my patient.
25  Q.  All right.  So we are clear on that:  You

Page 61

1   have not treated Ms. Hills in the past, you do not
2   intend to treat her in the future.  Are both of
3   those things correct?
4   A.  Correct.
5   Q.  You do not intend to monitor her
6   medications, monitor her condition, or do anything
7   of the kind; correct?
8   A.  True.
9   Q.  You do not consider her your patient and the
10  patient privilege does not apply here; true?
11  A.  True.
12  Q.  And so, maybe it's just the word
13  "recommendation" or you're recommending it.  Are
14  you truly asking her, or telling her to take this
15  course of action, or are you just simply saying if
16  she takes this course of action, it will cost X
17  dollars?
18  A.  Again, my recommendations are based on what
19  I -- on my training, and what I read in the
20  reporting, and this is what I feel she is going to
21  need in the future, and this is the associated
22  costs.
23  Q.  But are you telling her to do this in the
24  future?
25  A.  Well, I haven't had the conversation with

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020          **Pages 62..65**

**Page 62**

1  her. I mean, I submitted the report to the
2  attorneys and I would assume they would have showed
3  it to her; right?
4      Q. But, I mean, again in your capacity as a
5  non-treater, should you be treating her what to do
6  in the future?
7      A. I mean, this is a different context; right?
8  Because I'm not a treater. These are the
9  recommendations.
10     Q. Okay. And as to whether Ms. Hills has
11  continued to take the Emgality or the Dihydroergo
12  -- how do you say that?
13     A. Dihydroergotamine.
14     Q. Yeah. As to whether Ms. Hills has continued
15  to take those medications for the past six months,
16  do you know?
17     A. So I did review the records provided
18  recently. I'll tell you which one. It's Baylor
19  Scott & White neurology clinic. It's dated from
20  June 27, 2019 through October 10, 2019. And she
21  continued treating for her headaches. She reported
22  taking the OCPs, which I didn't include in the life
23  care plan, which were also working for her
24  headaches and --
25     Q. What are OCPs?

**Page 63**

1      A. Oral contraceptive pills.
2      Q. What -- oral what?
3      A. Contraceptive.
4      Q. Contraceptive?
5      A. Yeah.
6      Q. And am I thinking the same thing? We're
7  talking about a contraceptive pill? What does that
8  have to do with treatment here?
9      A. Yeah. It works for some kinds of headaches.
10  Yeah.
11     Q. Well, does it work for posttraumatic
12  headaches?
13     A. In her case it was. Yeah.
14     Q. Well, is it typically used to treat
15  posttraumatic headaches?
16     A. It depends on the response of the patient.
17  I mean, if it works.
18     Q. Is it routinely prescribed for that purpose?
19     A. The OCPs, no. It's -- to my understanding,
20  I believe it's an off-label prescription, you know,
21  an indication probably.
22     Q. Okay. So oral contraceptives are not on the
23  label prescribed for posttraumatic headaches; true?
24     A. Not that I recall.
25     Q. All right. So -- and I'm sure I do have

**Page 64**

1  those records, but I didn't see them leading up to
2  today. What -- did they show that she continued to
3  take the Emgality?
4      A. Let me double-check on that. Do you mind if
5  I look at this for a second?
6      Q. No. No. Not at all.
7      A. Yes, she was.
8      Q. And what about the other one? The
9  Dihydroergo --
10     A. Yeah.
11     Q. And what else is she taking?
12     A. Toradol, Reglan or Metoclopramide, Xalatan,
13  but that's for the eye, Cyclobenzaprine, Kurvelo.
14     Q. What -- can you help me understand what each
15  of these are prescribed for in her case?
16     A. Hold on a second. Do you mind? So the
17  Xalatan is an ophthalmic solution, the Emgality is
18  for the headaches, the Reglan is also for
19  headaches, the Dihydroergotamine also for the
20  headaches, Dihydroergot for severe headaches,
21  Cyclobenzaprine also works for headaches, and the
22  Kurvelo in this case is the contraceptive pill,
23  also works for headaches.
24     Q. Back to an earlier question. Can you
25  explain -- help me understand how your particular

**Page 65**

1  expertise is applied in offering an opinion that
2  Ms. Hills will need this expensive headache
3  medication for the duration of her life. How that
4  number relies on expertise as opposed to simply
5  looking up the price and multiplying?
6      A. I'm having trouble understanding the
7  question.
8      Q. Let me ask you -- yeah, I agree. It was
9  kind of convoluted. Let me start over.
10         How did you apply your expertise in
11  offering an opinion as to the price for the
12  migraine medication that Ms. Hills will need in the
13  future? How did you use your expertise?
14     A. So, the price, again, I looked that up, as
15  you said. Obviously, I mean, I don't know that by
16  heart. So I identified the medication that I think
17  she is going to need in the future, and I looked up
18  the price, and I extended that throughout her
19  lifetime.
20     Q. And based on what you just said, that does
21  not require your expertise to offer that opinion;
22  true?
23         MS. PESCHEL: Objection. Form.
24         THE WITNESS: I mean, it does
25  because I'm recommending the medication,

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                     Pages 66..69

Page 66

1         and the price that I found, and, you
2         know, doing the research for it.  So it
3         does.
4   BY MR. PAYNE:
5      Q.  And what is the basis that you're
6   recommending that medication?
7      A.  It's working for her headaches,
8   posttraumatic headaches.
9      Q.  All right.  The medical care itself.  You
10  rely on something called Fairhealth.org?
11     A.  The medical care -- you mean the injections,
12  neurology visits, and the cervical MRI price?  Yes,
13  sir.
14     Q.  All right.  As I think I've understood it,
15  what you do is you insert -- you get a subscription
16  to Fairhealth.org; correct?
17     A.  Yeah.
18     Q.  You insert the CPT codes, and you insert, I
19  think, a ZIP code, and Fairhealth will spit out a
20  number for you; right?
21     A.  Several.  Yeah.
22     Q.  Okay.  And that is the number that you use
23  in terms of filling out, or imputing, or preparing
24  your life care plan as far as what this medical
25  care is going to cost in the future; correct?

