# EXHIBIT E

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF TEXAS

 3                     WACO DIVISION

 4   ROSE HILLS,                    )   CIVIL ACTION NO:

 5              Plaintiff,          )   6:18-cv-00301-

 6                                  )   ADA-JCM

 7   VS.                            )

 8                                  )   JURY TRIAL

 9   SAM'S EAST, INC., SAM'S CLUB,  )   REQUESTED

10   AND WAL-MART, INC., formally   )

11   known as WAL-MART STORES,      )

12   INC.,                          )

13              Defendants.         )

14

15        BE IT REMEMBERED that the videotape

16   deposition of HECTOR MIRANDA-GRAJALES, M.D.

17   duly sworn, was taken on January 16, 2020, at

18   U.S. Legal Support, 701 Brazos Street, Suite

19   380, Austin, Texas 78701, between the times of

20   3:18 p.m. and 5:34 p.m., before Noelle Rose

21   Nevius, Court Reporter, reported by machine

22   shorthand, after which time the videotape

23   deposition was reduced to writing and set

24   forth as follows:

25
```

**Page 2**

```
 1   A P P E A R A N C E S :
 2
 3
 4   FOR THE PLAINTIFF:
 5   THE CARLSON LAW FIRM
 6   BY:   JULIE PESCHEL, ESQUIRE
 7   2010 SW HK Dodgen Loop
 8   Suite 201
 9   Temple, Texas  76504
10   254-771-5688
11
12
13   FOR THE DEFENDANTS:
14   WALTERS, BALIDO AND CRAIN, LLP
15   BY:   BRETT PAYNE, ESQUIRE
16   9020 N. Capital of Texas Highway
17   Building II, Suite 225
18   Austin, Texas 78759
19   512-472-9000
20
21
22   Videographer:  Joe Bazan
23
24
25
```

**Page 4**