Page 67

1      A.  Yeah.
2      Q.  You do not rely on any other data source, or
3   other information, or other statistical data, or
4   anything other than Fairhealth.org in the procedure
5   that you use; true?
6      A.  True.
7      Q.  All right.  And as far as the particulars
8   that Fairhealth relies on in giving you that data,
9   can you explain to us how they arrive there?  How
10  they get there?
11     A.  So those are billed rates from providers in
12  that area from insurance companies, meaning
13  Medicare and private payers.
14     Q.  All right.  But as to the particular data,
15  where it comes from, the particular payors,
16  particular billers, how large a server they use, or
17  how large a sample they use, you do not know that
18  information; true?
19     A.  I don't have the, you know, the explanation
20  of benefits of each CPT code and service provider
21  from the providers in that area.  I don't have that
22  raw data.
23     Q.  And as I think I understand it, what -- the
24  number that is given to you is what is charged, not
25  what is accepted by a provider to perform that

Page 68

1   service; true?
2      A.  Correct.
3      Q.  All right.  And you agree generally -- it's
4   a fair, and true accurate statement that a medical
5   provider will accept less than what they charge for
6   any particular service; true?
7      A.  It's possible.  Depending on if they have a
8   contract or not.
9      Q.  And a particular -- a notal example of that
10  is the retail price that you have used for the
11  cervical MRI was $2,000 plus; right?
12     A.  Yeah.
13     Q.  And what Baylor Scott & White charged here,
14  at least according to that document, Exhibit 2, was
15  significantly less.  True?
16     A.  It was -- what they charged was $352 for the
17  cervical MRI.  Correct.
18     Q.  All right.  And so, are you bringing -- are
19  you applying anything independent based on your own
20  expertise as a life care planner and medical doctor
21  in offering those figures, are you simply relying
22  on Fairhealth.org?
23     A.  I'm relying on the database that determines
24  the cost of cervical MRIs, for example, in this
25  case in that region.

Page 69

1      Q.  And do you know if Fairhealth utilizes
2   different rates, like private insurance versus
3   Medicare versus Medicare versus workers' comp?  Do
4   you know if they utilize all of that information,
5   or any of it, or --
6      A.  They do use that information for the bill
7   charges, not the contracted rates.  Now Medicare
8   has their own website where they show you how much
9   they're paying in a given year.  And if you up a
10  private payer, I'm almost certain that that
11  information is priority.  I don't think they would
12  share that.  To my knowledge, I don't know if
13  there's a database for BlueCross, or private payers
14  in Texas.
15     Q.  But at least as far as the numbers you use,
16  you're relying only on Fairhealth.org and no other
17  database; correct?
18     A.  Correct.
19     Q.  And nothing -- no independent analysis or
20  investigation; true?
21     A.  I haven't done a survey of costs in that
22  area.  Correct.
23     Q.  And certainly, that amount is what you were
24  noting your opinion as to the charges in the future
25  is simply that it's the charges that might be

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 70..73

Page 70

1  anticipated; correct?
2     A.  Correct.
3     Q.  It's not what those providers would accept
4  in satisfaction for the services that they
5  provided; true?
6     A.  True.
7     Q.  And those, just like the pharmacy bills --
8  and we may have already addressed this.  None of
9  the charges, pharmacy or medical, do you reduce to
10  present value; true?
11     A.  True.
12     Q.  And likewise, your numbers do not reflect
13  that those charges may be higher in the future, or
14  lower in the future, or changed; true?
15     A.  True.
16     Q.  Did you visit with any of Ms. Hills'
17  treating doctors?
18     A.  No, sir.
19     Q.  Do you practice in Bell County?
20     A.  No.
21     Q.  And you recognized that the Fairhealth
22  website has a disclaimer on it that there are
23  limitations on its use; true?
24     A.  I believe there's something to that effect.
25  Yeah.

Page 71

1     Q.  And I'll hand you what I will mark as 5 and
2  6, I think.
3              (Exhibit Nos. 5 and 6 were marked
4              for identification.)
5  BY MR. PAYNE:
6     Q.  And I'll give you -- you can peruse it, and
7  then we'll talk about it in a second.
8     A.  I'm good if you want to ask.
9     Q.  I don't -- not reading it word for word, but
10  can you offer us just a general summary of kind of
11  the disclaimer that they made?
12     A.  So for health consumer website -- again,
13  mine is not consumer website because they have a
14  public one, and I'm part of the, you know, the
15  members of they're not for consumer public access
16  website, which -- in their website, they
17  specifically list life care planners as people that
18  are using the software.
19         So we acknowledge that much.  So it
20  considers to say, and your -- you can plan for this
21  thoroughly and provided solely for personal
22  consumer use, and not for any commercial
23  professional research, litigation, or other
24  purpose.
25     Q.  Do you know if your version has a disclaimer

Page 72

1  on it?
2     A.  I don't recall that.  But I do know for a
3  fact that, at least that last time I checked, they
4  have specific examples of how their database is
5  used by life care planners.  So they do acknowledge
6  that.
7     Q.  Would it be fair to summarize those
8  disclaimers as saying, we try really hard to be
9  accurate, but we can be off.  Is that fair?
10     A.  I mean, I -- you're saying here where does
11  it say that?
12     Q.  Well, I'm just saying is that a good summary
13  of that disclaimer?
14     A.  What I just read has nothing to do with what
15  you said.
16     Q.  Well, does their disclaimer suggest, at
17  least to the consumer, that you cannot or you
18  should use caution in relying on our data, because
19  while we try to be accurate, it can be inaccurate?
20     A.  Do you mind if I continue reading this?
21     Q.  Of course.
22     A.  So for Exhibit 6, that's the next page.
23  Okay.  Yes.  I see what you're saying.  Yeah.
24     Q.  And just generally speaking, is that an
25  accurate summary of essentially what that says?