```
 1                E X H I B I T S
 2
 3                                          PAGE
 4   Exhibit 1   CD - Dr. HMG's Files         12
 5
 6   Exhibit 2   11/25/2016 Cervical Spine    50
 7               MRI Record
 8
 9   Exhibit 3   The Legal Connection, Inc.   52
10               Documents
11
12   Exhibit 4   GoodRX Website Forms         54
13
14   Exhibit 5   Fairhealth Form              71
15
16   Exhibit 6   Accuracy of Information Form 71
17
18   Exhibit 7   Baylor Scott & White Records 84
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  I N D E X
 2
 3
 4   EXAMINATION OF HECTOR MIRANDA-GRAJALES, M.D.   PAGE
 5
 6   Mr. Payne....................................5,91
 7   Ms. Peschel.................................78,98
 8   Witness Signature Page........................100
 9   Court Reporter's Certification Pg.............103
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1                    -  -  -
 2            THE VIDEOGRAPHER:  We are on the
 3   record for the videotape deposition of
 4   Dr. Hector Miranda-Grajales taken on
 5   Thursday, January 16, 2020.  The time is
 6   3:18 p.m.
 7            Will the court reporter please
 8   swear in the witness?
 9                    -  -  -
10            HECTOR MIRANDA-GRAJALES, M.D. was
11   called as a witness, and after having
12   been duly sworn to tell the truth,
13   testified as follows:
14            (Witness sworn)
15                    -  -  -
16            DIRECT EXAMINATION
17                    -  -  -
18   BY MR. PAYNE:
19       Q.  Doctor, could you please state your full
20   name for the video record?
21       A.  Hector Miranda-Grajales, but I go by
22   Dr. Miranda.
23       Q.  And, Doctor, you -- well, what is your
24   occupation?
25       A.  I'm a physical medicine -- I'm a doctor, and
```

1  I practice in pain medicine, and physical medicine,
2  and rehabilitation.
3      Q.  And so that Ms. Peschel doesn't have to do
4  it later, let me ask you to go through your
5  training and educational background.
6      A.  Yes.  So I went to Medical School at the
7  University of Puerto Rico School of Medicine four
8  years, and I did an internship at the VA San Juan
9  Medical Center in internal medicine.  Then I did a
10  three-year program in physical medicine and
11  rehabilitation at the University of Miami.  Then I
12  did a one-year fellowship in pain medicine in New
13  York at Beth Israel Medical Center.
14      Q.  In what do you consider yourself to be an
15  expert in as far as offering testimony?
16      A.  Physical medicine rehabilitation, pain
17  medicine, brain injury medicine, and life care
18  planning.
19      Q.  All right.  You do not consider yourself to
20  have expertise or be an expert who can testify as
21  to radiology issues; is that accurate?
22      A.  I can.
23      Q.  But do you consider yourself to be an
24  expert?
25      A.  It depends on the situation.  Yes.

1      Q.  All right.  Okay.  And you feel comfortable
2  offering opinions about headache treatment from
3  your background and physical medicine and pain
4  management, but not in neurology; is that
5  accurate?
6      A.  It's accurate to the sense that I'm not a
7  neurologist.  I didn't complete a residency in
8  neurology.  But again, one of my board
9  certifications is in brain injury of medicine, and
10  part of the brain injury is having posttraumatic
11  headaches.
12      Q.  All right.  Doctor, to the extent that my
13  questions call for an expert opinion, a medical
14  expert opinion, would you give me that opinion
15  based on a reasonable degree of medical
16  probability?
17      A.  Yes, sir.
18      Q.  If you cannot answer a question and are not
19  comfortable answering a question based on a
20  reasonable degree of medical probability, will you
21  let us know?
22      A.  Yes, sir.
23      Q.  All right.  And if you feel that a topic or
24  a question is outside of your area of expertise,
25  will you likewise let us know?

1      Q.  Would you defer to a radiologist if your
2  opinion was different than a radiologist?
3      A.  It's possible.
4      Q.  All right.  What about orthopedics?  Do you
5  consider yourself to be an expert in orthopedics?
6      A.  Orthopedics is a board term.  So I am an
7  expert in certain regards of orthopedic profession,
8  but I'm not a surgeon, you know.
9      Q.  Where or in what parts do you consider
10  yourself to have expertise in orthopedics?
11      A.  The musculoskeletal system, including the
12  spine.
13      Q.  All right.  And I guess to use your
14  qualifications, you do not consider yourself to be
15  an expert in orthopedic surgery; true?
16      A.  Correct.
17      Q.  Would it also be true that you do not
18  consider yourself to be an expert in neurology?
19      A.  I'm not a neurologist.  That's correct.
20      Q.  And so, you would agree you would not feel
21  comfortable offering an opinion, an expert opinion,
22  on neurology; is that accurate?
23      A.  It depends, because I do treat headaches,
24  and I know this case involves headaches.  So I feel
25  comfortable, you know, treating headaches.

1      A.  Yes, sir.
2      Q.  In this instance, you were hired by Ms. Rose
3  Hills' attorneys to prepare a life care plan; is
4  that true?
5      A.  Yes, sir.
6      Q.  You do not consider yourself to be a
7  treating physician of Ms. Hills.  Accurate?
8      A.  Correct.
9      Q.  All right.  You have never provided any
10  treatment to Ms. Hills; true?
11      A.  True.
12      Q.  Did you have an in-person meeting with
13  Ms. Hills?
14      A.  Yes, sir.
15      Q.  When did that occur?
16      A.  Let me open up my report here.
17      Q.  Of course.
18      A.  I evaluated Ms. Hills on July 11, 2019.
19      Q.  All right.  So about six months ago?
20      A.  Just about.  Yeah.
21      Q.  Okay.  And what was the nature of your visit
22  with Ms. Hills on that occasion last July?
23      A.  It was for a history interview, and physical
24  examination in relation to a life care plan.
25      Q.  How long did that examination last?

Page 10

1    A.   I'm going to guess about an hour.
2    Q.   What did it entail?
3    A.   History and physical exam.
4    Q.   Did it involve anything beyond a history and
5    a physical examination?
6    A.   No, sir.
7    Q.   You did not perform or have performed any
8    type of radiology testing; true?
9    A.   True.
10   Q.   You did not perform or have performed any
11   type of nerve conduction testing or anything of
12   that nature; correct?
13   A.   Correct.
14   Q.   There would be no other testing that would
15   have been performed in connection with your visit
16   on July of 2019; true?
17   A.   True.
18   Q.   It would have simply been a standard
19   physical examination, as well as a conduction of
20   her history; true?
21   A.   True.
22   Q.   And that was done at the request of
23   Ms. Hills' legal counsel in this litigation matter;
24   true?
25   A.   True.

Page 11

1    Q.   Just so the jury is not confused.  It was
2    not at the request of the Court; true?
3    A.   True.
4    Q.   It was not at the request of me, defense
5    counsel; true?
6    A.   True.
7    Q.   It was at the request of the attorneys
8    representing her in her personal injury litigation;
9    true?
10   A.   Yes.
11   Q.   All right.  Was Ms. Hills cooperative in
12   your examination?
13   A.   Yes, sir.
14   Q.   And as a result of the examination, you did
15   in fact prepare a life care plan; is that true?
16   A.   Correct.
17   Q.   And I believe you have produced that, along
18   with -- what I understand to be your complete file
19   on a CD form, which I've briefly been able to
20   produce through the courtesy of Ms. Peschel, who
21   has a CD player.
22        MR. PAYNE:  And this CD that I'll
23        now mark as Exhibit Number 1.
24   BY MR. PAYNE:
25   Q.   Is that your response to my request for your

Page 12

1    entire file pertaining to this litigation?
2    A.   Yes, sir.
3    Q.   All right.
4             MR. PAYNE:  And, again, I marked
5             that CD, or at least the envelope of the
6             CD, as Exhibit Number 1.
7                  (Exhibit No. 1 was marked for
8             identification.)
9    BY MR. PAYNE:
10   Q.   Of course, I only took a few minutes because
11   we were running a little late to begin with, but I
12   didn't see any correspondences exchange between you
13   and The Carlson Law Firm.  Does such correspondence
14   exist?
15   A.   Yes, but it wasn't requested in the Duces
16   Tecum.
17   Q.   Okay.  You don't consider that part of your
18   file?
19   A.   It wasn't requested, so, no.
20   Q.   Okay.  The request -- and I'll read it to
21   you.  Exhibit A, Duces Tecum number one, the
22   witness' entire file pertaining to this litigation.
23   You do not consider correspondences from the
24   attorneys who hired you to be pertinent to this
25   litigation?

Page 13

1    A.   It might be.  But again, when I do produce
2    e-mail correspondences, it's because specifically
3    stated in the Duces Tecum.  I didn't see it there.
4    Q.   Okay.  But you may or may not consider it
5    part of your entire file, but you did not produce
6    it here today; true?
7    A.   I didn't bring either correspondences.
8    Correct.
9    Q.   Do you have e-mails -- well, let me ask it
10   two different ways.  Do you have e-mail
11   correspondences from The Carlson Law Firm?
12   A.   Yes, sir.
13   Q.   Do you have written correspondences received
14   by regular mail or by fax from The Carlson Law
15   Firm?
16   A.   Not that I recall regarding this case.
17   Q.   Okay.  There had been other occasions where
18   The Carlson Law Firm has retained you to prepare a
19   life care plan on behalf of one of their clients;
20   true?
21   A.   True.
22   Q.   Okay.  On how many occasions has The Carlson
23   Firm retained you for that purpose?
24   A.   I'm going to guess about 20 or less.
25   Q.   I'm sorry?

**Page 14**

1   A. Twenty or less.

2   Q. Okay. All right. While I am on this, let

3 me just go through it. The second item I requested

4 for you to bring here today is all written or other

5 documentation concerning reflecting factual

6 observations test supporting data, calculations,

7 and opinions of you including your reports.

8       Have you provided that information to

9 me?

10   A. Yes. That's in the CD.

11   Q. Okay. And that consists of the life care

12 plan; true?

13   A. True.

14   Q. All right. There are no other tests,

15 supporting data, calculations, or opinions that you

16 have made, or obtained, or created in this case

17 that are not present on that CD; is that accurate?

18   A. Accurate.

19   Q. Number three on the Duces Tecum I request

20 all writings or other documentation used in forming

21 the basis of your opinions. Are there any such

22 writings?

23   A. Like literature review? No, sir.

24   Q. Okay. So in this instance, you did not rely

25 on any documentation or writings as a basis for

**Page 15**

1 forming your opinions other than anything contained

2 on that CD; true?

3   A. True.

4   Q. Did you bring your CV here today?

5   A. It's in the CD.

6   Q. All right. Did you bring a list of your

7 writings, speeches, and publications?

8   A. No, sir. There's a mention of one of the

9 publications that I was involved in in the CD, or

10 it should be.

11   Q. All right. And then number six is similar,

12 I guess, to number two or three. All documents,

13 reports, letters, studies, and statistical data of

14 compilations that will be to substantial your

15 opinions. Are there any documents, reports,

16 letters, data that support your opinions that are

17 not on that CD and in your life care plan?

18   A. No, sir.

19   Q. Item number seven is calculations, formulas,

20 and equations to support your opinion. Is there

21 anything that you utilized that's not on that CD?

22   A. No, sir.

23   Q. Finally, number eight is a display of

24 exhibits that you intend to use at the trial of

25 this case. Do you intend to use any visuals or

**Page 16**

1 anything like that?

2   A. I don't anticipate any. No.

3   Q. All right. I did see in my brief look at

4 what was on the CD that you were provided with some

5 medical records; is that true?

6   A. Yes, sir.

7   Q. And did you review those medical records in

8 preparation of your life care plan?

9   A. Yes, sir.

10   Q. And I think your life care plan does contain

11 a record Summary, does it not? On page five?

12   A. Yes, sir.

13   Q. And then the Summary continues on to the top

14 of page seven; true?

15   A. True.

16   Q. All right. And so, your report itself

17 consists of the initial phase -- well, there is a

18 cover page, page two is an introduction, and then

19 the bottom part of page -- pardon me -- of page

20 three references the IME.

21       And I do not see on the IME, page three

22 of 12, any particular notations about the results

23 of your physical examination. Are they located

24 anywhere else in your report?

25   A. Yes. The physical examination starts in

**Page 17**

1 page six of 12 until seven of 12.

2   Q. Okay. All right. And on page four of your

3 report, there's a section entitled Questionnaire.

4 And I assume this is, in part, or maybe in its

5 entirety the history that Ms. Hills provided to

6 you; is that true?

7   A. The request was part of it. Also, the

8 Summary section page five of 12 includes part of

9 the interview that I had with her.

10   Q. And you -- she reported to you that she had

11 been involved in a motor vehicle accident in 1999?

12   A. Yes, sir.

13   Q. And she had been involved in another

14 accident in either 2000 or 2001?

15   A. Yes.

16   Q. For which she received or was taken to the

17 hospital?

18   A. Yes.

19   Q. And for which she had reported to you lower

20 back pain, right hip pain for which she received

21 chiropractic care; is that true?

22   A. Yes.

23   Q. And then in 2002, she reported to you that

24 she had -- was assaulted and punched in the nose,

25 and went to the emergency room?

**Page 18**

1    A.   Yes.
2    Q.   But that she did not have aggravating
3 headaches, neck pain, or back pain as a result?
4    A.   Correct.
5    Q.   She also reported to you that she did have a
6 prior history of migraine headaches; is that true?
7    A.   Yes, sir.