Page 73

1     A.  So on Exhibit 6, it says, despite our
2  efforts, the information on this site may be
3  inaccurate, or incomplete, or out of date.  We make
4  no representation or guarantee that the information
5  on the site is complete, accurate, or current.
6     Q.  Do you know whether Ms. Hills missed any
7  work because of her headaches?
8     A.  I don't recall that.
9     Q.  Do you know if it affected her other daily
10  activities?
11     A.  I don't recall that.
12     Q.  Do you know what Ms. Hills medical expenses
13  have been in the past -- up to at least July of
14  2019?
15     A.  That, I don't recall.
16     Q.  I'll represent to you it's somewhere in the
17  neighborhood of $13,000 or at least according to
18  what's been provided to my office.
19         And just so I'm clear, you understand
20  that between 2016 and the middle of 2019, Ms. Hills
21  has incurred medical expenses totalling
22  approximately $13,000.  Do you understand that?
23     A.  If you represent that, I believe you.  Yes,
24  sir.
25     Q.  And your life care plan suggests that she

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020          Pages 74..77

**Page 74**

1   will require treatment totalling how much per year?
2       A.   Total, a lower number of $713,802 or a
3   higher number of $1,261,770.
4       Q.   And it looks like years of duration is 48.
5   So what is that annually?
6       A.   Hold on.  So annually it's $26,623.80.
7       Q.   All right.  And so, at least you're
8   projections of approximately 20 or $26,000 a year,
9   that has not been borne out by her last three years
10  of treatment; true?
11      A.   Are you saying incurred?
12      Q.   Yeah.
13      A.   Correct.  Yeah.
14      Q.   So three years -- let's say -- let's call it
15  12.  Well, yeah, just because we can divide 12
16  pretty easy by three.  So that's about 4,000 a year
17  that she's incurred in the past, plus -- and you're
18  suggesting, what, 20-something each year in the
19  future?
20      A.   $26,323.80.  Yeah.
21      Q.   All right.  Dr. Miranda, you -- again, we've
22  talked about you were hired by --
23      A.   I'm sorry.
24      Q.   Of course.
25      A.   This one was with the occipital nerve

**Page 75**

1   blocks, you know.  The other one was an average
2   annual cost of $14,907.80.  So that's -- the one we
3   just discussed was the higher number, and the one I
4   just said is the one without the occipital nerve
5   blocks.
6       Q.   And to date, are you aware of Ms. Hills
7   having any occipital nerve blocks?
8       A.   Not that I recall.
9       Q.   Okay.
10      A.   But it was said she was recommended Botox
11  injections, which might -- I don't recall doing
12  specific research, but it might be more expensive
13  than the occipital nerve blocks.
14      Q.   But again, kind of back to this theme, for
15  the past three years, Ms. Hills has not had any
16  type of occipital nerve blocks; true?
17      A.   Not that I recall.  No.
18      Q.   All right.  And you -- at least one of your
19  averages, the higher average, suggests that she
20  will need them annually for the next 48 years;
21  true?
22      A.   Yes.  Well, two.
23      Q.   Two per year?
24      A.   Yeah.
25      Q.   All right.  So again, you billed for your

**Page 76**

1   time.  You have billed The Carlson Law Firm $7,200?
2       A.   Yes.
3       Q.   And what is that for?  Is that just for the
4   life care plan?
5       A.   Yes.
6       Q.   And that includes a rush fee?
7       A.   Yes.
8       Q.   All right.  And then you billed -- do you
9   still bill $2,500 for your deposition?
10      A.   I did today.  Yeah.
11      Q.   All right.  And if -- and I'm about done.
12  So if it's two hours, you're not going to bill them
13  any more, are you?
14      A.   I don't anticipate doing so.
15      Q.   And have you been asked to appear at trial
16  in this case?
17      A.   I don't recall that, but if I need to go,
18  I'll consider doing trial.
19      Q.   What do you bill for trial time?
20      A.   $5,000.
21      Q.   Do you -- how about if it's up in Waco?
22      A.   I haven't -- is this in Waco?  I didn't know
23  that.  I haven't thought about that.  I don't think
24  so.
25      Q.   Okay.  At this time in the beginning of

**Page 77**

1   2020, how many life care plans have you prepared in
2   this person injury context?
3       A.   North of 250.
4       Q.   And how many depositions have you given?
5       A.   Deposition trial, north of 50.
6       Q.   How many trial appearances have you given?
7       A.   I'm going to guess six to eight.
8       Q.   When was the last one you gave?
9       A.   Yesterday.
10      Q.   Really?
11      A.   Yeah.
12      Q.   In Travis County?
13      A.   Yes.
14      Q.   What was your opinion that you offered?
15      A.   It was a cervical spine injury.
16      Q.   And what -- and did you offer life care
17  opinions or as a treating physician?
18      A.   No.  As a life care planner.
19      Q.   Okay.  And what -- generally speaking, what
20  was your recommendation in that case?
21      A.   That was a cervical spinal cord stimulator
22  trial, and implant, and epidural steroid
23  injections.
24      Q.   Have you testified live at trial in an
25  instance involving migraine headaches or

Page 78

1  posttraumatic headaches?
2      A.  Not that I recall.
3      Q.  Have you offered deposition testimony on
4  occasion involving posttraumatic headaches or an
5  opinion involving that?
6      A.  They're rare.  Not that I recall.
7      Q.  I did fail to ask you for one, but do you
8  still have an Excel spreadsheet of all of your
9  testimony?
10     A.  I do.  It wasn't asked of me, but I have
11  one.  Yeah.
12     Q.  And is it up-to-date, including yesterday?
13     A.  Yes.
14     Q.  All right.  Well, Dr. Miranda, it's always a
15  pleasure.  I appreciate you being so candid with
16  me.
17     A.  Sure.
18             MR. PAYNE:  And with that, I pass
19      the witness.
20                  -  -  -
21             CROSS-EXAMINATION
22                  -  -  -
23  BY MS. PESCHEL:
24     Q.  Good afternoon, Dr. Miranda.
25     A.  Hi.