8    Q.   When did she tell you those first started?
9 And I'll refer you to the top of page six, I think.
10    A.   She said since her mid 20s.
11    Q.   And how old of a lady is she now?
12    A.   She was 37 when I saw her.
13    Q.   So she had been having headaches for at
14 least a decade before the event at the Sam's Club,
15 according to her own history; is that true?
16    A.   Yes.
17    Q.   Now, your record notes that the headaches
18 preceding the event at Sam's were not nearly as
19 frequent or severe as they were following the event
20 at Sam's. Do you see where that is written in that
21 same area? At the top of page six?
22    A.   Hold on. True. True. Yeah. Yeah. I see
23 it.
24    Q.   So -- but the inclusion of that statement
25 that the headaches before this event as opposed to

**Page 19**

1 after this event, that is written in there as part
2 of her history, that is what she told you; true?
3    A.   True.
4    Q.   That statement is not written in there based
5 on your independent review of her medical records;
6 true?
7    A.   True.
8    Q.   As to any kind of -- well, you are not
9 offering a medical opinion that her headaches were
10 more severe following this event as opposed to
11 prior to this event on anything other than what she
12 told you; true?
13    A.   And the medical records.
14    Q.   Well, but did you do an independent review
15 of her medical records?
16    A.   I reviewed her records. Yeah.
17    Q.   And you saw where there were numerous
18 reports of a history of migraine headaches
19 preceding the event at Sam's; true?
20    A.   She did have a -- she reported headaches.
21 But the ones that I'm referring to were the ones
22 described as posttraumatic headaches from her
23 neurologist.
24    Q.   Well, let me ask it this way: Did your
25 independent review of Ms. Hills -- well, did you

**Page 20**

1 have her prior records?
2    A.   I had her records. Yeah.
3    Q.   Did you have records predating the October
4 event? October 2016?
5    A.   No.
6    Q.   So you didn't have her prior records?
7    A.   I had her -- I mean, prior obviously to my
8 evaluation, but not prior to the accident.
9    Q.   And perhaps I should be more precise. You
10 were not provided and as we sit here today, you
11 have not reviewed Ms. Hills' medical records that
12 predate the event the Sam's; true?
13    A.   True.
14    Q.   And so kind of back to my other question.
15 As to the severity and frequency of her prior
16 migraine headaches, you have no independent way of
17 knowing that; true?
18    A.   Other than what she said. Correct.
19    Q.   Other than what the plaintiff in this
20 lawsuit has told you, you have no way of knowing
21 her history of migraines that predate the event at
22 Sam's; true?
23    A.   To the extent that I didn't review records
24 showing that. Correct. And then prior to the
25 fall.

**Page 21**

1    Q.   Okay. And so, back to my question then.
2 Other than what she told you, you have no basis for
3 any -- well, are you offering an opinion that her
4 headaches were worse after the event at Sam's?
5    A.   Yes.
6    Q.   And that's based on what she told you?
7    A.   And the medical records showing that she has
8 a new kind of headache, a posttraumatic headache.
9    Q.   Well -- but you don't know what was going on
10 before; right?
11    A.   Headaches. I mean --
12         MS. PESCHEL: Objection to form.
13 BY MR. PAYNE:
14    Q.   But migraine headaches?
15    A.   Correct.
16    Q.   Okay. I mean, I didn't -- I'm not sure if I
17 brought her prior records. But I'll represent to
18 you, her prior records do reference migraine
19 headaches within the few years leading up the event
20 at Sam's.
21       Do you have any reason to disagree with
22 that?
23         MS. PESCHEL: I'm going to object
24      to the form of the question, because I
25      have the records here, and I don't want

Page 22

1  the witness to be misled because when I
2  looked at them, I didn't see anything
3  where she's complaining of migraines in
4  any of those prior records.
5      MR. PAYNE:  Okay.  Well --
6      MS. PESCHEL:  Only on the History
7  section, like, in her current records,
8  if that makes sense.  Like, there's a
9  medical history of the patient.
10     MR. PAYNE:  That says history of
11 migraine headaches.
12     MS. PESCHEL:  But there's no
13 treatment.
14     MR. PAYNE:  Okay.  Well, there is
15 treatment in her prior records; right?
16 You agree with that?
17     MS. PESCHEL:  For migraines?  For
18 migraines?
19     MR. PAYNE:  Yes.
20     MS. PESCHEL:  I did not see any
21 treatment for migraines.
22     MR. PAYNE:  Okay.  You didn't see
23 at least three references to migraine
24 headaches predating this accident?
25     MS. PESCHEL:  I saw her go in with

Page 23

1          complaints of headaches and have
2          sinusitis I had her go in, and complain
3          of headaches, and diarrhea, and they
4          said it was a viral infection.
5              Can we go off the record and
6          give the prior records to the doctor?
7              MR. PAYNE:  Well, no.  We are here
8          to discuss what his opinions are today;
9          okay?
10 BY MR. PAYNE:
11     Q.  You have not reviewed her prior records;
12 right?
13     A.  Prior to the fall.  Correct.
14     Q.  Yeah.  You don't know what she reported to
15 her doctors about migraines or not migraines based
16 on anything other than what she told you; right?
17     A.  True.
18     Q.  She told you they were more severe after the
19 event at Sam's, but you have no way of
20 independently verifying that based on what you've
21 received up to today; true?
22     A.  True.
23     Q.  But even she told you that she had at least
24 a decade-long history of headaches before any event
25 at Sam's; true?

Page 24

1      A.  True.
2      Q.  And you're not -- you have not reviewed any
3  objective testing that shows any way -- well, have
4  you observed any objective testing that supports
5  her complaints of migraine headaches?
6      A.  Short answer is no.  I mean, migraine
7  headaches for the most part -- there's, you know,
8  it's a subjective complaint.  You know, a brain MRI
9  will not tell you somebody -- it depends; right?
10 Some MRI showings can show you -- point a
11 differential diagnosis of a headache; right?  But,
12 you know, it's not 100 percent specific for that.
13     Q.  Let's talk a little bit about that.  You
14 characterized a migraine as a subjective complaint.
15 Can you explain to the ladies and gentlemen of the
16 jury what you mean by subjective?
17     A.  Subjective means something that the patient
18 is telling you.
19     Q.  And versus -- what does objective mean?
20     A.  Objective is something that you can measure.
21     Q.  And --
22     A.  Or, you know, independently verify
23 basically.
24     Q.  Okay.  Yeah.  So in this instance, and in
25 most instances unless you see some lesion, or, you

Page 25

1  know, something pretty traumatic, or important, or
2  significant, you're not typically going to find an
3  objective independent verification of a migraine
4  headache; correct?
5      A.  For the most part.  Correct.
6      Q.  All right.  And so, you have to rely on the
7  patient to tell you that they're having a migraine
8  headache; right?
9      A.  Right.
10     Q.  And so, any diagnosis of a migraine
11 headache, in this instance, is based only on what
12 Ms. Hills has told you and told her other medical
13 providers; true?
14     A.  True.
15     Q.  All right.  So we have to rely on Ms. Hills'
16 subjective complaints to support a diagnosis a
17 migraine headaches; true?
18     A.  True.
19     Q.  And if she is mistaken or otherwise wrong,
20 then that diagnosis cannot be supported; true?
21         MS. PESCHEL:  Form.
22         THE WITNESS:  If she is mistaken as
23     to what?
24 BY MR. PAYNE:
25     Q.  As to whether she is actually having a

Page 26

1  migraine headache.
2      A.  I mean, in the event that she's not being
3  truthful about her symptoms, you know, that would
4  be a problem.
5      Q.  Right.  It would be a problem -- you cannot
6  offer an accurate diagnosis if someone is not
7  accurate about their symptoms?
8      A.  True.
9      Q.  And if someone says that their symptoms are
10  worse after a particular event, you have no way of
11  independently varying that; true?
12      A.  In this case, it would be tough.  I mean, I
13  would rely on her verbalization of her symptoms.
14  Right.
15      Q.  Well, and did you review her emergency room
16  records?
17      A.  From the date of the accident?  I have
18  Baylor, Scott & White notes.
19      Q.  Okay.
20      A.  Here.
21      Q.  And did you have an opportunity to review
22  those?
23      A.  Yes.  I reviewed those records.
24      Q.  Okay.  And according to the history of
25  present illness, what was her primary complaint on

Page 27

1  the date of this event at the Sam's Club?  Was it
2  shoulder pain?
3      A.  I got to find that document.
4      Q.  All right.
5      A.  Hold on.  If you have it there, and you want
6  to provide it, it'll make it faster.
7      Q.  You know, and again, unfortunately I only
8  brought my summary.
9      A.  Okay.
10      Q.  I did not bring -- well, I may actually have
11  brought the ER record.  Let me see.
12      A.  Okay.
13      Q.  No, I don't.  It's October 13, 2016 from
14  Baylor Scott & White.
15      A.  The date of the accident you're talking
16  about; right?
17      Q.  Yes.  And the date of that record.  And I
18  think buy Baylor Scott & White goes backward if
19  that's -- you know what I mean?
20      A.  Let me try to find it.  Hold on.  I need to
21  be sure.  October 13, 2016; correct?
22      Q.  Yes, sir.
23      A.  Yeah.  And your question was?
24      Q.  What was her primary complaint when she
25  appeared at the Baylor Scott & White Emergency

Page 28

1  Room?
2      A.  Okay.  I'm looking at the document Bate
3  Stamped at the bottom, PLTF00029.  Okay.  It says
4  here, chief complaints patient presents with
5  shoulder pain.
6      Q.  Okay.  And do you see on there where she
7  denied hitting her head?
8      A.  Yes.
9      Q.  Do you see where she denied losing
10  consciousness?
11      A.  Yes.
12      Q.  Do you see where she denied hitting her
13  shoulder or neck directly?
14      A.  Yes.
15      Q.  Then it is noted that she had small
16  abrasions on her foot and ankle.  Do you see that?
17      A.  Yeah.
18      Q.  And so, do you see anything in the emergency
19  room record referencing a blow to the head or any
20  reference to headaches?
21      A.  It says here, a few hours later she reports
22  bilateral neck stiffness and muscle soreness.  And
23  there's a history here (witness indicating) of
24  migraine headaches.
25      Q.  A history of migraine headaches; right?

Page 29

1      A.  Yeah.
2      Q.  But no report of a -- no current complaint
3  of headaches; true?
4      A.  Let me double-check here.  Almost done
5  here.
6      Q.  Sure.
7      A.  Yes.  You're correct about that.
8      Q.  And just so we are clear:  You've now had
9  the opportunity to review the emergency room
10  record.  The primary complaint is shoulder pain;
11  true?
12      A.  True.
13      Q.  She denies hitting her head or losing
14  consciousness; correct?
15      A.  Correct.
16      Q.  She denies hitting her shoulder or neck
17  directly; correct?
18      A.  True.
19      Q.  And there -- she does tell the folks at the
20  emergency room about her history of migraine
21  headaches; true?
22      A.  True.
23      Q.  But she is not reporting any new headaches
24  on the date of the accident; correct?
25      A.  Correct.

Page 30

1    Q.  And then, if you can turn to October 17,
2    which I think is her next visit to Baylor Scott &
3    White.
4    A.  I'm here (witness indicating).
5    Q.  And do you see where she specifically denies
6    headaches in that record?
7    A.  Hold on.  I see it.
8    Q.  All right.  And it also reports that her
9    neck has no midline or bony tenderness with a good
10   range of motion.  Do you see that?
11   A.  In the Physical exam section?
12   Q.  I'm not sure where.  I think so.
13   A.  Let me see.  I see in review of symptoms,
14   positive for arthrology as in neck pain, but you're
15   saying limitation of range of motion?
16   Q.  Again, and I apologize for not bringing that
17   record today.  I'm just -- my Summary reflects good
18   ROM next to neck or denial of neck tenderness.
19   A.  I see it.
20   Q.  Okay.  And they --
21   A.  However -- I'm sorry to interrupt.  It says
22   she exhibits spasms in her neck.
23   Q.  Okay.  And they did an x-ray on her left
24   wrist; correct?
25   A.  Yes, sir.

Page 31

1    Q.  And that appears to be her primary complaint
2    that day; true?
3    A.  And --
4              MS. PESCHEL:  Objection.
5              THE WITNESS:  And neck pain.  Yeah.
6    BY MR. PAYNE:
7    Q.  But they don't x-ray, they don't MRI, they
8    don't do anything in terms of tests or films of her
9    neck on that day; true?
10   A.  Correct.
11   Q.  And they certainly don't do anything with
12   respect to her head in terms of testing; true?
13   A.  Correct.
14   Q.  Now, those records on the date of the
15   accident and a few days following the accident, are
16   those consistent or inconsistent with an
17   aggravation of her migraine complaints?
18   A.  The question is did the records that we just
19   talked about, are they consistent with --
20   Q.  Or inconsistent with a -- some type of
21   aggravation of her issue with migraines?
22   A.  So she didn't develop any worsening
23   headaches or migraine headaches after --
24   immediately after the fall.
25   Q.  And there was no blow to the head or

Page 32

1    anything like that; true?
2    A.  True.
3    Q.  And no loss of consciousness; correct?
4    A.  Correct.
5    Q.  And no films made of the head?  Any type of
6    x-ray, or MRI, or CT scan; true?
7    A.  True.
8    Q.  All right.  You reference in the History and
9    Summary posttraumatic headaches.  Why -- what is
10   the basis of your characterization of her headaches
11   as being posttraumatic?
12   A.  Partly it's her treating neurologist
13   categorized it as that.  But independently, it is a
14   posttraumatic headache because may not immediately
15   after the fall, but progressively thereafter she