Page 79

1      Q.  I just want to kind of circle back to a few
2  things.  Now, you stated that your speciality areas
3  were pain management, physical medicine,
4  rehabilitation, and brain injury; is that correct?
5      A.  Brain injury and medicine.  Yeah.
6      Q.  Okay.  And for the jury, can you please just
7  briefly describe what each of those specialty areas
8  are?
9      A.  So, physical medicine and rehabilitation,
10  the residency entails mostly an in-patient and
11  out-patient setting.  The in-patient setting, we
12  take care of patients that have more serious
13  musculoskeletal, or central nervous system
14  conditions, like strokes, spinal cord injury, hip
15  replacements, multiple fractures, and multiple
16  bones, polytrauma, subarachnoid hemorrhage.  What
17  else?  Joint replacements, cerebral palsy.  That's
18  the inpatient side.  On the outpatient side, we
19  take care of patients that have either headaches,
20  or neck pain, back pain, or things of that nature.
21  Yeah.
22     Q.  Okay.  And --
23     A.  And, I'm sorry, so the pain medication
24  component is where we trained on how to do a spinal
25  injections, you know, like epidurals, frequency of

Page 80

1  lesioning, spinal cord stimulators, and things of
2  that nature.
3             So we get a better expertise doing those
4  procedures in the fellowship of pain medicine.  I
5  was grandfathered into the brain injury medicine
6  board.
7      Q.  Okay.  And what do you mean by that?
8      A.  I didn't have to do a fellowship to sit for
9  the board.
10     Q.  Okay.  But you -- what did sitting for the
11  board entail?
12     A.  Well, you have to be board certified in
13  physical medicine and rehabilitation, and have
14  experience treating people with brain injuries.
15     Q.  Okay.  And then you sit for an exam?
16     A.  You sit for an exam.  Yeah.
17     Q.  Okay.  And is it something extra to pursue
18  -- like, do most physical medicine rehab doctors
19  also have board certifications in pain medicine, or
20  is that something -- are those two separate
21  certifications?
22     A.  They're two separate ones.  Yeah.
23     Q.  Okay.  And it is my -- so you testified
24  earlier you were certified as a life care planner;
25  correct?

Page 81

1      A.  Yup.
2      Q.  Can you explain to the jury what a life care
3  planner does?
4      A.  So like in this case, a life care planner --
5  when I can, I examine the patient, I interview the
6  patient, I review the medical records, and I make
7  recommendations to future care, and the cost
8  related to that future care.
9      Q.  Okay.  And are there certain requirements
10  that you have to become a certified life care
11  planner?
12     A.  Well, the overwhelming majority of life care
13  planners are not doctors.  They are -- they can be
14  vocational rehab experts, they can be nurses,
15  physical therapist, or occupational therapist,
16  psychologist.
17             So you have to have some form of
18  background in the healthcare arena, and then you
19  have to complete 80 credit hours.  And then --
20  that's online.  And then 40 credit hours done at a
21  life center.  And then you sit for an exam and you
22  pass.
23     Q.  Okay.  And why is there a need for life care
24  planners versus simply asking a doctor who's
25  treating a patient what that future care is going

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 82..85

**Page 82**

1  to cost them?
2    A. So the life care planner, you know, at least
3  in my experience of treating conditions like this,
4  and we have seen some extents what the outlook is
5  for some of these patients. And based on that
6  experience, and what we learned in the courses of
7  life care planning, and make the recommendations of
8  future care.
9        Mind you though, being a physical medicine
10  and rehab doctor, you know, and pain medicine, I
11  didn't necessarily have to be a certified life care
12  planner, but that's why I wanted to have that extra
13  training.
14    Q. Okay. But do you typically see treating
15  doctors who are treating a patient actually going
16  out and telling their patients what this future
17  care if going to cost without being a life care
18  planner?
19    A. Really rare. I've never seen it.
20    Q. Okay. And --
21    A. With some exceptions like talking about
22  cervical recommendation. I've seen that with an
23  associated cost. So but that exception, I don't
24  recall seeing any other scenario.
25    Q. Okay. So for something 30 or 40 years down

**Page 83**

1  the line?
2    A. Something like that.
3    Q. Okay. And who certifies life care planners?
4    A. It's International Commission and Healthcare
5  Certification.
6    Q. Okay. And what kind of organization is
7  that?
8    A. It's an organization that basically
9  maintains the standards, and publications of the
10  standards and articles regarding life care
11  planning.
12    Q. Where are they out of?
13    A. I don't recall that.
14    Q. Okay. Earlier you got a lot of questions
15  regarding your basis for your opinions as to
16  Ms. Hills having posttraumatic headaches, including
17  questions regarding her past medical records.
18        What I'd like to do is hand you a stack
19  of records that I actually received yesterday
20  evening. And I would like to go off the record,
21  and take a short break, and let you look through
22  these, if that's okay.
23        THE VIDEOGRAPHER: We are off the
24        record 4:52 p.m.
25        (At this time, off the record.)

**Page 84**

1        (At this time, back on the record.)
2        THE VIDEOGRAPHER: We are back on
3        the record at 5:17 p.m.
4  BY MS. PESCHEL:
5    Q. All right. Thank you for taking that short
6  break and taking the time to review those records,
7  Dr. Miranda.
8    A. Yeah. No problem.
9    Q. I marked them as Exhibit 7. Have you had
10  the opportunity to look through the pages handed to
11  you as Exhibit 7?
12    A. Yes, ma'am.
13        (Exhibit No. 7 was marked for
14        identification.)
15  BY MS. PESCHEL:
16    Q. Okay. And so, when you wrote your report
17  and reviewed Ms. Hills' records, you did not have
18  the opportunity to review any of her prior records,
19  did you?
20    A. No. Prior to the fall.
21    Q. Prior to the fall. Correct. So your
22  opinions at that time were based on just -- they
23  were based on your physical examination?
24    A. Physical examination, medical records I
25  reviewed, and my training, and expertise.