16   did develop headaches after that fall.
17   Q.  Well, let me ask you this:  We -- based on
18   our own medical records that you have looked at,
19   she's got a history of migraines; right?
20   A.  Yes.
21   Q.  She has no blow to the head on the date of
22   the accident; right?
23   A.  Right.
24   Q.  No subjective complaints of headaches on the
25   date of the accident; right?

Page 33

1    A.  True.  Well, she did have neck pain in that
2    one.
3    Q.  Okay.
4    A.  Sometimes that can take time before it
5    starts.
6    Q.  Well, I understand.  But no migraine
7    headaches are reported either on the accident, or
8    three or four days later; right?
9    A.  Not immediately after the accident.
10   Correct.
11   Q.  All right.  And so, I understand you're
12   saying that a neurologist characterized them as
13   posttraumatic headaches, but I'm asking you.  Do
14   you have an independent basis of -- an opinion, if
15   you're offering that opinion, that her headaches
16   are posttraumatic as opposed to these ongoing
17   issues she has with migraines?
18   A.  Posttraumatic.  That's my opinion.
19   Q.  Based on what?  What are you basing that on?
20   A.  Well, the fall.  Again, it doesn't have to
21   happen immediately after the injury.  However, the
22   course of -- and again, as we established, I don't
23   have her prior records before the fall.
24         But according to her history and the
25   nature of her condition dramatically changed after

Page 34

1  that fall.  So that's why I'm attributing the
2  diagnosis of posttraumatic headache to the fall.
3      Q.  Okay.  Based on what she said happened?
4      A.  Yes, sir.
5      Q.  Okay.
6      A.  And again, the medical records and the
7  change of her pathology afterwards.
8      Q.  But again, headaches are what she says;
9  right?
10     A.  She has headaches.  Yeah.
11     Q.  Okay.  Ms. Hills; reported to you, she
12 reported to her neurologist, she did not report to
13 the ER physicians, but reported to those folks that
14 her headaches became worse after this fall; true?
15     A.  Hmm-hmm.  Yeah.
16     Q.  And nothing else supports her headaches
17 becoming worse after this fall other than her
18 saying that to her healthcare providers; true?
19     A.  True.
20               MS. PESCHEL:  Objection to form.
21               THE WITNESS:  Right.
22 BY MR. PAYNE:
23     Q.  And so, the sole basis that you're relying
24 on from your review of the records, the neurologist
25 is relying on is what Ms. Hills said happened as

Page 35

1  far as her headaches becoming worse; true?
2      A.  Yeah.  Again, my opinion is based on her
3  saying that her -- and what she told her treaters
4  that her headaches worsened.  Yeah.
5      Q.  And if she is mistaken, or wrong, or is not
6  being candid, then that diagnosis is misplaced;
7  true?
8      A.  It's possible.  Yeah.
9      Q.  All right.  So moving on under your analysis
10 of findings.  And we have kind of talked about this
11 as well.  You offer a diagnosis -- three diagnoses:
12 Posttraumatic headaches, posttraumatic cervical
13 radiculopathy, and posttraumatic disc herniations
14 at three levels.  Do you see that?
15     A.  Yeah.
16     Q.  We've already talked about the posttraumatic
17 headaches that your opinion relies solely on what
18 Ms. Rose -- pardon me -- Ms. Hills said; true?
19     A.  True.
20     Q.  What about -- what is the basis of your
21 diagnosis that Ms. Hills has cervical
22 radiculopathy?
23     A.  On her history, her neck pain was shooting
24 down the arms, and there's a cervical MRI showing
25 the herniations at C5-6, C6-7, T1.  I'm sorry.

Page 36

1  C5-6, C7-T1, and T1, and T2.
2      Q.  And have you reviewed those actual films?
3      A.  No.  I saw the reports.
4      Q.  You rely on the radiology report?
5      A.  I do.
6      Q.  Okay.
7      A.  In this case, I do.
8      Q.  All right.  As far as whether those
9  herniations resulted from the event in question or
10 were preexisting degenerative conditions, do you
11 have any way of knowing?
12     A.  Yeah.  My opinion is that they were caused
13 by the fall.
14     Q.  What is the basis of that opinion?
15     A.  The fact that, you know, multiple disc
16 herniations after a traumatic event with reports of
17 neck pain, and having physical exam findings of,
18 you know, neck tenderness and spasms.  And within a
19 reasonable degree of medical probability, that's my
20 opinion.
21     Q.  But again, it relies on her saying that she
22 had neck pain following this event; true?
23     A.  Yes.  I mean, these herniations are
24 symptomatic in her case.  Correct.
25     Q.  Well, in -- I mean, are thoracic herniations

Page 37

1  typically related to any type of trauma?
2      A.  They can be.  Yeah.
3      Q.  But as to here -- as I understand it, you
4  are relying on the radiology report, which notes
5  herniations.  Your opinion that they resulted --
6  that those herniations that are reflected or
7  reported relate to this particular event, as
8  opposed to two car wrecks, being punched in the
9  face, ordinary disease of life, and degeneration.
10 The reason you distinguish it and say it was from
11 this accident is based only on what she told you;
12 true?
13     A.  No.  And the medical records as well.
14 Right.  She did report neck pain, stiffness.  She
15 had, you know, a physical exam that showed she had
16 neck pain and spasms.  So those things have --
17     Q.  So what she told you and what she told her
18 medical providers; true?
19     A.  True.
20     Q.  Is that --
21     A.  And part of the physical exam that is an
22 objective finding is palpating for spasms.  Right.
23 So --
24     Q.  But as to what those spasms resulted from,
25 any relationship to this event versus these other

Page 38

1 events that she reported to you, it relies solely
2 on her saying that it came from this fall; true?
3     MS. PESCHEL: Objection to form.
4     THE WITNESS: To the extent that
5         the emergency room, you know, from the
6         fall reported those symptoms. Yes.
7 BY MR. PAYNE:
8     Q. Well, you just read the ER record. Didn't
9 she in fact even after the event occurred, she went
10 home, and took a nap, and then decided go back to
11 the emergency room. Did you say that in there?
12     A. What date are we talking about?
13     Q. The initial emergency room visit. She did
14 not feel bad -- I'll just read from it from
15 nurses's notes. She did not feel bad at first, but
16 realized at home that she feels hurt.
17         Do you see that in there?
18     A. I got to find it.
19     Q. Okay. I'll tell you what, let's keep
20 moving, if you don't mind.
21     A. All right.
22     Q. Certainly the event at the Sam's Club did
23 not necessitate -- based on history and your review
24 of the record any paramedics come to the scene;
25 true?

Page 39

1     A. I don't recall that.
2     Q. She wasn't transported by ambulance;
3 correct?
4     A. Correct.
5     Q. She reported -- I'll represent to you that
6 she reported that she actually left on her own,
7 went home, took a nap, and then realized she
8 decided she wanted to go to the emergency room.
9 That's reflected in that ER record. Do you have
10 any reason to disagree with that?
11     A. If you represent it, I'll believe you.
12     Q. All right. And as far as any prior neck
13 complaints, you have not reviewed any record
14 predating the October event at Sam's; true?
15     A. True.
16     Q. Nor have you reviewed any films, if they
17 exist, of any -- for her that predate the event at
18 Sam's; true?
19     A. Correct.
20     Q. All right. As far -- well, really part
21 three of your diagnoses really relates to part two.
22 You're saying she has disc herniations, but you're
23 relying only on the radiology report that reports
24 of herniations; true?
25     A. Correct.

Page 40

1     Q. You did not make an independent review of
2 the films to offer that opinion; true?
3     A. Correct.
4     Q. Now, you go on to say that her impairments
5 are permanent. What is the basis of that opinion?
6     A. The fact that she persists with the symptoms
7 of, you know, neck pain, cervical radiculopathy,
8 posttraumatic headaches that are chronic in nature,
9 despite treatment. You know, that's why my opinion
10 is that she has a permanent impairment.
11     Q. But as far as whether she already had a
12 permanent impairment from her history of migraine
13 headaches -- we've already discussed this, you have
14 no way of making that distinction; true?
15     A. I'm sorry. Can you repeat that?
16     Q. You cannot say, based on a reasonable degree
17 of medical certainty, that she was not already
18 permanently impaired given her history of migraine
19 headaches; true?
20     A. I can. No, I can.
21     Q. Based only on what she told you?
22     A. Yes. And again, the medical records --
23 you're right, I didn't review the medial record
24 prior, but based on the records I reviewed and her
25 history. Yes.

Page 41

1         MS. PESCHEL: And if we are going
2             to go down there, I have them sitting
3             right here. I was just provided the
4             previous records last night at about
5             5:30. If we could go off the record, he
6             can peruse them real quickly.
7         MR. PAYNE: Okay. Well, let's
8             continue on. And if you want to do that
9             with your direct, that's fine.
10         MS. PESCHEL: That's fine.
11 BY MR. PAYNE:
12     Q. All right. Let's shift gears and talk about
13 kind of what I would characterize as part two of
14 your opinions. And that is the life care plan.
15 You have offered a life care plan in this case;
16 correct?
17     A. Yes, sir.
18     Q. And as it relates to the life care plan,
19 what is your opinion that you're offering to the
20 jury or opinions?
21     A. You're talking about the specific -- the
22 cost of future care?
23     Q. Well, I mean whatever they are. Tell me
24 what your opinions are in terms of what Ms. Hills
25 needs in the future.

Page 42

1    A.  Okay.  So regarding the future needs of Ms.
2  Hills -- I'm looking at page -- I did two types of
3  care, one more conservative and one less
4  conservative.  I'm looking at page 8 of 12.  Let me
5  know when you're there.
6    Q.  Okay.
7    A.  So future care would be neurology visits at
8  least three times per year.  Then the
9  Dihydroergotamine medications at least twice a
10  week, Emgality medication one per a week, Reglan
11  (ph) 10 milligram once a week, Naratriptan 40
12  milligrams every night, and a cervical MRI one time
13  every five years.
14          The other option for her would be the same
15  thing, but to treat her headaches also with
16  bilateral greater and lesser occipital nerve blocks
17  two times a year.
18    Q.  Now you understand -- well, do you
19  understand whether Ms. Hills has glaucoma?
20    A.  Yes, sir.
21    Q.  Would you still recommend occipital nerve
22  blocks to someone who has glaucoma?
23    A.  Yeah.  When you do the -- part of the reason
24  -- she was told not to get cervical epidural
25  steroid injections.  She went to the doctor because

Page 43

1  steroids can aggravate the glaucoma.  But when you
2  do occipital nerve blocks, you can do them with
3  steroids.  Personally, I use local anesthetics
4  only.  I don't use steroids.  So it shouldn't be a
5  concern.
6    Q.  But again, as to whether this future care
7  resulted from or relates to the event at Sam's
8  Club, we talked about this several times now, is
9  based on what she told you and what she told her
10  other medical providers; true?
11    A.  True.
12    Q.  As far as -- help me understand -- are you
13  recommending that she take two different
14  high-dollar migraine medications all at once?
15    A.  You're talking about the medications that I
16  recommend?
17    Q.  Yeah.
18    A.  That's the regimen.  Yeah.  The regimen that
19  I recommended here.  Correct.
20    Q.  And as I generally understand it, this --
21  how do you say it?  Emgality?
22    A.  Yeah.
23    Q.  Emgality.  That's a drug that just received
24  FDA approval within the last couple of years;
25  right?

Page 44

1    A.  I don't recall exactly.
2    Q.  Pretty recently.  It's a pretty expensive
3  drug?
4    A.  I list the price here, $8,280 per year.
5    Q.  Okay.  Are there migraine medications
6  available that are priced less than what you list
7  as 8,000 per year?
8    A.  It's possible.  Yeah.
9    Q.  And likewise, the Dihydroergotamine -- and
10  I'll give that to you -- which I think it goes --
11  what's its trade name?  Which is certainly easier
12  to say.
13    A.  Trade name?  I don't recall that one.
14    Q.  It's something like migratol (ph) or
15  something?
16    A.  No.
17    Q.  That doesn't ring any bells?
18    A.  No.
19    Q.  Are you familiar with that medication?
20    A.  The Ergotamine family.  Yeah.
21    Q.  I'm sorry.  Which family?
22    A.  Ergotamine family.  Yeah.
23    Q.  Okay.  And why did you choose that
24  particular drug that costs $5,000 a year?
25    A.  She was taking it.

Page 45

1    Q.  Okay.  Did you plug in those medications for
2  any reason other than she had taken those two drugs
3  in the past?
4    A.  And they work.  Yeah.
5    Q.  Well, she said they worked; right?
6    A.  Yeah.
7    Q.  Okay.  Is that the sole basis for you using
8  those drugs?
9    A.  Yes, sir.
10    Q.  Okay.  There are other drugs -- migraine
11  drugs that you could have put into your life care
12  plan; true?
13    A.  Yes.  However, she did try others and she
14  failed, like, Tripheinze (ph), Lyrica.  So the
15  regimen she is on right now, you know, she is not
16  headache-free, but it's -- to a certain extent,
17  it's working for her.
18    Q.  And you are reporting that she will continue
19  to need that for her entire life span; right?
20    A.  Yes.
21    Q.  And you have not discounted it for present
22  value; true?
23    A.  True.
24    Q.  And you have not accounted for the fact that
25  new drugs often fall in price as they're replaced

Page 46

1  by other new drugs; correct?
2    A.  It's possible.  Yeah.
3    Q.  So it's certainly possible that this
4  Emgality will not continue to cost, as you put it,
5  $8,200 a year, but will reduce in price over time;
6  true?
7    A.  Well, it's possible.  Yeah.
8    Q.  Well, based on -- I mean, you're a pain