**Page 85**

1    Q. Okay. And that was her record review of --
2  not just got Scott & White records, but also
3  chiropractic records and pain management records;
4  is that correct?
5    A. I reviewed the pain management records as
6  well. Yeah. Correct.
7    Q. And is it typical or industry standard for a
8  life care planner to actually perform a physical
9  examination before creating a life care plan?
10    A. You don't have to.
11    Q. Okay. And what benefit does performing a
12  physical examination provide you?
13    A. A physical exam can correlate things you
14  already suspect from reading the records and
15  talking to the patient.
16    Q. Okay. And in this case when you reviewed
17  Rose's records, and then you performed your
18  physical exam, what specific findings from your
19  physical exam corroborated her records?
20    A. So mostly the tenderness in her neck and the
21  limited range of motion of her cervical spine.
22    Q. Okay. And you just today had the
23  opportunity to review, I want to say, past records
24  all the way from around May or June 2016, which
25  would be months prior to this incident, and back

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                    Pages 86..89

Page 86

1   all the way to -- I want to say they go to 2011 or
2   '12?
3       A.   2008, I believe.
4       Q.   2008?  Okay.
5       A.   Or something like that.
6       Q.   Is that correct?
7       A.   I think it's 2008.  Yeah.
8       Q.   Okay.  From your review of those records
9   here today, is there anything in those records that
10  makes you change your opinions?
11      A.   No, ma'am.
12      Q.   Is there anything in those records that
13  indicates to you that Ms. Hills was having any kind
14  of active treatment for ongoing migraine issues
15  prior to this fall?
16      A.   Not that I can think of.
17      Q.   Or actually, is there a difference between
18  migraines and posttraumatic headaches?
19      A.   Yeah.  So the intensity of a posttraumatic
20  headache can be worse.  You know, location can be
21  more generalized.  The frequency could be more, you
22  know.
23      Q.   Okay.  And did you see any medications that
24  she was actively taking in that time period prior
25  to this fall back to 2008 that would indicate that

Page 87

1   she was having the same injuries that you found her
2   to be diagnosed with from this fall?
3       A.   Not that I can think of.
4       Q.   Are the injuries that Ms. Hills sustained
5   after this fall, are those similar to injuries you
6   treat in your practice on a daily basis?
7       A.   Yes, ma'am.
8       Q.   And is it common for a neck injury to cause
9   a posttraumatic headache?
10      A.   It can.  Yeah.
11      Q.   And it's not necessarily going to be an
12  immediate thing, is it?
13              MR. PAYNE:  Objection.  Leading.
14              THE WITNESS:  Correct.
15  BY MS. PESCHEL:
16      Q.   How long can it take for a posttraumatic
17  headache to set in?
18      A.   My experience, it could be a week or
19  sometimes more.
20      Q.   Okay.  Can you explain for the jury, because
21  you talked a little bit about this that she had
22  some disc issues with her spine.  What is the disc
23  -- I think you called it a herniation; is that
24  correct?
25      A.   Yes.

Page 88

1       Q.   What is a herniation?
2       A.   So a disc herniation is a displacement of
3   one of the discs of the -- in her case, the
4   cervical spine or the neck.  Basically, the
5   structure that moved in relation to where it was
6   originally.  It's displaced.
7       Q.   Okay.  Is it common -- do you see patients
8   in your practice spend thousands of dollars for
9   medication needlessly?
10      A.   No.
11      Q.   If they're not in pain?
12              MR. PAYNE:  Objection.  Leading.
13              THE WITNESS:  No.  They were
14          medications -- in my case, they're in
15          pain.
16  BY MS. PESCHEL:
17      Q.   And you probably -- in your practice, do you
18  get a sense if somebody is being honest with you?
19      A.   I can.  I mean, I'm not perfect obviously.
20  I mean, I take them at face value.
21      Q.   Did you feel like when you met with
22  Ms. Hills, and you examined her that she was being
23  truthful?
24      A.   Yeah.
25      Q.   I want to kind of switch gears a little bit,

Page 89

1   and talk about the database you use when coming up
2   with the numbers in your life care plan.
3              Are you familiar with the methodology
4   typically accepted in the field of life care
5   planning?
6       A.   Yes, ma'am.
7       Q.   And the methodology that you used to prepare
8   Ms. Hills' life care plan, is that consistent with
9   the methodology you're familiar with?
10              MR. PAYNE:  Objection.  Leading.
11              THE WITNESS:  Yes, ma'am.
12  BY MS. PESCHEL:
13      Q.   And what methodology is that?
14      A.   The methodology that I use here is the
15  methodology that's used by life care planners.
16  Like I said, when you can you examine the patient,
17  you do a physical exam, I interview the patient, I
18  review the medical records.  And then you
19  determine, you know, the future care needs of that
20  patient.  And then you calculate the associated
21  costs of that future care.
22      Q.   And a life care plan is not necessarily done
23  to anticipate all future needs?
24      A.   Correct.  This is a minimal care life care.
25  Yeah.

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020          **Pages 90..93**

**Page 90**

1    Q.  Okay.  On Exhibit 2 -- when we are talking
2   about Exhibit 2, are you familiar with different
3   medical facilities, as you're a medical
4   professional, that charge both professional charges
5   and then they charge separate facility charges?
6    A.  Yes.
7    Q.  Is that quite common?
8    A.  Yes, ma'am.
9         MR. PAYNE:  Objection.  Leading.
10  BY MS. PESCHEL:
11   Q.  So, if I portray to you that Exhibit 2 is
12  just the professional charges -- do you see that
13  there?
14   A.  Yes.
15   Q.  So when you're being asked questions about
16  the cost of an MRI -- if I portray to you that
17  Baylor Scott & White has facility charges as well,
18  you're not getting the full cost of the MRI just by
19  the professional charges; would that be correct?
20        MR. PAYNE:  Objection.  Leading.
21        THE WITNESS:  Yes.  Yeah.  That's
22        correct.
23  BY MS. PESCHEL:
24   Q.  Okay.  Are all the opinions that you gave
25  today within a reasonably degree of medical