9  doctor in part.  You're familiar with pain
10  medications.  Do prices go down over time as
11  different drugs come in and out of style?  For lack
12  of a better phrase.
13    A.  Now, it's possible.  But again, there are
14  examples of -- I mean, you might have heard a
15  medication for -- I think it was tuberculosis.
16  Some company bought that particular drug, and then
17  they raised the prices, and --
18    Q.  And he went to jail.
19    A.  No.  That was somebody else.  But, you know,
20  so is it possible that new medications will come
21  and compete with this one?  Driving the price down
22  is possible.  Yeah.
23    Q.  Okay.  And just so we are clear:  Your
24  opinion as to Ms. Hills' future need of
25  pharmaceutical drugs, one number, does not consider

Page 47

1  present value of the future needs of those drugs;
2  true?
3    A.  No.  When you said present value, I did not
4  adjust it -- I used today's dollars.
5    Q.  Okay.  And that is in part what I'm asking.
6  And let's be clear about all of those points.  You
7  did not adjust your figure for present value for
8  the future need of these drugs; true?
9    A.  True.
10    Q.  And likewise, you did not consider that
11  those drugs may change in price over time; true?
12    A.  I did not make that calculation.  Correct.
13    Q.  And your inclusion of these drugs is based
14  only on the fact that she has used them in the past
15  with some success; correct?
16    A.  Correct.
17    Q.  And her need for those drugs, it may change
18  over time; correct?
19    A.  It's possible.  She may need more.
20    Q.  She may need more or she may need less?
21    A.  It's possible.
22    Q.  All right.  And as far as the -- well, the
23  need of a cervical MRI, you're saying she needs one
24  every five years?
25    A.  Yes, sir.

Page 48

1    Q.  What is -- why do you -- how do you arrive
2  at that opinion?
3    A.  So this is a conservative life care plan;
4  right?  I mean, you could make the argument that
5  she was a candidate for the epidural steroid
6  injection, which wasn't done because of her
7  glaucoma.  However, there are other kinds of
8  injections and therapy.  She may be a candidate for
9  or such as cervical radial nerve branch blocks,
10  cervical radiofrequency lesioning.  I'm not a
11  surgeon, but it's possible that she might need
12  surgery in the future.  Spinal cord stimulator
13  trials, implants, and all of that stuff, I didn't
14  include that in here (witness indicating).  But at
15  the very least, to monitor the condition of her
16  cervical spine once every five years.
17    Q.  And you price the cervical spine that she'll
18  need -- or pardon me.  Cervical MRI that she'll
19  need every five years at $590.80; true?
20    A.  I'm sorry.  What?
21    Q.  You priced the cervical MRI at an average
22  annual cost of $590.80.  True?
23    A.  You changed the page on me.  It's 5 -- yeah,
24  you're right, $590.80.  Yeah.
25    Q.  Okay.  And in fact, the cervical MRI that

Page 49

1  Ms. Hills had in this instance was done --
2    A.  Could I interrupt you for a second?
3    Q.  Of course.
4    A.  The MRI cost is $2,954.  So what you're
5  looking at is a different table that divides it by
6  five years.
7    Q.  Well, how much are you suggesting or opining
8  that the cervical MRI is going to cost?  Each one
9  of them?
10    A.  $2,954.  And that's page 8 of 12.
11    Q.  Oh.  Okay.  So you're actually saying that
12  the cervical MRI will cost almost $3,000?  I guess
13  I did misread your table.  You're saying the MRI
14  costs that much?
15    A.  Yes, sir.
16    Q.  Has that been your practice and experience
17  that they actually cost that much?
18    A.  I've seen higher than that.
19    Q.  Well, did you look at what she was actually
20  billed in this case for a cervical MRI that she did
21  have?
22    A.  I don't recall that.
23    Q.  It isn't -- you do have the billing records
24  though; right?
25    A.  I think so.

Page 50

1    Q. All right. I will hand you what I will mark
2    as Exhibit Number 2.
3    A. Okay.
4              (Exhibit No. 2 was marked for
5              identification.)
6    BY MR. PAYNE:
7    Q. Did Ms. Hills undergo a cervical MRI in this
8    instance?
9    A. Yes, sir.
10   Q. And when was that done?
11   A. I have here November 25, 2016.
12   Q. And what was she initially charged for that
13   cervical MRI?
14   A. $352.
15   Q. All right. And what did the provider
16   ultimately accept in satisfaction for having that
17   cervical MRI done?
18        MS. PESCHEL: Do you have both
19        sides of the bills?
20        MR. PAYNE: I don't know what that
21        means.
22        MS. PESCHEL: Scott White bills
23        facility charge and doctor charge. So
24        if you only have one of them, that's not
25        the full charge of the MRI.

Page 51

1         MR. PAYNE: Okay.
2         THE WITNESS: So to answer your
3         question $111.25.
4    BY MR. PAYNE:
5    Q. And so, your opinion as to future cervical
6    MRIs did not account the actually -- and if I have
7    a misrepresentation, either way your number doesn't
8    account for what she was actually billed in this
9    case; true?
10   A. That number is the average of, you know, the
11   region for that.
12   Q. And we'll get to that. But your number does
13   not consider what she was actually billed; true?
14   A. It does consider it. Yeah.
15   Q. No. What she was actually billed for this
16   charge.
17   A. Well, the database I use looks at all bill
18   charges in that region.
19   Q. We're going to get to this. But in this
20   instance, this particular bill, do you know what
21   she was billed in this case for her cervical MRI?
22   A. Yeah. $352. Yeah.
23   Q. And do you -- and you did not consider your
24   actual bill in offering an opinion as to what it
25   will cost her in the future to have more cervical

Page 52

1    MRIs done; true?
2    A. True. Because I used the database that
3    includes bill charges from Baylor Scott & White.
4    Q. And likewise, did you see what she was
5    billed for that Emgality? And what she was actually
6    billed for that medication?
7    A. I don't recall that.
8    Q. Okay.
9              MR. PAYNE: Let me hand you what
10             I'll mark as Exhibit 3.
11             (Exhibit No. 3 was marked for
12             identification.)
13   BY MR. PAYNE:
14   Q. What do you have as the price per dose of
15   the Emgality? What number do you plug in?
16   A. Per year? $8,280.
17   Q. Well, per dose.
18   A. So what I did was I usually look at the cost
19   of the total 120 milligrams, and then look at the
20   cost for that for the whole year. So I guess you
21   can divide that by 12.
22   Q. And what's your number again?
23   A. The -- can divide it if you want. So if you
24   divide it by 12, it's $690 a month.
25   Q. Okay.

Page 53

1    A. For the Emgality.
2    Q. All right. And I'm going to hand you
3    Exhibit 3, and show you, and represent to you these
4    are billing charges from a Walmart Pharmacy. And
5    you see it was actually a little bit lower than
6    that. What she was actually billed for that?
7    A. She was billed $1,153.60. Correct.
8    Q. No. Look at each dose. 120 milligrams,
9    they're each about 575. That's like a triple dose
10   or a double dose?
11   A. Oh, okay. I see Emgality 120 milligrams per
12   millimeter injection $577.45.
13   Q. And again, your life care plan does not
14   account for what she has actually been billed in
15   the past, just this input that you use or the
16   system that you use; true?
17   A. True.
18   Q. Okay.
19   A. Can I get some water? If you don't mind.
20   Q. Of course. Yeah. Let's take a little
21   break.
22             THE VIDEOGRAPHER: We are off the
23             record at 4:14 p.m.
24             (At this time, off the record.)
25             (At this time, back on the record.)

Page 54

1    THE VIDEOGRAPHER: Standby. We are
2  back on the record at 4:16 p.m.
3  BY MR. PAYNE:
4    Q. All right. Dr. Miranda, are you ready to
5  continue?
6    A. Yes, sir.
7    Q. All right. Dr. Miranda, the -- let's talk
8  about how you arrived -- you talked about an
9  average. How do you arrive at the annual costs for
10 each of the medications and the other treatment
11 that you have recommended for Ms. Hills?
12   A. I used it -- for the medications, I used
13 GoodRX. For the neurology visits, I have the MRI.
14 I used a database called Fairhealth.org, the same
15 thing for the injections, occipital nerve blocks.
16   Q. All right. So as far as GoodRX --
17 interestingly, I just happened upon a website
18 called GoodRX, and I'll mark this as Exhibit 4.
19       And again, this is just what I looked up
20 yesterday, just kind of looking at this thing. You
21 can see down here at the bottom, it says www.getrx,
22 and it actually lists a bunch of pricing for that
23 Emgality. Do you see that?
24   A. Yes, sir.
25       (Exhibit No. 4 was marked for

Page 55

1       identification.)
2  BY MR. PAYNE:
3    Q. And then again, it processes it even lower
4  than what she's been paying, does it not?
5    A. I don't know why they used here, but the
6  numbers here are -- well, you look at the retail
7  price, not looking at the free discount; right?
8  So, we don't use collateral sources when we do life
9  care plans. So when I do use these numbers, I use
10 the estimated retail price.
11   Q. Well, I'll tell you -- I'll represent to
12 you, all I did was type in cost of Emgality, and
13 that page popped up, and that pricing popped up.
14 Did you do something different?
15   A. I put the area code for the patient. That
16 would be the only different thing.
17   Q. Okay. At least based on what I've
18 represented to you that I did, that pricing is
19 different than what's reflected in your report for
20 what is Emgality pricing; true?
21   A. True.
22   Q. And as far as the --
23   A. Mind you, it's not way off.
24   Q. No. It's not way off. About 100 bucks a
25 pop off; right?

Page 56

1    A. No, not even. I mean, if you look at the
2  estimated retail price per dose, I divided my
3  number by 12. It was 690. I'm looking at the
4  estimated retail price from Walmart 658, CVS 787,
5  Walgreens 691, Kroger's 691, Target 680, Costco
6  676. So it's there, you know, in the 600s.
7    Q. Using the retail pricing; right?
8    A. No.
9    Q. You don't consider any discounts that are
10 readily available; right?
11   A. Correct.
12   Q. So your life care plan does not consider
13 either the discount reflected in Ms. Hills' own
14 records, nor does it reflect generally available
15 discounted pricing available on the Internet; true?
16   A. True.
17   Q. All right. And as far as the
18 pharmaceuticals go, it's pretty simple what you
19 have done. You have simply taken a retail price
20 for Emgality, and have assumed that Ms. Hills will
21 not change that medication -- well, first it
22 assumes her life span; right?
23   A. Yes.
24   Q. And then it assumes she will continue to
25 take that exact medication; right?

Page 57

1    A. Sure.
2    Q. And then it assumed that the price of that
3  medication will not change over the next, what is
4  it, 30 or 40 years?
5    A. Whatever her life care plan is. Yeah.
6    Q. All right. Okay. Now, as far as the
7  medical treatment, what did you rely on as a basis
8  for your opinions?
9    A. I'm sorry. I don't understand the question.
10 You mean what database I use for --
11   Q. Yes.
12   A. So for the neurology visits, the cervical
13 MRI, and the occipital nerve blocks, I used a
14 database called Fairhealth.org.
15   Q. But as far as the -- and I am not -- I mean,
16 obviously you're a professional and have a lot more
17 education than I do. You know, you treat patients.
18 I'm not trying to belittle what you do.
19       What I'm saying is -- would you
20 agree with me that at least as far as offering an
21 opinion about the pharmaceutical pricing that Ms.
22 Hills can anticipate in the future, that doesn't
23 really require any of your medical background or
24 expertise, either as a life care planner or a
25 physician; right?

Page 58

1    A.  The question is do I require medical
2    expertise in determining exactly what -- the
3    changes in costs in the future or --
4    Q.  Well, you -- as I understood what you did
5    here, you just got the retail price at GoodRX.com
6    for Emgality, and the one I can't say, and you have
7    assumed all of those things that she'll take it for
8    the rest of her life, and it won't change in price;
9    right?  Those opinions do not require your medical
10   expertise and they also do not require your life
11   care planner expertise; true?
12            MS. PESCHEL:  Objection.  Form.
13            THE WITNESS:  I mean, as a life
14        care planner, they train us to look up
15        pricing; right?  So, I mean, it does
16        require that part of the background.
17            As far as the medical
18        component and recommendations,
19        obviously, you know, my training and
20        expertise in these matters.
21            As far as, you know,
22        determining if these numbers are going
23        to change, I don't know that for 100
24        percent sure.
25   BY MR. PAYNE:

Page 59

1    Q.  Yeah.  And you haven't offered that opinion;
2    right?
3    A.  What opinion?
4    Q.  That they'll change, that the pricing will
5    change?
6    A.  They might.  They might.  Yeah.  They might
7    change.
8    Q.  But your opinion assumes they're not going
9    to change; right?
10   A.  Well, my opinion -- again, I used today's
11   dollars.  I don't have a database telling me what
12   the price is going to be in the future.
13   Q.  All right.  So back to my original question:
14   Your opinion as to Ms. Hills' future pharmaceutical
15   costs is only based on you looking up the retail
16   price of those medications in today's dollars, and
17   assuming it for some period of time; true?
18   A.  Correct.
19   Q.  And would you agree that that does not
20   require expertise to offer that opinion either from
21   your medical background or your life care planner
22   background; true?
23            MS. PESCHEL:  Objection to form.
24            THE WITNESS:  Little confusing.  It
25        does require my medical background in

Page 60

1        terms that I -- you know, I'm