**Page 91**

1   certainty?
2    A.  Yes, ma'am.
3    Q.  And was your prediction for her future
4   treatment based on your experience, expertise,
5   training, education, and review of the relevant
6   medical literature?
7    A.  Yes, ma'am.
8    Q.  Is there anything else we haven't asked you
9   that you think is significant?
10   A.  Not that I can think of.
11   Q.  Okay.
12        MS. PESCHEL:  I'll pass the
13        witness.
14            -  -  -
15        REDIRECT EXAMINATION
16            -  -  -
17  BY MR. PAYNE:
18   Q.  Doctor, you've now at the request of
19  plaintiff's counsel have reviewed at least some of
20  Ms. Hills' medical records predating the event at
21  the Sam's Club; correct?
22   A.  Yes, sir.
23   Q.  And you saw at least three references to a
24  history of migraine headaches that predate the
25  event at Sam's.  Do you -- just generally speaking,

**Page 92**

1   do you recall that?
2    A.  I saw a mention of history of migraines.
3   Yes, sir.
4    Q.  Including the date -- and we've already
5   talked about this.  She referenced a history of
6   migraine headaches on the date of the event at the
7   Sam's Club; true?
8    A.  Yes.
9    Q.  Do you know if -- you've said you've now
10  prepared about 250 of these life care plans; right?
11   A.  North of that.
12   Q.  More than that.  Do you know and have you
13  verified if any plaintiff in a personal injury
14  lawsuit has implemented a life care plan that you
15  recommended?
16   A.  I don't recall that.
17   Q.  Do you know if that's ever been done?
18   A.  Not that I recall.
19   Q.  Do you know if Ms. Hills has implemented
20  your plan?
21   A.  Well, I know she continues to treat
22  recently.  But I don't know for certainty if she
23  follows the plan.
24   Q.  Well, in fact, you would have seen Ms. Hills
25  on exactly one occasion when you performed the

**Page 93**

1   physical examination; correct?
2    A.  Yes.
3    Q.  You did not meet with her again to actually
4   go over your recommendations; true?
5    A.  True.
6    Q.  I think you said earlier you would assume
7   that her attorneys would share your life care plan
8   with her, but that's all that is is an assumption;
9   true?
10   A.  Yeah.  I haven't confirmed if they have or
11  not.
12   Q.  And so you have not -- just so we are clear:
13  You have not sat down with Ms. Hills and said,
14  these are my recommendations for you in the future;
15  true?
16   A.  True.
17   Q.  And you don't know if that's ever been done;
18  true?
19   A.  By somebody other than me?  I don't know
20  that.  Yeah.
21   Q.  Okay.  On the -- do you know -- have you
22  reviewed with any particularity Ms. Hills' past
23  medical charges or what her providers have accepted
24  for her charges?
25   A.  I don't recall with exact detail of that.

ROSE HILLS vs SAM'S EAST, INC., ET AL.
Hector Miranda-Grajales, M.D. on 01/16/2020                Pages 94..97

| Page 94 | Page 96 |
|---|---|

**Page 94**

1   No.

2      Q.  All right.  So at to what Baylor charged her

3   facility fee or otherwise for the MRI, you simply

4   don't know; right?

5      A.  Well, I mean, what you showed me and I do

6   have some billing records.  But to my recollection

7   right now, I can't tell you, you know, item by item

8   what they are.

9      Q.  And so, as far as any of the treatment that

10  she's had in the past, what was billed for it, and

11  what she -- and what was accepted for it, that was

12  not a part of the numbers that you arrived at as

13  far as future care; true?

14     A.  Well, remember though the database assumes

15  that, you know, multiple providers are billing in

16  that data.  But I did not specifically include

17  Baylor Scott & White's numbers in my projections.

18     Q.  Do you consider yourself to be in the best

19  place for this case to offer an opinion as to

20  causation?

21     A.  I feel good enough to make that

22  recommendation.  Yes, sir.

23     Q.  And that's based on a review of medical

24  records that postdate the accident, up until 30

25  minutes ago, and at most, a one-hour physical

**Page 95**

1   examination of the plaintiff; true?

2      A.  And also my experience and training.  Yes,

3   sir.

4      Q.  Do you think Ms. Hills' treating doctors

5   would be in a better position to offer an opinion

6   as to causation?

7      A.  I mean, I don't feel in this particular

8   case.  I mean, they also agree with diagnosis of

9   posttraumatic headaches, by the way.

10     Q.  And again, we've talked about that.  And

11  their basis and your basis of posttraumatic

12  headaches is based on what she told you and them

13  only; true?

14     A.  True.

15     Q.  And you do not intend to be the physician --

16  you've recommended, in the alternative, these nerve

17  blocks; true?

18     A.  I'm sorry?  What?

19     Q.  You have offered, in the alternative, that

20  Ms. Hills undergo these nerve blocks; true?

21     A.  That's the other more -- less conservative

22  life care plan.  Yes.

23     Q.  And is it your intention that you would be

24  the physician to perform those?

25     A.  Nope.

**Page 96**

1      Q.  Why did you move to Texas from Florida?

2      A.  So I lived in Florida for several years.

3   You know, I moved to Miami, Gainsville,

4   Jacksonville, and I was waiting for my wife to

5   finish her training.  And we talked about staying

6   in Florida, but together we decided to leave the

7   state.  We've heard good things about Austin.  So

8   here we are.

9      Q.  Is there any other reason?

10     A.  Not that I can think of.

11     Q.  Did it have anything to do with some

12  allegations about overprescribing pain medication?

13     A.  No.  I did have several lawsuits regarding

14  deformation from several pharmacies, and you know,

15  it was litigated.  One went to trial, and the other

16  three settled out of court.  And I have attorneys

17  for that, if you're interested in talking to them.

18     Q.  Did that have anything to do with you moving

19  your practice from Florida to Texas?

20     A.  It wasn't a pleasant experience, you know,

21  but I have family in Florida.  And the town where

22  that occurred was in Lake City, Florida in

23  Gainsville.  I have family in Orlando so I had, you

24  know, some ties.  And we still go to Florida quite

25  often.  We have family there, you know.  But at the

**Page 97**

1   end of the day, we just decided to leave.