2        recommending a treatment for headaches
3        and full-out care.  And the life care
4        planning part comes in when we look at
5        the costing.  I mean, that's something
6        that they train us how to do.
7    BY MR. PAYNE:
8    Q.  But now you're not recommending treatment to
9    Ms. Hill, are you?
10   A.  Well, the treatment that I'm putting here.
11   Yeah.  She's not my patient, but the life care plan
12   is future treatment.
13   Q.  But let's be clear:  Are you making a
14   recommendation to Ms. Hills as to what she needs to
15   do in the future?
16   A.  That's what the life care plan is.  Yeah.
17   Q.  It's a recommendation to her?  Do you -- are
18   you comfortable doing that even though you're not
19   her treating physician?
20   A.  Again, she's not my patient.  But the
21   recommendations that I'm making, you know, they're
22   medical recommendations.
23   Q.  Okay.
24   A.  Knowing she's not my patient.
25   Q.  All right.  So we are clear on that:  You

Page 61

1    have not treated Ms. Hills in the past, you do not
2    intend to treat her in the future.  Are both of
3    those things correct?
4    A.  Correct.
5    Q.  You do not intend to monitor her
6    medications, monitor her condition, or do anything
7    of the kind; correct?
8    A.  True.
9    Q.  You do not consider her your patient and the
10   patient privilege does not apply here; true?
11   A.  True.
12   Q.  And so, maybe it's just the word
13   "recommendation" or you're recommending it.  Are
14   you truly asking her, or telling her to take this
15   course of action, or are you just simply saying if
16   she takes this course of action, it will cost X
17   dollars?
18   A.  Again, my recommendations are based on what
19   I -- on my training, and what I read in the
20   reporting, and this is what I feel she is going to
21   need in the future, and this is the associated
22   costs.
23   Q.  But are you telling her to do this in the
24   future?
25   A.  Well, I haven't had the conversation with

Page 62

1  her. I mean, I submitted the report to the
2  attorneys and I would assume they would have showed
3  it to her; right?
4    Q. But, I mean, again in your capacity as a
5  non-treater, should you be treating her what to do
6  in the future?
7    A. I mean, this is a different context; right?
8  Because I'm not a treater. These are the
9  recommendations.
10   Q. Okay. And as to whether Ms. Hills has
11 continued to take the Emgality or the Dihydroergo
12 -- how do you say that?
13   A. Dihydroergotamine.
14   Q. Yeah. As to whether Ms. Hills has continued
15 to take those medications for the past six months,
16 do you know?
17   A. So I did review the records provided
18 recently. I'll tell you which one. It's Baylor
19 Scott & White neurology clinic. It's dated from
20 June 27, 2019 through October 10, 2019. And she
21 continued treating for her headaches. She reported
22 taking the OCPs, which I didn't include in the life
23 care plan, which were also working for her
24 headaches and --
25   Q. What are OCPs?

Page 63

1    A. Oral contraceptive pills.
2    Q. What -- oral what?
3    A. Contraceptive.
4    Q. Contraceptive?
5    A. Yeah.
6    Q. And am I thinking the same thing? We're
7  talking about a contraceptive pill? What does that
8  have to do with treatment here?
9    A. Yeah. It works for some kinds of headaches.
10 Yeah.
11   Q. Well, does it work for posttraumatic
12 headaches?
13   A. In her case it was. Yeah.
14   Q. Well, is it typically used to treat
15 posttraumatic headaches?
16   A. It depends on the response of the patient.
17 I mean, if it works.
18   Q. Is it routinely prescribed for that purpose?
19   A. The OCPs, no. It's -- to my understanding,
20 I believe it's an off-label prescription, you know,
21 an indication probably.
22   Q. Okay. So oral contraceptives are not on the
23 label prescribed for posttraumatic headaches; true?
24   A. Not that I recall.
25   Q. All right. So -- and I'm sure I do have

Page 64

1  those records, but I didn't see them leading up to
2  today. What -- did they show that she continued to
3  take the Emgality?
4    A. Let me double-check on that. Do you mind if
5  I look at this for a second?
6    Q. No. No. Not at all.
7    A. Yes, she was.
8    Q. And what about the other one? The
9  Dihydroergo --
10   A. Yeah.
11   Q. And what else is she taking?
12   A. Toradol, Reglan or Metoclopramide, Xalatan,
13 but that's for the eye, Cyclobenzaprine, Kurvelo.
14   Q. What -- can you help me understand what each
15 of these are prescribed for in her case?
16   A. Hold on a second. Do you mind? So the
17 Xalatan is an ophthalmic solution, the Emgality is
18 for the headaches, the Reglan is also for
19 headaches, the Dihydroergotamine also for the
20 headaches, Dihydroergot for severe headaches,
21 Cyclobenzaprine also works for headaches, and the
22 Kurvelo in this case is the contraceptive pill,
23 also works for headaches.
24   Q. Back to an earlier question. Can you
25 explain -- help me understand how your particular

Page 65

1  expertise is applied in offering an opinion that
2  Ms. Hills will need this expensive headache
3  medication for the duration of her life. How that
4  number relies on expertise as opposed to simply
5  looking up the price and multiplying?
6    A. I'm having trouble understanding the
7  question.
8    Q. Let me ask you -- yeah, I agree. It was
9  kind of convoluted. Let me start over.
10        How did you apply your expertise in
11 offering an opinion as to the price for the
12 migraine medication that Ms. Hills will need in the
13 future? How did you use your expertise?
14   A. So, the price, again, I looked that up, as
15 you said. Obviously, I mean, I don't know that by
16 heart. So I identified the medication that I think
17 she is going to need in the future, and I looked up
18 the price, and I extended that throughout her
19 lifetime.
20   Q. And based on what you just said, that does
21 not require your expertise to offer that opinion;
22 true?
23        MS. PESCHEL: Objection. Form.
24        THE WITNESS: I mean, it does
25        because I'm recommending the medication,

**Page 66**

1     and the price that I found, and, you

2     know, doing the research for it.  So it

3     does.

4  BY MR. PAYNE:

5     Q.  And what is the basis that you're

6  recommending that medication?

7     A.  It's working for her headaches,

8  posttraumatic headaches.

9     Q.  All right.  The medical care itself.  You

10  rely on something called Fairhealth.org?

11     A.  The medical care -- you mean the injections,

12  neurology visits, and the cervical MRI price?  Yes,

13  sir.

14     Q.  All right.  As I think I've understood it,

15  what you do is you insert -- you get a subscription

16  to Fairhealth.org; correct?

17     A.  Yeah.

18     Q.  You insert the CPT codes, and you insert, I

19  think, a ZIP code, and Fairhealth will spit out a

20  number for you; right?

21     A.  Several.  Yeah.

22     Q.  Okay.  And that is the number that you use

23  in terms of filling out, or imputing, or preparing

24  your life care plan as far as what this medical

25  care is going to cost in the future; correct?

**Page 67**

1     A.  Yeah.

2     Q.  You do not rely on any other data source, or

3  other information, or other statistical data, or

4  anything other than Fairhealth.org in the procedure

5  that you use; true?

6     A.  True.

7     Q.  All right.  And as far as the particulars

8  that Fairhealth relies on in giving you that data,

9  can you explain to us how they arrive there?  How

10  they get there?

11     A.  So those are billed rates from providers in

12  that area from insurance companies, meaning

13  Medicare and private payers.

14     Q.  All right.  But as to the particular data,

15  where it comes from, the particular payors,

16  particular billers, how large a server they use, or

17  how large a sample they use, you do not know that

18  information; true?

19     A.  I don't have the, you know, the explanation

20  of benefits of each CPT code and service provider

21  from the providers in that area.  I don't have that

22  raw data.

23     Q.  And as I think I understand it, what -- the

24  number that is given to you is what is charged, not

25  what is accepted by a provider to perform that

**Page 68**

1  service; true?

2     A.  Correct.

3     Q.  All right.  And you agree generally -- it's

4  a fair, and true accurate statement that a medical

5  provider will accept less than what they charge for

6  any particular service; true?

7     A.  It's possible.  Depending on if they have a

8  contract or not.

9     Q.  And a particular -- a notal example of that

10  is the retail price that you have used for the

11  cervical MRI was $2,000 plus; right?

12     A.  Yeah.

13     Q.  And what Baylor Scott & White charged here,

14  at least according to that document, Exhibit 2, was

15  significantly less.  True?

16     A.  It was -- what they charged was $352 for the

17  cervical MRI.  Correct.

18     Q.  All right.  And so, are you bringing -- are

19  you applying anything independent based on your own

20  expertise as a life care planner and medical doctor

21  in offering those figures, are you simply relying

22  on Fairhealth.org?

23     A.  I'm relying on the database that determines

24  the cost of cervical MRIs, for example, in this

25  case in that region.

**Page 69**

1     Q.  And do you know if Fairhealth utilizes

2  different rates, like private insurance versus

3  Medicare versus Medicare versus workers' comp?  Do

4  you know if they utilize all of that information,

5  or any of it, or --

6     A.  They do use that information for the bill

7  charges, not the contracted rates.  Now Medicare

8  has their own website where they show you how much

9  they're paying in a given year.  And if you up a

10  private payer, I'm almost certain that that

11  information is priority.  I don't think they would

12  share that.  To my knowledge, I don't know if

13  there's a database for BlueCross, or private payers

14  in Texas.

15     Q.  But at least as far as the numbers you use,

16  you're relying only on Fairhealth.org and no other

17  database; correct?

18     A.  Correct.

19     Q.  And nothing -- no independent analysis or

20  investigation; true?

21     A.  I haven't done a survey of costs in that

22  area.  Correct.

23     Q.  And certainly, that amount is what you were

24  noting your opinion as to the charges in the future

25  is simply that it's the charges that might be

Page 70

1  anticipated; correct?
2     A.  Correct.
3     Q.  It's not what those providers would accept
4  in satisfaction for the services that they
5  provided; true?
6     A.  True.
7     Q.  And those, just like the pharmacy bills --
8  and we may have already addressed this.  None of
9  the charges, pharmacy or medical, do you reduce to
10  present value; true?
11    A.  True.
12    Q.  And likewise, your numbers do not reflect
13  that those charges may be higher in the future, or
14  lower in the future, or changed; true?
15    A.  True.
16    Q.  Did you visit with any of Ms. Hills'
17  treating doctors?
18    A.  No, sir.
19    Q.  Do you practice in Bell County?
20    A.  No.
21    Q.  And you recognized that the Fairhealth
22  website has a disclaimer on it that there are
23  limitations on its use; true?
24    A.  I believe there's something to that effect.
25  Yeah.

Page 71

1     Q.  And I'll hand you what I will mark as 5 and
2  6, I think.
3            (Exhibit Nos. 5 and 6 were marked
4            for identification.)
5  BY MR. PAYNE:
6     Q.  And I'll give you -- you can peruse it, and
7  then we'll talk about it in a second.
8     A.  I'm good if you want to ask.
9     Q.  I don't -- not reading it word for word, but
10  can you offer us just a general summary of kind of
11  the disclaimer that they made?
12    A.  So for health consumer website -- again,
13  mine is not consumer website because they have a
14  public one, and I'm part of the, you know, the
15  members of they're not for consumer public access
16  website, which -- in their website, they
17  specifically list life care planners as people that
18  are using the software.
19        So we acknowledge that much.  So it
20  considers to say, and your -- you can plan for this
21  thoroughly and provided solely for personal
22  consumer use, and not for any commercial
23  professional research, litigation, or other
24  purpose.
25    Q.  Do you know if your version has a disclaimer

Page 72

1  on it?
2     A.  I don't recall that.  But I do know for a
3  fact that, at least that last time I checked, they
4  have specific examples of how their database is
5  used by life care planners.  So they do acknowledge
6  that.
7     Q.  Would it be fair to summarize those
8  disclaimers as saying, we try really hard to be
9  accurate, but we can be off.  Is that fair?
10    A.  I mean, I -- you're saying here where does
11  it say that?
12    Q.  Well, I'm just saying that a good summary
13  of that disclaimer?
14    A.  What I just read has nothing to do with what
15  you said.
16    Q.  Well, does their disclaimer suggest, at
17  least to the consumer, that you cannot or you
18  should use caution in relying on our data, because
19  while we try to be accurate, it can be inaccurate?
20    A.  Do you mind if I continue reading this?
21    Q.  Of course.
22    A.  So for Exhibit 6, that's the next page.
23  Okay.  Yes.  I see what you're saying.  Yeah.
24    Q.  And just generally speaking, is that an
25  accurate summary of essentially what that says?

Page 73

1     A.  So on Exhibit 6, it says, despite our
2  efforts, the information on this site may be
3  inaccurate, or incomplete, or out of date.  We make
4  no representation or guarantee that the information
5  on the site is complete, accurate, or current.
6     Q.  Do you know whether Ms. Hills missed any
7  work because of her headaches?
8     A.  I don't recall that.
9     Q.  Do you know if it affected her other daily
10  activities?
11    A.  I don't recall that.
12    Q.  Do you know what Ms. Hills medical expenses
13  have been in the past -- up to at least July of
14  2019?
15    A.  That, I don't recall.
16    Q.  I'll represent to you it's somewhere in the
17  neighborhood of $13,000 or at least according to
18  what's been provided to my office.