2      Q.  Do you have hospital privileges at the

3   Baylor facilities?  Baylor Scott & White

4   facilities?

5      A.  No, sir.

6      Q.  Do you have hospital privileges at the St.

7   David facilities?

8      A.  No.

9      Q.  What about the Seton, which I guess is

10  now --

11     A.  Ascension?

12     Q.  Yeah.

13     A.  No.

14     Q.  Do you have hospital privileges with

15  Ascension?

16     A.  No, sir.

17     Q.  Is it fair to say you do not consider

18  yourself an expert in finance, accounting, or

19  economics; true?

20     A.  True.

21     Q.  Okay.

22          MR. PAYNE:  Doctor, again, I thank

23      you for your time.  That's all I have.

24      I pass the witness.

25          THE WITNESS:  Thank you.

**ROSE HILLS vs SAM'S EAST, INC., ET AL.**
**Hector Miranda-Grajales, M.D. on 01/16/2020**          **Pages 98..101**

---

**Page 98**

1  MS. PESCHEL:  And I promise I'll be
2  quick.
3      MR. PAYNE:  Ut-oh.
4      MS. PESCHEL:  I have one follow-up.
5      THE WITNESS:  Don't get up out of
6  the chair.
7      MS. PESCHEL:  I know.  I'm sorry.
8          - - -
9      RECROSS-EXAMINATION
10         - - -
11 BY MS. PESCHEL:
12   Q.  So earlier you testified that when you used
13 the Fairhealth database to determine future costs,
14 it's not predicated on your insurance reimbursement
15 rates; correct?
16   A.  Yes.
17   Q.  And if you were to utilize the database that
18 was predicated on insurance reimbursement rates,
19 would that be proper methodology for a life care
20 planner?
21   A.  No.
22   Q.  Why not?
23   A.  We don't use any collateral source when we
24 do our costing analysis.  It's part of the
25 standards of life care planning.

---

**Page 99**

1   Q.  Okay.
2       MS. PESCHEL:  That is my last
3   question, so I will reserve.
4       MR. PAYNE:  All right.  This
5   doesn't have to be on the -- it really
6   doesn't have to be on either record.  So
7   we can go off.
8       THE VIDEOGRAPHER:  Okay.  This --
9   we are off the record at 5:34 p.m.
10          - - -
11      (Whereupon, the videotape
12   deposition of HECTOR MIRANDA-GRAJALES,
13   M.D. concluded at 5:34 p.m.)

---

**Page 100**

1      WITNESS CORRECTIONS AND SIGNATURE
2
3  Please indicate changes on this sheet of
4  paper, giving the change, page number, line
5  number and reason for the change.  Please sign
6  each page of changes.
7  PAGE/LINE      CORRECTION      REASON FOR CHANGE
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

---

**Page 101**

1  _____
2  _____
3
4
5          HECTOR MIRANDA-GRAJALES, M.D.
6
7  I, HECTOR MIRANDA-GRAJALES, M.D., have read the
8      foregoing transcript and hereby affix my
9      signature that same is true and correct,
10     except as noted on the previous page(s), and
11     that I am signing this before a Notary Public.
12     _____
13          HECTOR MIRANDA-GRAJALES, M.D.
14 State of Texas      )
15 County of _____ )
16
17 Before me, _____, on this day
18 personally appeared HECTOR MIRANDA-GRAJALES,
19 M.D., known to me or proved to me under oath
20 or through _____
21 (description of identification card or other
22 document), to be the person whose name is
23 subscribed to the foregoing instrument and
24 acknowledge to me that they executed the same
25 for the purposes and consideration

---

**ROSE HILLS vs SAM'S EAST, INC., ET AL.**
**Hector Miranda-Grajales, M.D. on 01/16/2020**          **Pages 102..103**

Page 102

1   therein expressed.

2       Given under my hand and seal of office on

3   this, the ____ day of _____, 2020.

4   _____

5                Notary Public for and in

6                The State of Texas

7                Commission Expires _____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 103

1           REPORTER'S CERTIFICATION
          TO THE VIDEOTAPE DEPOSITION OF
2          HECTOR MIRANDA-GRAJALES, M.D.
            TAKEN ON JANUARY 16, 2020
3
4           I, Noelle R. Nevius, a Notary in and
      for the State of Texas, hereby certify that
5     this deposition transcript is a true record of
      the videotape testimony given by the witness
6     name herein, after said witness was duly
      sworn/affirmed by me.
7           I further certify that I am neither
      attorney nor counsel for, related to, nor
8     employed by any of the parties to the action
      in which this testimony was taken.  Further, I
9     am not a relative or employee of any attorney
      of record in this cause, nor do I have a
10    financial interest in the action.
           The original videotape deposition
11    transcript was delivered to the attorney party
      who asked the first question appearing in the
12    transcript on January 16, 2020.  Brett Payne
      was the attorney present at the time of taking
13    this videotape deposition.
14
15    _____
      Noelle R. Nevius
16    Notary in and for
      The State of Texas
17
18
19
20
21
22
23
24
25

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **ROSE HILLS,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 6:18-cv-301-ADA** |
| | § | |
| **SAM'S EAST, INC., SAM'S CLUB, and** | § | |
| **WAL-MART, INC., formerly known as** | § | |
| **WAL-MART STORES, INC.,** | § | |
| **Defendants** | § | |

**PLAINTIFF ROSE HILL'S EXPERT DISCLOSURES**

To:  Defendants, Sam's East Inc., Sam's Club, and Wal-Mart, Inc., formerly known as Wal-Mart Stores, Inc., by and through their attorneys of record Brett H. Payne and Katie McLean, WALTERS, BALIDO & CRAIN, L.L.P., 9020 N. Capital of Texas Highway, Building II, Suite 225, Austin, Texas 78759

Plaintiff, ROSE HILLS makes these expert disclosures as required by Federal Rule of Civil Procedure 26 (a)(2).