19        And just so I'm clear, you understand
20  that between 2016 and the middle of 2019, Ms. Hills
21  has incurred medical expenses totalling
22  approximately $13,000.  Do you understand that?
23    A.  If you represent that, I believe you.  Yes,
24  sir.
25    Q.  And your life care plan suggests that she

**Page 74**

1  will require treatment totalling how much per year?
2    A.  Total, a lower number of $713,802 or a
3  higher number of $1,261,770.
4    Q.  And it looks like years of duration is 48.
5  So what is that annually?
6    A.  Hold on.  So annually it's $26,623.80.
7    Q.  All right.  And so, at least you're
8  projections of approximately 20 or $26,000 a year,
9  that has not been borne out by her last three years
10  of treatment; true?
11    A.  Are you saying incurred?
12    Q.  Yeah.
13    A.  Correct.  Yeah.
14    Q.  So three years -- let's say -- let's call it
15  12.  Well, yeah, just because we can divide 12
16  pretty easy by three.  So that's about 4,000 a year
17  that she's incurred in the past, plus -- and you're
18  suggesting, what, 20-something each year in the
19  future?
20    A.  $26,323.80.  Yeah.
21    Q.  All right.  Dr. Miranda, you -- again, we've
22  talked about you were hired by --
23    A.  I'm sorry.
24    Q.  Of course.
25    A.  This one was with the occipital nerve

**Page 75**

1  blocks, you know.  The other one was an average
2  annual cost of $14,907.80.  So that's -- the one we
3  just discussed was the higher number, and the one I
4  just said is the one without the occipital nerve
5  blocks.
6    Q.  And to date, are you aware of Ms. Hills
7  having any occipital nerve blocks?
8    A.  Not that I recall.
9    Q.  Okay.
10    A.  But it was said she was recommended Botox
11  injections, which might -- I don't recall doing
12  specific research, but it might be more expensive
13  than the occipital nerve blocks.
14    Q.  But again, kind of back to this theme, for
15  the past three years, Ms. Hills has not had any
16  type of occipital nerve blocks; true?
17    A.  Not that I recall.  No.
18    Q.  All right.  And you -- at least one of your
19  averages, the higher average, suggests that she
20  will need them annually for the next 48 years;
21  true?
22    A.  Yes.  Well, two.
23    Q.  Two per year?
24    A.  Yeah.
25    Q.  All right.  So again, you billed for your

**Page 76**

1  time.  You have billed The Carlson Law Firm $7,200?
2    A.  Yes.
3    Q.  And what is that for?  Is that just for the
4  life care plan?
5    A.  Yes.
6    Q.  And that includes a rush fee?
7    A.  Yes.
8    Q.  All right.  And then you billed -- do you
9  still bill $2,500 for your deposition?
10    A.  I did today.  Yeah.
11    Q.  All right.  And if -- and I'm about done.
12  So if it's two hours, you're not going to bill them
13  any more, are you?
14    A.  I don't anticipate doing so.
15    Q.  And have you been asked to appear at trial
16  in this case?
17    A.  I don't recall that, but if I need to go,
18  I'll consider doing trial.
19    Q.  What do you bill for trial time?
20    A.  $5,000.
21    Q.  Do you -- how about if it's up in Waco?
22    A.  I haven't -- is this in Waco?  I didn't know
23  that.  I haven't thought about that.  I don't think
24  so.
25    Q.  Okay.  At this time in the beginning of

**Page 77**

1  2020, how many life care plans have you prepared in
2  this person injury context?
3    A.  North of 250.
4    Q.  And how many depositions have you given?
5    A.  Deposition trial, north of 50.
6    Q.  How many trial appearances have you given?
7    A.  I'm going to guess six to eight.
8    Q.  When was the last one you gave?
9    A.  Yesterday.
10    Q.  Really?
11    A.  Yeah.
12    Q.  In Travis County?
13    A.  Yes.
14    Q.  What was your opinion that you offered?
15    A.  It was a cervical spine injury.
16    Q.  And what -- and did you offer life care
17  opinions or as a treating physician?
18    A.  No.  As a life care planner.
19    Q.  Okay.  And what -- generally speaking, what
20  was your recommendation in that case?
21    A.  That was a cervical spinal cord stimulator
22  trial, and implant, and epidural steroid
23  injections.
24    Q.  Have you testified live at trial in an
25  instance involving migraine headaches or

Page 78

1  posttraumatic headaches?
2     A.  Not that I recall.
3     Q.  Have you offered deposition testimony on
4  occasion involving posttraumatic headaches or an
5  opinion involving that?
6     A.  They're rare.  Not that I recall.
7     Q.  I did fail to ask you for one, but do you
8  still have an Excel spreadsheet of all of your
9  testimony?
10    A.  I do.  It wasn't asked of me, but I have
11  one.  Yeah.
12    Q.  And is it up-to-date, including yesterday?
13    A.  Yes.
14    Q.  All right.  Well, Dr. Miranda, it's always a
15  pleasure.  I appreciate you being so candid with
16  me.
17    A.  Sure.
18             MR. PAYNE:  And with that, I pass
19      the witness.
20           -  -  -
21          CROSS-EXAMINATION
22          -  -  -
23  BY MS. PESCHEL:
24    Q.  Good afternoon, Dr. Miranda.
25    A.  Hi.

Page 79

1    Q.  I just want to kind of circle back to a few
2  things.  Now, you stated that your speciality areas
3  were pain management, physical medicine,
4  rehabilitation, and brain injury; is that correct?
5    A.  Brain injury and medicine.  Yeah.
6    Q.  Okay.  And for the jury, can you please just
7  briefly describe what each of those specialty areas
8  are?
9    A.  So, physical medicine and rehabilitation,
10  the residency entails mostly an in-patient and
11  out-patient setting.  The in-patient setting, we
12  take care of patients that have more serious
13  musculoskeletal, or central nervous system
14  conditions, like strokes, spinal cord injury, hip
15  replacements, multiple fractures, and multiple
16  bones, polytrauma, subarachnoid hemorrhage.  What
17  else?  Joint replacements, cerebral palsy.  That's
18  the inpatient side.  On the outpatient side, we
19  take care of patients that have either headaches,
20  or neck pain, back pain, or things of that nature.
21  Yeah.
22    Q.  Okay.  And --
23    A.  And, I'm sorry, so the pain medication
24  component is where we trained on how to do a spinal
25  injections, you know, like epidurals, frequency of

Page 80

1  lesioning, spinal cord stimulators, and things of
2  that nature.
3        So we get a better expertise doing those
4  procedures in the fellowship of pain medicine.  I
5  was grandfathered into the brain injury medicine
6  board.
7    Q.  Okay.  And what do you mean by that?
8    A.  I didn't have to do a fellowship to sit for
9  the board.
10    Q.  Okay.  But you -- what did sitting for the
11  board entail?
12    A.  Well, you have to be board certified in
13  physical medicine and rehabilitation, and have
14  experience treating people with brain injuries.
15    Q.  Okay.  And then you sit for an exam?
16    A.  You sit for an exam.  Yeah.
17    Q.  Okay.  And is it something extra to pursue
18  -- like, do most physical medicine rehab doctors
19  also have board certifications in pain medicine, or
20  is that something -- are those two separate
21  certifications?
22    A.  They're two separate ones.  Yeah.
23    Q.  Okay.  And it is my -- so you testified
24  earlier you were certified as a life care planner;
25  correct?

Page 81

1    A.  Yup.
2    Q.  Can you explain to the jury what a life care
3  planner does?
4    A.  So like in this case, a life care planner --
5  when I can, I examine the patient, I interview the
6  patient, I review the medical records, and I make
7  recommendations to future care, and the cost
8  related to that future care.
9    Q.  Okay.  And are there certain requirements
10  that you have to become a certified life care
11  planner?
12    A.  Well, the overwhelming majority of life care
13  planners are not doctors.  They are -- they can be
14  vocational rehab experts, they can be nurses,
15  physical therapist, or occupational therapist,
16  psychologist.
17        So you have to have some form of
18  background in the healthcare arena, and then you
19  have to complete 80 credit hours.  And then --
20  that's online.  And then 40 credit hours done at a
21  life center.  And then you sit for an exam and you
22  pass.
23    Q.  Okay.  And why is there a need for life care
24  planners versus simply asking a doctor who's
25  treating a patient what that future care is going

Page 82

1    to cost them?
2        A.  So the life care planner, you know, at least
3    in my experience of treating conditions like this,
4    and we have seen some extents what the outlook is
5    for some of these patients.  And based on that
6    experience, and what we learned in the courses of
7    life care planning, and make the recommendations of
8    future care.
9            Mind you though, being a physical medicine
10   and rehab doctor, you know, and pain medicine, I
11   didn't necessarily have to be a certified life care
12   planner, but that's why I wanted to have that extra
13   training.
14       Q.  Okay.  But do you typically see treating
15   doctors who are treating a patient actually going
16   out and telling their patients what this future
17   care if going to cost without being a life care
18   planner?
19       A.  Really rare.  I've never seen it.
20       Q.  Okay.  And --
21       A.  With some exceptions like talking about
22   cervical recommendation.  I've seen that with an
23   associated cost.  So but that exception, I don't
24   recall seeing any other scenario.
25       Q.  Okay.  So for something 30 or 40 years down

Page 83

1    the line?
2        A.  Something like that.
3        Q.  Okay.  And who certifies life care planners?
4        A.  It's International Commission and Healthcare
5    Certification.
6        Q.  Okay.  And what kind of organization is
7    that?
8        A.  It's an organization that basically
9    maintains the standards, and publications of the
10   standards and articles regarding life care
11   planning.
12       Q.  Where are they out of?
13       A.  I don't recall that.
14       Q.  Okay.  Earlier you got a lot of questions
15   regarding your basis for your opinions as to
16   Ms. Hills having posttraumatic headaches, including
17   questions regarding her past medical records.
18           What I'd like to do is hand you a stack
19   of records that I actually received yesterday
20   evening.  And I would like to go off the record,
21   and take a short break, and let you look through
22   these, if that's okay.
23           THE VIDEOGRAPHER:  We are off the
24       record 4:52 p.m.
25           (At this time, off the record.)

Page 84

1            (At this time, back on the record.)
2        THE VIDEOGRAPHER:  We are back on
3        the record at 5:17 p.m.
4    BY MS. PESCHEL:
5        Q.  All right.  Thank you for taking that short
6    break and taking the time to review those records,
7    Dr. Miranda.
8        A.  Yeah.  No problem.
9        Q.  I marked them as Exhibit 7.  Have you had
10   the opportunity to look through the pages handed to
11   you as Exhibit 7?
12       A.  Yes, ma'am.
13           (Exhibit No. 7 was marked for
14       identification.)
15   BY MS. PESCHEL:
16       Q.  Okay.  And so, when you wrote your report
17   and reviewed Ms. Hills' records, you did not have
18   the opportunity to review any of her prior records,
19   did you?
20       A.  No.  Prior to the fall.
21       Q.  Prior to the fall.  Correct.  So your
22   opinions at that time were based on just -- they
23   were based on your physical examination?
24       A.  Physical examination, medical records I
25   reviewed, and my training, and expertise.

Page 85

1        Q.  Okay.  And that was her record review of --
2    not just got Scott & White records, but also
3    chiropractic records and pain management records;
4    is that correct?
5        A.  I reviewed the pain management records as
6    well.  Yeah.  Correct.
7        Q.  And is it typical or industry standard for a
8    life care planner to actually perform a physical
9    examination before creating a life care plan?
10       A.  You don't have to.
11       Q.  Okay.  And what benefit does performing a
12   physical examination provide you?
13       A.  A physical exam can correlate things you
14   already suspect from reading the records and
15   talking to the patient.
16       Q.  Okay.  And in this case when you reviewed
17   Rose's records, and then you performed your
18   physical exam, what specific findings from your
19   physical exam corroborated her records?
20       A.  So mostly the tenderness in her neck and the
21   limited range of motion of her cervical spine.
22       Q.  Okay.  And you just today had the
23   opportunity to review, I want to say, past records
24   all the way from around May or June 2016, which
25   would be months prior to this incident, and back

**Page 86**

1  all the way to -- I want to say they go to 2011 or
2  '12?
3      A.  2008, I believe.
4      Q.  2008?  Okay.
5      A.  Or something like that.
6      Q.  Is that correct?
7      A.  I think it's 2008.  Yeah.
8      Q.  Okay.  From your review of those records
9  here today, is there anything in those records that
10  makes you change your opinions?
11     A.  No, ma'am.
12     Q.  Is there anything in those records that
13  indicates to you that Ms. Hills was having any kind
14  of active treatment for ongoing migraine issues
15  prior to this fall?
16     A.  Not that I can think of.
17     Q.  Or actually, is there a difference between
18  migraines and posttraumatic headaches?
19     A.  Yeah.  So the intensity of a posttraumatic
20  headache can be worse.  You know, location can be
21  more generalized.  The frequency could be more, you
22  know.
23     Q.  Okay.  And did you see any medications that
24  she was actively taking in that time period prior
25  to this fall back to 2008 that would indicate that

**Page 87**

1  she was having the same injuries that you found her
2  to be diagnosed with from this fall?
3      A.  Not that I can think of.
4      Q.  Are the injuries that Ms. Hills sustained
5  after this fall, are those similar to injuries you
6  treat in your practice on a daily basis?
7      A.  Yes, ma'am.
8      Q.  And is it common for a neck injury to cause
9  a posttraumatic headache?
10     A.  It can.  Yeah.
11     Q.  And it's not necessarily going to be an