**I.**
**A. IDENTITY OF EXPERTS**

1.    Plaintiff may use the following persons at trial to present evidence under Federal Rule of Evidence 702, 703, or 705:

        a.    <u>Retained Expert Witnesses</u>

                1) Jason T. English, M.S., CSP, P.E.
                543 William D Fitch Parkway
                Suite 112
                College Stations, TX 77845
                (979)431-0702


                2) Dr. Hector A. Miranda-Grajales, MD, FAAPM&R, CLCP
                4201 Bee Caves Rd.
                Suite C-213
                West Lake Hills, Texas 78746

1

(512) 960-4717

    b.    <u>Non-Retained Expert Witnesses</u>

Pain Specialists of Austin
Gary L. Heath, MD
Including its physicians, nurses, employees, staff, and records custodians
1210 South 31st Street
Temple, Texas 76504
(512) 485-7200

Baylor Scott & White Health Medical Center & Clinics—Temple
Jason Noel Collins, MD
Carla Christine Khalaf McStay, MD
Garrett Fitzpatrick Frantz, MD
Dorian Frederick Drigalla, MD
David Harold Uhrbrock, MD
Including its physicians, nurses, employees, staff, and records custodians
2401 South 31st Street
Temple, Texas 76508
(254) 724-2111

Baylor Scott & White Health Medical Center & Clinics—Temple Westfield Clinic
Jennifer Konvicka Flory, MD
Including its physicians, nurses, employees, staff, and records custodians
7556 Honeysuckle Road
Temple, Texas 76502
(254) 742-7400

Baylor Scott & White Health – Scott & White Pavilion
Christopher Jason Burnett, MD
Jennifer Konvicka Flory, MD
Christopher Mark Sirianni, MD
Elwood Fray Williams, MD
Christina Maria Cabret-Aymat, MD
Bret Wardle, PT
Including its physicians, nurses, employees, staff, and records custodians
1815 South 31st Street
Temple, Texas 76504
(254) 724-2111

Comprehensive Injury Treatment Services
Patrick McHorse, DC
Ronald M. George, DC
Chris Price, DC

Including its chiropractors, physicians, physical therapists, nurses, nurse
practitioners, employees, staff, and records custodians
1602 West Avenue A, Suite B
Temple, Texas 76504
(254) 899-2225

## B. INFORMATION FROM RETAINED OR SPECIALLY EMPLOYED EXPERTS

2.      The following persons are those whom Plaintiff has retained or specially employed to

provide expert testimony or whose duties as Plaintiff's employee regularly involve giving expert

testimony:

    Jason T. English, M.S., CSP, P.E.

    Dr. Hector Miranda-Grajales, MD, FAAPM&R, CLCP

3.      Plaintiff attaches a written report for each retained or specially employed expert. Each

report is prepared and signed by the expert and contains the following:

    i.      A complete statement of all opinions the expert will express and the basis and
        reasons for them.

    ii.     The facts or data considered by the expert in forming the opinions.

    iii.    Any exhibits that will be used to summarize or support the opinions.

    iv.    A curriculum vitae, résumé, or other listing of each expert's qualifications.

    v.     A list of all publications authored by the expert in the previous ten years.

    vi.    A list of all other cases in which the expert testified as an expert at trial or by
        deposition during the previous four years.

    vii.   A statement of the compensation to be paid for the study and testimony in the case.

## C. INFORMATION FROM NONRETAINED EXPERTS

4.      The following persons are those who are not required to provide a written report:

physicians, nurses, employees, staff, and records custodians for:

Baylor Scott & White Health Medical Center & Clinics- Temple;
Baylor Scott & White Health Medical Center & Clinics- Temple Westfield Clinic;
Baylor Scott & White Health Medical Center & Clinics- Scott & White Pavilion
Comprehensive Injury Treatment Services
Pain Specialists of Austin.

5.      Pursuant to FED. R. CIV. P. 26(a)(2)(C) for the above identified nonretained experts

Plaintiff identifies the following:

   a.     The subject matter on which the expert is expected to present evidence.

   b.     A summary of the facts and opinions on which the expert is expected to testify.

The experts listed above who are health care providers may testify about the health care
provided to Plaintiff and other subjects or issues within their expertise, to include but not
limited to:

(a)      the injuries Plaintiff sustained as a result of the incident made the basis of this
         lawsuit;
(b)      that the incident was a cause of Plaintiff's injuries;
(c)      their diagnoses and prognoses of Plaintiff's condition;
(d)      that Plaintiff's injuries were caused or aggravated by the incident made
         the basis of this lawsuit;
(e)      the treatment they provided to Plaintiff;
(f)      that Plaintiff suffered pain and physical and mental impairment in the
         past;
(g)      that Plaintiff may suffer pain and physical and mental impairment in the
         future;
(h)      that the services provided to Plaintiff were medically necessary;
(i)      that the charges for the medical services were reasonable at the time and
         place they were provided;
(j)      that Plaintiff may or will require medical treatment in the future; and
(k)      the reasonable charges for any future necessary medical services.

For a further explanation of the opinions of the nonretained experts identified above see
the provided medical records.

Plaintiff reserves the right to elicit expert testimony from individuals designated by the
Defendant and any persons listed as persons with knowledge of relevant facts should they
be so qualified.

Respectfully Submitted,

**THE CARLSON LAW FIRM, P.C.**
2010 SW HK Dodgen Loop, Suite 201
Temple, Texas 76504
(254) 771-5688
FAX (254) 771-0655

By: */s/ Julie L. Peschel*
Julie L. Peschel
SBN: 24052308
jpeschel@carlsonattorneys.com
Philip J. Koelsch
SBN: 24110103
pkoelsch@carlsonattorneys.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the above and foregoing instrument has been served upon all known counsel of record by email and certified mail on this the 18th day of July, 2019.

VIA EMAIL: katie.sacra@wbclawfirm.com / paynevfax@wbclawfirm.com
VIA CMRRR: 91 7199 9991 7035 3568 0296
Brett Payne / Katie McLean
Walters, Balido & Crain, L.L.P.
9020 N. Capital of Texas Highway
Building II, Suite 225
Austin, Texas 78759

*/s/ Julie L. Peschel*
Julie L. Peschel

6