12  immediate thing, is it?
13             MR. PAYNE:  Objection.  Leading.
14             THE WITNESS:  Correct.
15  BY MS. PESCHEL:
16     Q.  How long can it take for a posttraumatic
17  headache to set in?
18     A.  My experience, it could be a week or
19  sometimes more.
20     Q.  Okay.  Can you explain for the jury, because
21  you talked a little bit about this that she had
22  some disc issues with her spine.  What is the disc
23  -- I think you called it a herniation; is that
24  correct?
25     A.  Yes.

**Page 88**

1      Q.  What is a herniation?
2      A.  So a disc herniation is a displacement of
3  one of the discs of the -- in her case, the
4  cervical spine or the neck.  Basically, the
5  structure that moved in relation to where it was
6  originally.  It's displaced.
7      Q.  Okay.  Is it common -- do you see patients
8  in your practice spend thousands of dollars for
9  medication needlessly?
10     A.  No.
11     Q.  If they're not in pain?
12             MR. PAYNE:  Objection.  Leading.
13             THE WITNESS:  No.  They were
14         medications -- in my case, they're in
15         pain.
16  BY MS. PESCHEL:
17     Q.  And you probably -- in your practice, do you
18  get a sense if somebody is being honest with you?
19     A.  I can.  I mean, I'm not perfect obviously.
20  I mean, I take them at face value.
21     Q.  Did you feel like when you met with
22  Ms. Hills, and you examined her that she was being
23  truthful?
24     A.  Yeah.
25     Q.  I want to kind of switch gears a little bit,

**Page 89**

1  and talk about the database you use when coming up
2  with the numbers in your life care plan.
3             Are you familiar with the methodology
4  typically accepted in the field of life care
5  planning?
6      A.  Yes, ma'am.
7      Q.  And the methodology that you used to prepare
8  Ms. Hills' life care plan, is that consistent with
9  the methodology you're familiar with?
10             MR. PAYNE:  Objection.  Leading.
11             THE WITNESS:  Yes, ma'am.
12  BY MS. PESCHEL:
13     Q.  And what methodology is that?
14     A.  The methodology that I use here is the
15  methodology that's used by life care planners.
16  Like I said, when you can you examine the patient,
17  you do a physical exam, I interview the patient, I
18  review the medical records.  And then you
19  determine, you know, the future care needs of that
20  patient.  And then you calculate the associated
21  costs of that future care.
22     Q.  And a life care plan is not necessarily done
23  to anticipate all future needs?
24     A.  Correct.  This is a minimal care life care.
25  Yeah.

**Page 90**

1  Q. Okay. On Exhibit 2 -- when we are talking
2  about Exhibit 2, are you familiar with different
3  medical facilities, as you're a medical
4  professional, that charge both professional charges
5  and then they charge separate facility charges?
6  A. Yes.
7  Q. Is that quite common?
8  A. Yes, ma'am.
9       MR. PAYNE: Objection. Leading.
10 BY MS. PESCHEL:
11  Q. So, if I portray to you that Exhibit 2 is
12 just the professional charges -- do you see that
13 there?
14  A. Yes.
15  Q. So when you're being asked questions about
16 the cost of an MRI -- if I portray to you that
17 Baylor Scott & White has facility charges as well,
18 you're not getting the full cost of the MRI just by
19 the professional charges; would that be correct?
20       MR. PAYNE: Objection. Leading.
21       THE WITNESS: Yes. Yeah. That's
22    correct.
23 BY MS. PESCHEL:
24  Q. Okay. Are all the opinions that you gave
25 today within a reasonably degree of medical

**Page 91**

1  certainty?
2  A. Yes, ma'am.
3  Q. And was your prediction for her future
4  treatment based on your experience, expertise,
5  training, education, and review of the relevant
6  medical literature?
7  A. Yes, ma'am.
8  Q. Is there anything else we haven't asked you
9  that you think is significant?
10  A. Not that I can think of.
11  Q. Okay.
12       MS. PESCHEL: I'll pass the
13    witness.
14           - - -
15       REDIRECT EXAMINATION
16           - - -
17 BY MR. PAYNE:
18  Q. Doctor, you've now at the request of
19 plaintiff's counsel have reviewed at least some of
20 Ms. Hills' medical records predating the event at
21 the Sam's Club; correct?
22  A. Yes, sir.
23  Q. And you saw at least three references to a
24 history of migraine headaches that predate the
25 event at Sam's. Do you -- just generally speaking,

**Page 92**

1  do you recall that?
2  A. I saw a mention of history of migraines.
3  Yes, sir.
4  Q. Including the date -- and we've already
5  talked about this. She referenced a history of
6  migraine headaches on the date of the event at the
7  Sam's Club; true?
8  A. Yes.
9  Q. Do you know if -- you've said you've now
10 prepared about 250 of these life care plans; right?
11  A. North of that.
12  Q. More than that. Do you know and have you
13 verified if any plaintiff in a personal injury
14 lawsuit has implemented a life care plan that you
15 recommended?
16  A. I don't recall that.
17  Q. Do you know if that's ever been done?
18  A. Not that I recall.
19  Q. Do you know if Ms. Hills has implemented
20 your plan?
21  A. Well, I know she continues to treat
22 recently. But I don't know for certainty if she
23 follows the plan.
24  Q. Well, in fact, you would have seen Ms. Hills
25 on exactly one occasion when you performed the

**Page 93**

1  physical examination; correct?
2  A. Yes.
3  Q. You did not meet with her again to actually
4  go over your recommendations; true?
5  A. True.
6  Q. I think you said earlier you would assume
7  that her attorneys would share your life care plan
8  with her, but that's all that is is an assumption;
9  true?
10  A. Yeah. I haven't confirmed if they have or
11 not.
12  Q. And so you have not -- just so we are clear:
13 You have not sat down with Ms. Hills and said,
14 these are my recommendations for you in the future;
15 true?
16  A. True.
17  Q. And you don't know if that's ever been done;
18 true?
19  A. By somebody other than me? I don't know
20 that. Yeah.
21  Q. Okay. On the -- do you know -- have you
22 reviewed with any particularity Ms. Hills' past
23 medical charges or what her providers have accepted
24 for her charges?
25  A. I don't recall with exact detail of that.

Page 94

1   No.
2       Q.  All right.  So as to what Baylor charged her
3   facility fee or otherwise for the MRI, you simply
4   don't know; right?
5       A.  Well, I mean, what you showed me and I do
6   have some billing records.  But to my recollection
7   right now, I can't tell you, you know, item by item
8   what they are.
9       Q.  And so, as far as any of the treatment that
10  she's had in the past, what was billed for it, and
11  what she -- and what was accepted for it, that was
12  not a part of the numbers that you arrived at as
13  far as future care; true?
14      A.  Well, remember though the database assumes
15  that, you know, multiple providers are billing in
16  that data.  But I did not specifically include
17  Baylor Scott & White's numbers in my projections.
18      Q.  Do you consider yourself to be in the best
19  place for this case to offer an opinion as to
20  causation?
21      A.  I feel good enough to make that
22  recommendation.  Yes, sir.
23      Q.  And that's based on a review of medical
24  records that postdate the accident, up until 30
25  minutes ago, and at most, a one-hour physical

Page 95

1   examination of the plaintiff; true?
2       A.  And also my experience and training.  Yes,
3   sir.
4       Q.  Do you think Ms. Hills' treating doctors
5   would be in a better position to offer an opinion
6   as to causation?
7       A.  I mean, I don't feel in this particular
8   case.  I mean, they also agree with diagnosis of
9   posttraumatic headaches, by the way.
10      Q.  And again, we've talked about that.  And
11  their basis and your basis of posttraumatic
12  headaches is based on what she told you and them
13  only; true?
14      A.  True.
15      Q.  And you do not intend to be the physician --
16  you've recommended, in the alternative, these nerve
17  blocks; true?
18      A.  I'm sorry?  What?
19      Q.  You have offered, in the alternative, that
20  Ms. Hills undergo these nerve blocks; true?
21      A.  That's the other more -- less conservative
22  life care plan.  Yes.
23      Q.  And is it your intention that you would be
24  the physician to perform those?
25      A.  Nope.

Page 96

1       Q.  Why did you move to Texas from Florida?
2       A.  So I lived in Florida for several years.
3   You know, I moved to Miami, Gainsville,
4   Jacksonville, and I was waiting for my wife to
5   finish her training.  And we talked about staying
6   in Florida, but together we decided to leave the
7   state.  We've heard good things about Austin.  So
8   here we are.
9       Q.  Is there any other reason?
10      A.  Not that I can think of.
11      Q.  Did it have anything to do with some
12  allegations about overprescribing pain medication?
13      A.  No.  I did have several lawsuits regarding
14  deformation from several pharmacies, and you know,
15  it was litigated.  One went to trial, and the other
16  three settled out of court.  And I have attorneys
17  for that, if you're interested in talking to them.
18      Q.  Did that have anything to do with you moving
19  your practice from Florida to Texas?
20      A.  It wasn't a pleasant experience, you know,
21  but I have family in Florida.  And the town where
22  that occurred was in Lake City, Florida in
23  Gainsville.  I have family in Orlando so I had, you
24  know, some ties.  And we still go to Florida quite
25  often.  We have family there, you know.  But at the

Page 97

1   end of the day, we just decided to leave.
2       Q.  Do you have hospital privileges at the
3   Baylor facilities?  Baylor Scott & White
4   facilities?
5       A.  No, sir.
6       Q.  Do you have hospital privileges at the St.
7   David facilities?
8       A.  No.
9       Q.  What about the Seton, which I guess is
10  now --
11      A.  Ascension?
12      Q.  Yeah.
13      A.  No.
14      Q.  Do you have hospital privileges with
15  Ascension?
16      A.  No, sir.
17      Q.  Is it fair to say you do not consider
18  yourself an expert in finance, accounting, or
19  economics; true?
20      A.  True.
21      Q.  Okay.
22          MR. PAYNE:  Doctor, again, I thank
23      you for your time.  That's all I have.
24      I pass the witness.
25          THE WITNESS:  Thank you.

**Page 98**

1 　　　　　MS. PESCHEL: And I promise I'll be

2 quick.

3 　　　　　MR. PAYNE: Ut-oh.

4 　　　　　MS. PESCHEL: I have one follow-up.

5 　　　　　THE WITNESS: Don't get up out of

6 the chair.

7 　　　　　MS. PESCHEL: I know. I'm sorry.

8 　　　　　- - -

9 　　　　　RECROSS-EXAMINATION

10 　　　　　- - -

11 BY MS. PESCHEL:

12 　Q. So earlier you testified that when you used

13 the Fairhealth database to determine future costs,

14 it's not predicated on your insurance reimbursement

15 rates; correct?

16 　A. Yes.

17 　Q. And if you were to utilize the database that

18 was predicated on insurance reimbursement rates,

19 would that be proper methodology for a life care

20 planner?

21 　A. No.

22 　Q. Why not?

23 　A. We don't use any collateral source when we

24 do our costing analysis. It's part of the

25 standards of life care planning.

**Page 99**

1 　Q. Okay.

2 　　　　　MS. PESCHEL: That is my last

3 question, so I will reserve.

4 　　　　　MR. PAYNE: All right. This

5 doesn't have to be on the -- it really

6 doesn't have to be on either record. So

7 we can go off.

8 　　　　　THE VIDEOGRAPHER: Okay. This --

9 we are off the record at 5:34 p.m.

10 　　　　　- - -

11 　　　　　(Whereupon the videotape

12 deposition of HECTOR MIRANDA-GRAJALES,

13 M.D. concluded at 5:34 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**Page 100**

1 　　　WITNESS CORRECTIONS AND SIGNATURE

2

3 Please indicate changes on this sheet of

4 paper, giving the change, page number, line

5 number and reason for the change. Please sign

6 each page of changes.

7 PAGE/LINE　　　CORRECTION　　REASON FOR CHANGE

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

**Page 101**

1 _____

2 _____

3

4 　　　_____

5 　　　HECTOR MIRANDA-GRAJALES, M.D.

6

7 I, HECTOR MIRANDA-GRAJALES, M.D., have read the

8 　foregoing transcript and hereby affix my

9 　signature that same is true and correct,

10 　except as noted on the previous page(s), and

11 　that I am signing this before a Notary Public.

12

13 　　　HECTOR MIRANDA-GRAJALES, M.D.

14 　State of Texas　　　)

15 　County of _____ )

16

17 　Before me, _____, on this day

18 　personally appeared HECTOR MIRANDA-GRAJALES,

19 　M.D., known to me or proved to me under oath

20 　or through _____

21 　(description of identification card or other

22 　document), to be the person whose name is

23 　subscribed to the foregoing instrument and

24 　acknowledge to me that they executed the same

25 　for the purposes and consideration

**Page 102**

1  therein expressed.

2      Given under my hand and seal of office on

3  this, the ____ day of _____, 2020.

4  _____

5              Notary Public for and in

6              The State of Texas

7              Commission Expires _____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 103**

1              REPORTER'S CERTIFICATION
         TO THE VIDEOTAPE DEPOSITION OF
2           HECTOR MIRANDA-GRAJALES, M.D.
              TAKEN ON JANUARY 16, 2020
3
4          I, Noelle R. Nevius, a Notary in and
      for the State of Texas, hereby certify that
5      this deposition transcript is a true record of
      the videotape testimony given by the witness
6      name herein, after said witness was duly
      sworn/affirmed by me.
7          I further certify that I am neither
      attorney nor counsel for, related to, nor
8      employed by any of the parties to the action
      in which this testimony was taken.  Further, I
9      am not a relative or employee of any attorney
      of record in this cause, nor do I have a
10     financial interest in the action.
           The original videotape deposition
11     transcript was delivered to the attorney party
      who asked the first question appearing in the
12     transcript on January 16, 2020.  Brett Payne
      was the attorney present at the time of taking
13     this videotape deposition.
14
15  _____
   Noelle R. Nevius
16  Notary in and for
   The State of Texas
17
18
19
20
21
22
23
24
25